1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| AMRISH RAJAGOPALAN, MARIE JOHNSON-PEREDO, ROBERT HEWSON, DONTE CHEEKS, DEBORAH HORTON, RICHARD PIERCE, ERMA SUE CLYATT, ROBERT JOYCE, AMY JOYCE, ARTHUR FULLER, DAWN MEADE, WAHAB EKUNSUMI, KAREN HEA, ALEX CASIANO, DECEMBER GUZZO, BEN PARKER, CHERYL ANDERSON, CARMEN ALFONSO, BETH JUNGEN, TANYA GWATHNEY, KEVIN DELOACH, SCOTT SNOEK, KELLY ENDERS, THOMAS LUDWICK, DONALD BOGAN, BILL KRUSE, JOYCE DRUMMOND, TAMARA COOPER, DEBRA MILLER, GEORGE LAWRENCE, CYNTHIA OXENDINE, MARTIN ANDERSON, ANGELA ROSS, ANDREA TOPPS, DEBRA FINAZZO, SHARRON BLACK, SYLVIA HADCOCK, AUDRIE LAWRENCE (POOLE), ADAM WARD, ISHULA MCCONNELL, ERICA CHASE, STEPHEN YOUNKINS, DAN WEDDLE, STILLMAN PARKER, TINA ROBERTS-ASHBY, BRANDON ASHBY, VALERIE NEWSOME, AND RUSSEL TANNER, on behalf of themselves and others similarly situated. | No.<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | |
| v. | |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND and PLATTE RIVER INSURANCE COMPANY, as Sureties for Meracord LLC, | |
| Defendants. | |

CLASS ACTION COMPLAINT AND JURY DEMAND

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................ 1

II.  JURISDICTION AND VENUE ................................................................. 3

III.  PARTIES ..................................................................................................... 4

    A.  PLAINTIFFS .......................................................................................... 4

    B.  DEFENDANTS ....................................................................................... 9

IV.  BACKGROUND ........................................................................................ 10

    A.  UNDERLYING WRONGFUL, UNLAWFUL, AND FRAUDULENT
       CONDUCT OF THE SURETY BONDS' PRINCIPAL ...................... 10

        1. The Debt Settlement Industry ......................................................... 10

        2. The Mortgage Assistance Relief Services Industry ....................... 12

        3. The Meracord Enterprise ............................................................... 13

        4. Injury to Plaintiffs and the Class ................................................... 26

    B.  THE *MERACORD ACTION* AND JUDGMENT AGAINST MERACORD .......... 44

    C.  MERACORD'S STATUTORY SURETY BONDS ............................ 46

    D.  SURETIES' BAD FAITH REFUSAL TO TENDER THE BONDS ......... 47

    E.  THE MERACORD CLASS'S ACTION AGAINST THE SURETIES. .......... 52

V.  CLASS ALLEGATIONS .......................................................................... 52

VI.  CLAIMS FOR RELIEF ............................................................................ 54

    A.  CLAIMS ON THE BONDS ................................................................ 54

       Count I Claim on the Bonds for Declaratory & Injunctive Relief (28
       U.S.C § 2201-2202) ........................................................................ 54

          1.  ALABAMA .................................................................... 55
          2.  ALASKA ....................................................................... 56
          3.  ARIZONA ...................................................................... 57
          4.  ARKANSAS ................................................................... 58
          5.  CALIFORNIA ................................................................ 60
          6.  COLORADO .................................................................. 61
          7.  CONNECTICUT ............................................................. 62
          8.  DELAWARE .................................................................. 63
          9.  FLORIDA ...................................................................... 65
          10.  GEORGIA ...................................................................... 66
          11.  HAWAII ........................................................................ 67
          12.  IDAHO .......................................................................... 69
          13.  ILLINOIS ...................................................................... 70
          14.  INDIANA ...................................................................... 71
          15.  IOWA ........................................................................... 72
          16.  KANSAS ....................................................................... 73
          17.  KENTUCKY ................................................................... 74
          18.  LOUISIANA .................................................................. 76
          19.  MAINE ......................................................................... 78

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

20.  MARYLAND ................................................................. 79
21.  MICHIGAN .................................................................. 80
22.  MINNESOTA ................................................................ 81
23.  MISSISSIPPI ............................................................... 83
24.  MISSOURI .................................................................. 84
25.  NEBRASKA ................................................................. 85
26.  NEVADA .................................................................... 86
27.  NEW HAMPSHIRE ......................................................... 87
28.  NEW JERSEY ............................................................... 88
29.  NEW YORK ................................................................. 90
30.  NORTH CAROLINA ........................................................ 91
31.  NORTH DAKOTA ........................................................... 93
32.  OHIO ....................................................................... 94
33.  OKLAHOMA ................................................................ 96
34.  PENNSYLVANIA ........................................................... 97
35.  RHODE ISLAND ............................................................ 98
36.  SOUTH DAKOTA ......................................................... 100
37.  TENNESSEE ............................................................... 101
38.  TEXAS .................................................................... 103
39.  VERMONT ................................................................. 104
40.  VIRGINIA ................................................................. 105
41.  WASHINGTON ............................................................. 107
42.  WASHINGTON, D.C. ...................................................... 108
43.  WEST VIRGINIA .......................................................... 109
44.  WISCONSIN ............................................................... 110
45.  WYOMING ................................................................. 112

B.   BAD FAITH CLAIMS .......................................................... 113

   1. Washington State Law Claims ........................................... 113

      Count II Breach of Duty of Good Faith and Fair Dealing .............. 113

      Count III Violation of the Insurance Fair Conduct Act,  RCW
      § 48.30.015  and Unfair Settlement Practices Regulations,  WAC § 284-
      30-300 ET SEQ. ...................................................... 114

   2. Other State Law Claims ................................................ 115

      COUNT IV Common Law Bad Faith ....................................... 115

      COUNT V Statutory Bad Faith, Improper Denial of Claims In Violation
      of Colorado R.S.A. § 10-3-1115 & § 10-3-1116 ....................... 116

      COUNT VI Violations of the Connecticut Unfair Trade Practices Act
      and Connecticut Unfair Insurance Practices Act,  Conn. Gen. Stat. § 42–
      110a et seq. and § 38a–815 et. seq. ................................ 117

      COUNT VII Bad Faith in Violation of Fla. Stat. Ann. § 624.155 ...... 118

      COUNT VIII Bad Faith In Violation of Georgia Statute § 33-4-6 ...... 119

      COUNT IX Violation of Illinois Insurance Code,  215 Ill. Comp. Stat.
      Ann. 5/155 .......................................................... 120

      COUNT X Bad Faith in Violation of La. Rev. Stat. Ann. § 22:1973 and
      § 22:1892 ........................................................... 120

COUNT XI Violation of Unfair Claims Settlement Practices Under Maine Rev. Stat. Ann. § 2436-A ...................................................121

COUNT XII Violation of Uniform Trade Practice Act, MCL § 500.2001, *et seq.*..........................................................................................122

COUNT XIII Vexatious Refusal to Pay in Violation of Mo. Stat. § 375.420 ...................................................................................123

COUNT XIV Violations of Rhode Island Gen. Laws § 9-1-33 ...................123

COUNT XV Violations of Tenn. Code Ann. § 56-7-105 ...............................124

COUNT XVI Unfair Claim Settlement Practices in violation of W. Va. Code Ann. § 33-11-1 *et seq.* .............................................................125

C.   DECLARATORY RELIEF ON UNDERLYING CLAIMS...................................125

Count XVII For a Declaration, Pursuant to 28 U.S.C. § 2201, that Meracord Violated the Washington Debt Adjusting Act ...............................126

Count XVIII For a Declaration, pursuant to 28 U.S.C. § 2201, that Meracord Violated the Washington Consumer Protection Act, Wash. Rev. Code § 19.86 .................................................................................128

Count XIX For a Declaration, pursuant to 28 U.S.C. § 2201, that Meracord AIDED and AbettED the Commission of Unfair and Deceptive Business Conduct ........................................................................129

Count XX For a Declaration, pursuant to 28 U.S.C. § 2201, of Meracord's Fraud ...........................................................................130

Count XXI For a Declaration, pursuant to 28 U.S.C. § 2201, of Meracord's Breach of Fiduciary Duty..........................................................131

Count XXII For a Declaration, pursuant to 28 U.S.C. § 2201, of Meracord's Unjust Enrichment ......................................................132

Count XXIII For a Declaration, pursuant to 28 U.S.C. § 2201, that Meracord Violated 18 U.S.C. § 1962(c) ...........................................132

1.   CONDUCT OF THE RICO ENTERPRISE'S AFFAIRS .....................................134
2.   MERACORD'S PATTERN OF RACKETEERING ACTIVITY ...........................134
   a.   Meracord's Use of the U.S. Mails and Interstate Wire Facilities in Violation of 18 U.S.C. §§ 1341 & 1343 ..................135
   b.   Meracord's Interstate Transportation of Stolen Property in Violation of 18 U.S.C. § 2314. .....................................139
   c.   Meracord's Commission of Bank Fraud Under 18 U.S.C. § 1344. ........................................................................140
3.   DAMAGES CAUSED BY THE MERACORD SCHEMES.................................141

Count XXIV For a Declaration, pursuant to 28 U.S.C. § 2201, that Meracord Violated of 18 U.S.C. § 1962(d)...........................................142

VII. PRAYER FOR RELIEF.................................................................143

VIII. DEMAND FOR JURY TRIAL .......................................................144



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# I.    INTRODUCTION

1.    States are vested with the power, through regulation, to protect their citizens from fraudulent business practices emanating from within, and outside their borders. One protection method that nearly all states use is requiring companies that handle consumers' monies in positions of trust to post bonds as a pre-requisite to doing business in the state. The predominant purpose of these bonds is to provide an avenue of recovery for consumers in a state who are victimized by companies that abuse their positions of trust, but do not, or cannot, make their victims whole.

2.    Defendants Fidelity and Deposit Company of Maryland ("Fidelity") and Platte River Insurance Company ("Platte River") (together, the "Sureties") issued approximately $17 million in surety bonds ("the Bonds") on behalf of a debt settlement company called Meracord LLC (formerly NoteWorld LLC), which obtained the Bonds as a condition of becoming a licensed money transmitter and escrow agent[1] in forty-five states, as listed in Appendix A ("Surety States").[2]

3.    This Court has already entered a $1.45 billion judgment against Meracord, which, along with its co-conspirators—a network of "front-end" debt relief companies ("Front DRCs") that it utilized to recruit customers—engaged in a criminal enterprise that stole hundreds of millions of dollars in fees from consumers throughout the United States. The Court also certified a class of consumers injured by Meracord's conduct.

4.    For years, the Sureties sat back and took payment for the Bonds they issued to cover Meracord's conduct as a money transmitter. But despite being presented years ago with claims on the Bonds by plaintiffs in this action, and despite those claims having been renewed after this Court's judgment against Meracord, the Sureties continually refused to tender the Bonds.

---

[1]    In one state, Meracord's license is as an "escrow agent" rather than a "money transmitter," and some state licensing statutes use differing terminology, referring, for example, to "sellers of checks" or similar terms. For convenience—and because the statutory schemes describe very similar activities, all of which, as alleged further below, Meracord engaged in—this Complaint refers to the relevant licenses generally as "money transmitter licenses," and to Meracord's relevant activities as a "money transmitter."

[2]    Appendix A contains a table of information about each Bond, including the Bond Period and total current Bond Amount. Throughout this Complaint, "Bond Period" and "Bond Amount" refer to the information about each Bond as listed in Appendix A.

HB  HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

5.     It is axiomatic, and the law of every state, that an insurance company must act in good faith when presented with claim, must promptly investigate all claims, and must promptly pay claims when warranted. But the Sureties here refused to do so. Instead, they falsely claimed to have insufficient information to determine Bond coverage for Plaintiffs' claims, despite having had access to all the necessary information for years. The Sureties have also consistently refused to specifically identify any additional information necessary to process Plaintiffs' claims or those of the class they represent.

6.     As described below in Section IV.E, the class previously certified by this Court against Meracord initially brought an action against the Sureties on June 15, 2015 ("*Surety I*"). That action is currently stayed as against Platte River, pending settlement, and was dismissed as against Fidelity because the Court found jurisdictional deficiencies with respect to the previously certified class being the proper plaintiff to bring the suit. The current action is brought in order to remedy those jurisdictional issues by including named Plaintiffs for each Surety State, and making more specific class allegations against the Sureties.

7.     As in *Surety I,* Plaintiffs, through this action, seek to force the Sureties to make good on their Bonds and pay the full Bond Amounts, which they plainly owe and agreed to pay under the precise circumstances here—Meracord's inability to reimburse consumers for its wrongful acts.

8.     Plaintiffs bring this action on behalf of themselves and a class of similarly situated persons, defined below in Section V ("Class").

9.     In addition, because certain states, including Washington, recognize statutory and/or common law bad faith claims by obligees against sureties, this action seeks damages above and beyond those states' Bond Amounts as a consequence of the Sureties' bad faith refusal to tender the Bonds to the obligee Class. Indeed, the facts of this case illustrate the strong policy reasons for allowing bad faith claims against sureties by obligees. The Washington bond, for example, is only $160,000 and covers injuries to the entire Class—not just Washington residents. Yet, despite the fact that this Court found that actual damages on the underlying claims against

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Meracord exceeded $400 million, Fidelity refused, until only days before the *Surety I* Complaint was filed, to tender the Washington Bond, and even then conditioned the tender on a release "eliminating" all its exposure—a release to which it is not entitled in light of Plaintiffs' and class members' bad faith claims. *See* Ex. 14.

10.   Until days before *Surety I* was to be filed—most recently in a letter dated May 29, 2015—the Sureties consistently took the frivolous position that they had "insufficient information" to determine whether tender of the Bonds was appropriate. Then, on June 11, 2015—four days before *Surety I* was filed—the Sureties wrote to Class Counsel claiming that they "ha[d] and continue[d] to engage in good faith investigation and evaluation . . . to determine . . . potential coverage," and, in a separate letter, tendering the Washington Bond.

11.   But the Sureties' sudden change in position did not result from the revelation of any new information with respect to whether class members' claims qualified for coverage under the Bonds. As detailed in the allegations below, the Sureties had *for years* possessed all the relevant information to determine their liability under the Bonds—the vast majority of which *do not require any legal judgment* of Meracord's underlying liability in order for the surety to make a coverage determination on a bond claim. Instead, *the only thing that had changed* was the fact that the filing of the *Surety I* complaint was growing more imminent, and the Sureties' continued failure to investigate class members' bond claims and/or to tender the Bonds was further establishing their bad faith.

12.   In other words, the first time the Sureties admitted they had sufficient information to determine their liability under the Bonds was when a bad faith claim was days away from their doorstep. This is the essence of bad faith.

## II.   JURISDICTION AND VENUE

13.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Based on information and belief, the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and the Class consists of numerous members who are citizens of states different from Defendants. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the

HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Complaint states causes of action arising out of a law of the United States, specifically the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (civil remedies for RICO violations). This Court has pendant jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events that gave rise to the claims occurred in substantial part in this judicial district. Meracord was headquartered in this district and the racketeering enterprise alleged is centered in Tacoma, Washington.

15.   This Court has personal jurisdiction over Defendants because they have conducted business in Washington State, specifically by contracting with Meracord LLC (which is headquartered in Washington State) and with Linda Remsberg (who lives in Washington State) to issue surety bonds. Personal jurisdiction over Defendant Fidelity & Deposit Company of Maryland is additionally appropriate because it issued the Washington State surety bond at issue in this litigation.

## III.   PARTIES

### A.  PLAINTIFFS

16.   Plaintiff December Guzzo resided in Alabama during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

17.   Plaintiff Ben Parker resided in Alaska during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

18.   Plaintiff Cheryl Anderson resided in Arizona during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

19.   Plaintiff Deborah Horton resided in Arkansas during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

20.   Plaintiff Richard Pierce resided in California during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

21.   Plaintiff Carmen Alfonso resided in Colorado during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

22.   Plaintiff Beth Jungen resided in Connecticut during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

23.   Plaintiff Tanya Gwathney resided in Delaware during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

24.   Plaintiffs Bob and Amy Joyce resided in Florida during the relevant Bond Period and had an account with Meracord related to debt relief services, into which they made payments during the relevant Bond Period.

25.   Plaintiff Erma Sue Clyatt resided in Florida during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

26.   Plaintiff Kevin Deloach resided in Georgia during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

27.   Plaintiff Scott Snoek resided in Hawaii during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

28.   Plaintiff Kelly Enders resided in Idaho during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

CLASS ACTION COMPLAINT AND JURY DEMAND - 5

29.     Plaintiff Thomas Ludwick resided in Illinois during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

30.     Plaintiff Donald Bogan resided in Indiana during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

31.     Plaintiff Bill Kruse resided in Iowa during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

32.     Plaintiff Joyce Drummond resided in Kansas during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

33.     Plaintiff Tamara Cooper resided in Kentucky during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

34.     Plaintiff Debra Miller (Vandersnick) resided in Louisiana during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

35.     Plaintiff George Lawrence resided in Maine during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

36.     Plaintiff Cynthia Oxendine resided in Maryland during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

37.     Plaintiff Karen Hea resided in Michigan during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

38.     Plaintiff Martin Anderson resided in Minnesota during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

39.     Plaintiff Angela Ross resided in Mississippi during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

40.     Plaintiff Andrea Topps resided in Missouri during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

41.     Plaintiff Debra Finazzo resided in Nebraska during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

42.     Plaintiff Sharron Black resided in Nevada during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

43.     Plaintiff Sylvia Hadcock resided in New Hampshire during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

44.     Plaintiff Dawn Meade resided in New Jersey during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

45.     Plaintiff Audrie Lawrence (Poole) resided in New York during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

46.     Plaintiff Amrish Rajagopalan resided in North Carolina during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

CLASS ACTION COMPLAINT AND JURY DEMAND - 7

47.    Plaintiff Adam Ward resided in North Dakota during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

48.    Plaintiff Wahab Ekunsumi resided in Ohio during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

49.    Plaintiff Ishula McConnell resided in Oklahoma during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

50.    Plaintiff Marie Johnson-Peredo resided in Pennsylvania during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

51.    Plaintiff Robert Hewson resided in Pennsylvania during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

52.    Plaintiff Erica Chase (Moniz) resided in Rhode Island during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

53.    Plaintiff Stephen Younkins resided in South Dakota during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

54.    Plaintiff Dan Weddle resided in Tennessee during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

55.    Plaintiff Alex Casiano resided in Texas during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

56.     Plaintiff Stillman Parker resided in Vermont during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

57.     Plaintiffs Tina Roberts-Ashby and Brandon Ashby resided in Virginia during the relevant Bond Period and had an account with Meracord related to debt relief services, into which they made payments during the relevant Bond Period.

58.     Plaintiff Traci McCormick resided in Washington State during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

59.     Plaintiff Donte Cheeks resided in the District of Columbia during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

60.     Plaintiff Valerie Newsome resided in West Virginia during the relevant Bond Period and had an account with Meracord related to debt relief services, into which she made payments during the relevant Bond Period.

61.     Plaintiff Arthur Fuller resided in Wisconsin during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

62.     Plaintiff Russel Tanner resided in Wyoming during the relevant Bond Period and had an account with Meracord related to debt relief services, into which he made payments during the relevant Bond Period.

**B.  DEFENDANTS**

63.     Defendant Fidelity & Deposit Company of Maryland ("Fidelity") is an insurance company that issues regulatory and contractual surety bonds. It has issued surety bonds for the use and benefit of claimants against Meracord in Washington State and other states identified in Appendix A ("Fidelity States"). Fidelity is registered with the Washington State Office of the Insurance Commissioner and its Washington State license number (WAOIC) is 442.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

64.   Defendant Platte River Insurance Co. is an insurance company that issues regulatory and contractual surety bonds. It has issued surety bonds for the use and benefits of claimants against Meracord in various states identified in Appendix A ("Platte River States"). Platte River Insurance Co. is registered with the Washington State Office of the Insurance Commissioner and its Washington State license number (WAOIC) is 504.

## IV.   BACKGROUND

### A.  UNDERLYING WRONGFUL, UNLAWFUL, AND FRAUDULENT CONDUCT OF THE SURETY BONDS' PRINCIPAL

#### 1.  The Debt Settlement Industry

65.   As the economy declined in the "great recession" and the several years that followed, the number of Americans unable to pay their debts increased, bringing a concurrent increase in the number of companies (both nonprofit and for-profit) offering to help consumers manage or eliminate their debts.

66.   Debt settlement companies purport to assist consumers by acting as intermediaries between a consumer and his or her creditors, charging fees to "negotiate" with creditors in the hopes of getting the creditors to settle for less than the full amount of the consumer's debt.

67.   The Front DRCs that conspired with Meracord and participated in its criminal enterprise provided debt settlement programs that operated by requiring that consumers agree to have a specific monthly (or semi-monthly) payment automatically deducted from the consumer's checking or savings account and sent to an "escrow" account at Meracord, which was not under the consumer's direct control. The monthly payment was used to pay fees to both the Front DRC and Meracord—indeed, generally those fees consumed the bulk, if not the entirety, of the customer's payments for many months, if not longer. The Front DRCs promised that the automatic transfers would go towards accumulating money to provide a "lump sum" amount which the debt settlement company could use to negotiate with creditors in order to lower the overall amount required to satisfy the consumer's debt.

68.   Individuals suffering from debt-related troubles may be among the most vulnerable

CLASS ACTION COMPLAINT AND JURY DEMAND - 10

1  consumers, due to the inherent emotional stress of carrying seemingly insurmountable debt

2  loads—a stress compounded by the harassment suffered by many debtors at the hands of

3  collection agencies. Despite the passage of the Fair Debt Collection Practices Act, many

4  collectors continue to subject indebted consumers to a deluge of harassing phone calls and letters

5  demanding payment of debts and threatening dire consequences, resulting in an increasing sense

6  of desperation experienced by many debtors. Add to this emotionally charged setting a debt

7  relief company promising to "make it all go away," and an environment rife with fraud and

8  consumer exploitation emerges.

9      69.   Indeed, many states, along with multiple federal government agencies and consumer

10  advocates, have recognized the rampant abuses taking place in the for-profit debt settlement

11  industry, and have taken steps to curb such abuses. The Meracord Enterprise's response to these

12  efforts was to shut down its schemes that clearly ran afoul of new regulations and start new,

13  independent schemes that it hoped would escape scrutiny from regulators.

14     70.   In 2010, the Government Accountability Office ("GAO") issued a report on the for-

15  profit debt settlement industry. Bearing the illustrative title "DEBT SETTLEMENT: Abusive,

16  and Deceptive Practices Pose Risk to Consumers," the report outlined the GAO's investigation

17  of 20 debt settlement companies, in which GAO staff members had posed as indebted

18  consumers. The GAO "found the experiences of its fictitious consumers to be consistent with

19  widespread complaints and charges made by federal and state investigators on behalf of real

20  consumers against debt settlement companies engaged in fraudulent, abusive, or deceptive

21  practices."

22     71.   In August 2010, the Federal Trade Commission ("FTC") issued new regulations

23  cracking down on the debt settlement industry by prohibiting many of the worst practices of

24  Meracord and its Front DRCs, including charging advance fees for debt settlement services, as

25  well as misrepresenting the nature and details of the services to be provided. In describing the

26  rationale for its new regulations, the FTC noted:

27           Consumers in the midst of financial distress suffer monetary
             harm—often in the hundreds or thousands of dollars—when,
28           following sales pitches frequently characterized by high pressure

CLASS ACTION COMPLAINT AND JURY DEMAND - 11

1

> and deception, they use their scarce funds to pay in advance for
> promised results that, in most cases, never materialize.

2 FTC Telemarketing Sales Rule, 75 Fed. Reg. 153, 48482 (August 10, 2010).

3     72.   When these new rules came into play, Meracord responded by spooling up new

4 criminal enterprises with Front DRCs that were still unknown to regulators and by starting a new

5 criminal enterprise focusing on new victims, such as those struggling to make their mortgage

6 payments and seeking mortgage modifications.

7 ### 2.  The Mortgage Assistance Relief Services Industry

8     73.   As the debt settlement industry came under increasing regulatory scrutiny, Meracord

9 and the Front DRCs needed a new and as yet unexamined avenue for continued illicit profits.

10 The answer was the mortgage assistance relief services ("MARS") industry. Former debt

11 settlement industry players—including the Front DRCs in the Meracord Enterprise—pivoted to

12 pray on some of the most vulnerable consumers: homeowners afraid of losing their homes to

13 foreclosure.

14     74.   Front DRCs offering MARS programs purported to assist homeowners by acting as

15 intermediaries between a homeowner and his or her mortgagor (or mortgage servicer), charging

16 fees to "negotiate" with mortgage companies with the aim of reducing the homeowner's monthly

17 mortgage payment by renegotiating various terms of the mortgage.

18     75.   In order to convince homeowners to sign up, the Front DRCs made various claims

19 about why they were able to negotiate mortgage modifications even where the homeowners had

20 already failed to do so. Some Front DRCs claimed, like many debt settlement companies, that

21 their large numbers of customers gave them leverage with the mortgage companies. Others

22 exploited perceptions about the mortgage industry more specifically, claiming that as part of

23 their service they would find legal "defects" in a homeowner's mortgage and thereby gain

24 leverage with the mortgage company.

25     76.   Just as they did with debt settlement, the Front DRCs offering MARS operated by

26 requiring that homeowners agree to have a specific monthly (or semi-monthly) payment

27 automatically deducted from their bank account and sent into an "escrow" account at Meracord,

28

HAGENS BERMAN

1   which was not under the homeowner's direct control.

2      77.   The Front DRCs generally represented that these payments would go towards the new

3   lower monthly mortgage payments ostensibly to be negotiated with the lender in the mortgage

4   modification process. In fact, the monthly payments were used to pay upfront fees to both the

5   Front DRC and Meracord—fees that consumed the bulk, if not the entirety, of the customer's

6   payments for many months, if not longer.

7      78.   Like other debtors, homeowners living in fear of losing their homes may suffer

8   harassing phone calls from lenders leading to an increasing sense of desperation—a sense of

9   desperation easily preyed upon by Front DRCs offering MARS programs promising to "make it

10  all go away." But that sense of desperation may be even worse in the case of homeowners, who

11  face not only lawsuits and possible bankruptcy, but fear of foreclosure as well.

12     79.   The MARS industry did not escape the scrutiny of federal regulators for long. The

13  FTC passed new regulations in December 2010 prohibiting many of the practices described

14  herein, including charging advance fees for MARS programs, as well as misrepresenting the

15  services to be provided. The FTC noted about the industry:

16  > [I]t appears that the vast majority of consumers do not receive the
>   results MARS providers promise. After collecting their up-front
17  >   fees, MARS providers often fail to make initial contact with the
>   consumer's lender or servicer for months, if at all, or to have
18  >   substantive discussions or negotiations with the lender or servicer.
>   In many cases, MARS providers fail to perform even the most
19  >   basic promised services or achieve any beneficial results. In some
>   cases, providers also cause harm to consumers by instructing them
20  >   to stop communicating with their lenders and servicers.

21  FTC Mortgage Assistance Relief Services Final Rule. 75 Fed. Reg. 230, 75097 (Dec. 1, 2010).

22      **3. The Meracord Enterprise**

23     80.   The debt settlement and MARS industries have proved to be extremely profitable not

24  only for the front-end debt relief companies, but also for back-end companies like Meracord.

25     81.   In order to vastly grow its customer base, while shielding itself from the scrutiny and

26  complaints of those it defrauded, Meracord partnered with an elaborate network of Front DRCs

27  in the debt settlement industry. On information and belief, when profits from debt settlement

28  CLASS ACTION COMPLAINT AND JURY DEMAND - 13

began to taper, Meracord started a new network and enterprise with Front DRCs in the MARS industry. In both enterprises, Meracord used the Front DRC network to sign up desperate and unsuspecting consumers looking for relief from the overwhelming stress of their debts.

82.    Upon information and belief, Meracord's original Front DRC network consisted exclusively of Front DRCs offering debt settlement services. Upon information and belief, only on or around October 2010, after the debt settlement industry began to come under increased scrutiny by the FTC[3] and consumer advocates—and after Meracord had already been the subject of two class action lawsuits alleging violations of Washington and Georgia statutes governing debt adjustors[4]—did Meracord decide to branch out into the MARS industry by creating a new and different criminal enterprise.

83.    The "Meracord Enterprises" described herein refer to both the debt settlement enterprise and MARS enterprise, unless specifically distinguished.

84.    In addition to expanding its debt relief business by starting the new MARS programs, Meracord also began a concerted effort to change the Washington Debt Adjusting Act—the statute under which it had originally been sued. According to a Meracord press release, the company "worked closely" with the sponsor of a bill that effectively exempted Meracord from the Act. The effort paid off, and the bill was approved by the Governor of Washington on March 19, 2012, and took effect on June 7, 2012. But Meracord could not get a retroactive carte blanche to defraud consumers. The change in law only applied to services performed after June 7, 2012. Meracord's fraudulent acts and practices described herein predate the change in law and, in any case, remain as illegal under the current statute.

85.    Within the Meracord Enterprises, typically a consumer would sign up with a Front DRC representing itself as a single debt relief company offering either debt settlement or mortgage modification services. Front DRCs sought customers through unsolicited phone calls, email, or mail, as well as internet, television, and radio advertising claiming to offer relief for

---

[3] *See supra*, ¶¶ 43-45.

[4] *Morefield v. NoteWorld*, No. 1:11-cv-00117-JRH-WLB (S.D. Ga., filed Aug. 5, 2010); *Wheeler v. NoteWorld*, No. 2:10-cv-00202-LRS (E.D. Wash., filed June 24, 2010).

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

consumers saddled with overwhelming debt or homeowners struggling to pay their mortgages.

86.   Only later, if ever, did the consumer discover that there were multiple companies involved in the process. The relationships between the various companies were purposefully obscured to prevent the consumer from disentangling the complicated schemes.

87.   To the extent the Front DRCs revealed that there were multiple companies involved, they falsely represented to the consumer—with Meracord's knowledge and approval—that Meracord was an independent, unbiased "payment processing" company. Meracord itself affirmed these misrepresentations and uniformly and falsely held itself out to consumers as completely "independent" from its Front DRCs and as "objective." In fact, there existed close relationships between Meracord and its network of Front DRCs:

a.   Meracord promoted, established, maintained, and managed debt relief payment servicing accounts ostensibly on behalf of consumers as an integral component of debt relief programs marketed by its Front DRCs;

b.   Meracord invited select Front DRCs to join its "VIP Club" and provided these Front DRCs with free industry research and free analyses of their "consumer portfolio[s];"

c.   Meracord treated major debt relief sales channels to VIP events;

d.   Meracord provided the software through which customers enrolled by the Front DRCs monitored their escrow accounts and/or approved creditor settlements—in the relatively rare circumstances that such settlements actually occurred;

e.   Meracord's profits were dependent on increasing the number of debt relief customers signed up by the Front DRCs because each such customer was also *required* to sign-up for Meracord's services;

f.   Despite Meracord's express representation that the Front DRCs did not act as its "agents," the Front DRCs acted under Meracord's direction and control when they provided customers with "Sign-Up Agreements" on its behalf;

g.   Despite Meracord's express representation that it did not act as an "agent" for its Front DRCs, Meracord in fact processed automatic withdrawals from customer bank accounts and distributed unlawful fees back to the Front DRCs—all supposedly pursuant to dubious "agreements" between the Front DRCs and customers and according to express agreements between Meracord and the Front DRCs;

h.   Meracord was deeply intertwined with the Front DRCs. Meracord's CEO, Linda Remsberg, often attended debt relief industry events on behalf of Meracord, where she served on panels alongside representatives of the Front DRCs, and, upon information and belief, described Meracord and the Front DRCs as engaged in the joint endeavor of recruiting debt relief customers:

CLASS ACTION COMPLAINT AND JURY DEMAND - 15



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

     i.    For example, in April 2011, Remsberg attended a conference of The Association of Settlement Companies ("TASC," which shortly thereafter changed its name to the American Fair Credit Council). At the TASC conference, Remsberg served on a panel with four other panelists—all four of whom represented Front DRCs. One of the panelists was Andrew Housser, CEO of Freedom Debt Relief, a Front DRC which at the time had already been investigated by the Washington State Attorney General's office for violations of Washington consumer protection laws; and

    ii.    During the panel discussion at the TASC conference, on information and belief, Remsberg referred to her company and the Front DRCs as part of a joint endeavor, saying that "[our customers] feel *we* are better at negotiating than they are. That's why they sign up with *us*," and advising that business success for the endeavor depends on "who *we* are enrolling" and "how fast are *we* delivering results." (Emphasis added.)

88.    The standardized contracts provided to consumers by the Front DRCs contained, at the very least, an agreement for a debt settlement or MARS program, as well as a Meracord "Sign-Up Agreement," and often contained a myriad of other confusingly worded forms.

89.    The debt settlement or MARS programs provided for by these agreements universally involved the following material elements:
The consumer agreed to pay specified debt relief fees that, unbeknownst to the consumer, were illegal and *per se* unfair, but generated large profits for the Meracord Enterprise;

   a.   In addition to the debt relief fees, Meracord charged the consumer unlawful fees to maintain and manage the trust account necessary for the operation of the debt relief program;

   b.   The trust account was established for the purported purpose of accumulating funds with which to pay creditors:

     i.    In the case of debt settlement programs, this was after the Front DRCs had ostensibly negotiated lower debts and thus lower monthly payments;

    ii.    In the case of MARS programs, this was after the Front DRCs had ostensibly negotiated mortgage modifications that would reduce the customer's monthly payments;

   c.   Meracord was authorized to automatically transfer periodic (usually monthly) payments from the consumer's personal bank account into a Meracord-controlled "trust account";

   d.   The program's success and the consumer's ability to financially afford the monthly debt relief program payments generally presupposed that the consumer makes payments into the trust account *instead* of paying creditors directly, resulting in the consumer falling further and further behind on his or her debt payments;



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

e.   Meracord was also authorized to automatically and periodically debit the trust account to pay the exorbitant debt relief fees specified in the debt relief agreement and "Sign-Up Agreement;"

f.   The fees usually entirely consumed consumers' monthly payments for the first months of participation in the program;

g.   In almost all cases, the consumer would have been far better off simply directing the monthly payments to his/her creditors directly, thereby saving the fees illegally, unfairly and deceptively extracted by the Meracord Enterprise, preventing the further accumulation of compounded interest, and preventing or delaying further default on the debt.

90.   The contracts used by the Front DRCs, in addition to charging illegal fees, contained false, misleading, and illegal statements. For example, the contracts, along with the claims made by the Front DRCs' salespeople, often:

a.   Misled customers into thinking that the debt relief process would be handled by attorneys, or that the Front DRCs were "backed by" law firms. In the case of MARS programs, the contracts/salespeople sometimes claimed that their services included using attorneys to review mortgages and find "legal defects";

b.   Failed to disclose with appropriate specificity the nature of the fees to be charged and when such fees would be incurred;

c.   Failed to disclose with specificity the nature of the services being provided, or used vague or confusing terms to avoid meaningful descriptions;

d.   Made false and/or misleading claims about the "success rates" of the programs;

e.   Made false and/or misleading statements about the length of time it would take to complete the program;

f.   Made false or misleading promises about the percentage of the customer's debt that the company would be able to settle, the amount by which the customer's monthly payment would be reduced, or the extent to which the terms of the customer's loan would be modified;

g.   Made false or misleading statements about the factors that affected the customer's credit score and the impact of the debt relief program on that score;

h.   Made false or misleading statements that claimed or suggested that the Front DRC is affiliated with nonprofit or government agencies or programs intended to help consumers, or that the Front DRC is affiliated with the customer's creditors; and

i.   Failed to make legally required disclosures regarding the debt relief services to be provided.

91.   Moreover, the Front DRCs' salespeople often pressured consumers into signing (or "e-signing") the contracts quickly, without any meaningful opportunity to review the terms; and for their part, the contract terms were often so confusingly worded as to be unintelligible to the

CLASS ACTION COMPLAINT AND JURY DEMAND - 17

HAGENS BERMAN

average consumer.

92.    Meracord knew that the contracts used by its Front DRCs were fraudulent and illegal, but still continued to process payments using those contracts as justification for the extraction of illegal fees. Meracord's knowledge was self-evident, as:

a.    Meracord produced copies of the contracts in prior litigation, demonstrating that it had the unlawful contracts in its possession, giving it direct knowledge of the fraudulent and illegal nature of those contracts;

b.    Meracord was acutely aware of the enormous volume of consumer complaints regarding these fraudulent contracts and the false claims made to enroll consumers in debt relief programs offered by the Meracord Enterprises. There are scores, if not hundreds, of consumer complaints on the Internet involving the schemes perpetrated by the Meracord Enterprises;

c.    Meracord's debt relief "payment processing" business was characterized by astronomically high churn rates (canceled accounts as a percentage of active accounts). Meracord internally determined that its churn rates invariably exceeded 60% and on occasion exceeded 70%—rates which are symptomatic of and thus reveal widespread fraud; and

d.    Meracord was aware of regulatory enforcement actions against Front DRCs with whom it did business and, in at least some cases, it unlawfully facilitated the transfer of accounts from Front DRCs under investigation to new or other Front DRCs under common control in order to evade regulatory action.

93.    Front DRCs often touted their association with Meracord as proof of their bona fides and to convince consumers that they were legitimate providers of debt relief services.

94.    The following are just a few examples of the complaints that consumers posted on the Internet:[5]

a.    "I am in a terrible debt situation, I used [Meracord] to help me get my debt collection off my back giving them $240.00 a month, now my situation has grown worst, and have paid them $480.00 I can't keep my payments up with [Meracord], I never got any thing done from them and I asked for a refund and they said no, I felt like all my money went into helping my self get out of debt and now they have made it impossible for me to pay anybody now I am in a rut. Why can't I get some of it back, not even $5.00 and they no longer want to help me. I just know that my creditors are still calling and I don't know what to do."

b.    "[Meracord] is doing business with Lloyd Ward Law Firm. Lloyd Ward Law Firm was supposed to settle my debt and 2 months have gone by and they have not settled any debts. Therefore, they breached their contract. [Meracord] does business with them (I believe they are run by the same person/people. They say they are an

---

[5] The complaints are reproduced verbatim, including grammatical and spelling errors.

CLASS ACTION COMPLAINT AND JURY DEMAND - 18



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

"independent" company). They made 2 deductions from my account and refuses to give the money back stating fees for services by Lloyd Ward. They didn't do anything for me as contracted. Yet, [Meracord] is refusing to refund the money. How independent is that? Just because you have a separate Federal ID number, doesn't mean you aren't owned by the same people. However, I will be filing complaints against both companies. DO NOT DO ANY BUSINESS WITH LLOYD WARD LAW FIRM OR [MERACORD]. THERE IS DISHONESTY BY BOTH. RESEARCH THEM ON THE NET. YOU FIND THERE ARE THE SAME TYPES OF COMPLAINTS AGAINST BOTH."

c.    "I went to [Meracord] for help on lowering interest on credit cards and they started taking money out of my account every month in the amount of $376.38 and referred me to another company named attorney at law associates Lloyd ward firm for help on the credit cards. The Lloyd ward customers services employees don't want to get in touch with the creditors over the phones, their way is over the mailing letters instead and not talking for the clients and keep taking my money of $376.38. I joined them in March the [Meracord] and the Lloyd wards for help. The account collected from me about three grand already and I just closed it on October 27, 2010 because the Lloyd wards and [Meracord] were taking my money and not helping us. . . . I tried to file a complaint online with the better business bureau and they want so much information, the money was being debit monthly out of my account. Why do I have to prove how crooked these companies are."

d.    "This Company is a big Scam and I think a class action law suite should be started even if it take years to finish. I encouraged my mother and mother-in-law to enroll and place my name as a contact to assist with both accounts. Me and my wife were providing financial support with the accounts, which my mother-in-law suddenly died last month and the company has had us fax documents as proof. We have sent death certificate, and power of attorney, but the company request q new document everytime because they don't want to release the money that's sitting in the trust account. Since the company appears to be a scam, I had my mother to cancel her account and all they refunded was $600 and paid off 1 debt in over a year after I provided a $216 payment to her for lloydward/[Meracord] every month. The second debt they claim to be paying an arrangement with has yet to receive the two $184 payments they claim to have paId. After all this, we didn't discover the lies until my wife contacted them that her mother died and requested the funds that were in the trust account. Currently we are seeking an attorney to persue the lloydward firm for the mental anquish they are creating for my wife. At this point it's not the small amount of money, but it's the principal that they are scamming many people including the disabled elderly."

e.    "Three years ago, I contracted the services of Clear Debt Solution to negotiate and reduce my credit card debt. Per the agreement, I made monthly payments to a third-party account for use in the debt settlement. Over $3000 was collected up front by CDS and [Meracord] Service Center, the party in control of my account. At the end of the program, for which I had contributed $317 per month for over two years, only one account was settled by CDS. When a second creditor sued, CDS did not respond to my requests for information in a timely manner. After I lost the suit, my account was wiped out, plus I had to pay more, to pay the court-ordered settlement. Three

CLASS ACTION COMPLAINT AND JURY DEMAND - 19

accounts remained unsettled. As I had made no payments nor attempts to communicate with the credit card companies, per my agreement with CDS, each balance had doubled over the two years. As I see it, these people made $3000 and I became deeper in debt than when I started."

f.  "Lifeguard Financial is a fraud. They make claims that they can settle your debt for 50 cents on the dollar of your debt. They claim that they negotiate your debt with your creditors, a lie. The client does all the work contacting the creditors that Lifeguard is handling the clients debt. Lifeguard takes monthly payments from your checking account through a escrow agent, namely [Meracord]. The problem is most of all of your payments through [Meracord] go back to Lifeguard Financial as fees leaving little funds to accumulate to go towards the settlement with the creditors. I was in this program almost a year and found that little amount of my monthly payments were accumulating towards settlement. In another instance, I was threated with a lawsuit from one of my creditors, I was told by their legal department to respond to the court clerk sending me notice of the potential lawsuit which I also had to copy to the Class Representatives' attorneys. Lifeguard is of no help. In addition the creditors explained to me that they refuse to deal with Lifeguard Financial. So what does that tell you. I will file a complaint with Florida's attorney general. I don't think that contacting BBB will get anywhere. I cancelled my contract with Lifeguard Financial and expected a cordial conversation and that they will refund of my monies that I paid them. Instead I got this "pitbull" whose name is "Robert" on the telephone that started screaming at me about cancelling the contract with threats of suing me. I ended up screaming back at him, needless to say at this point I out several thousand dollars. If there is a class action suit, I want to be part of it."

g.  "Back in March of 2008 I entered into a contract for debt relief with ClearDebt Results. I first spoke with a Robert Till, then a Patrick Schlosser, then I was passed to James Callahan, then again to Tiffany Shrum, all who appear to no longer work at this company. This company has taken $1300 dollars from me, provided no service as they say they were going to and they have a company called [Meracord] Service Center continue to take $100 a month directly out of my check. I want answers as to why they aren't taking care of these credit issues as they stated they would. None of these creditors have been paid and I continue to get harrassing phone calls."

h.  "On 09/16/09, I signed a contract with Covenant Debt Solutions to have them settle my unsecured debt and credit card accounts. Covenant used the services of [Meracord] Service Center to deduct monies from my checking account to payoff my debt. [Meracord] began to deduct $535.74 on the 17th of each month, beginning on 10/17/2009. The monthly deduction included $390.93 for service fee, $14.50 for maintenance fee and $130.31 to be placed in my trust account. It was very difficult to speak to Covenant's customer service department and I decided to cancel their services on 11/30/09. I spoke with "oscar" who stated my trust account funds would be mailed to me within 7-10 days and pursuant a phone call from Brian. I waited but no check was sent to me. I phoned Brian who stated that he was not in charge of approving issuance of any checks and that he would have a supervisor contact me. I never received a phone call from a Covenant supervisor. To this date, no check has been issued/received from Covenant or [Meracord]. I placed a stop payment with my bank to prevent [Meracord] to continue taking my monies."

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

i. "I was contacted by 1st. United Consultant about lowering my mortgage payment each month. They told me that they could get it down to $622.11 a month. I would set up payments to Meracord and they would have an agreement with the company that I pay my mortgage to and could get it lower. Like a idiot I did but when I got a statement from my mortgage company saying they did not recieve my payment for Sept. I knew I was in trouble. I tried to contact Lee Arthur at 1st United by fax, phone and email could not reach him he did not return email back to me. I was told I could cancel any time and get my money back all I had to do was send a letter. No address for them so I faxed none of the faxes would go through. I contacted Meracord by email got a repley back no problem my account is closed and any money that they have that doesn't go to the service provider would be returned to me within 24 hrs after the Oct. 24th. That came and went, I contacted them again I got a message back saying account is closed and 0 money to be returned. So I called I talked to some one there that told me my account is closed and they no longer do business with 1st United because of the way they conduct business, so longer wanted to be associated with them. That they sent my money to 1United since they were the ones that hired them. Supposed to be for fees or something which is a lie they never paid my Sept. payment so now I am behind and could lose my home. Lee Arthur is a thief and a liar. I also believe Meracord still is associated with them."

j. "Meracord united consultant all that work here rip me off 2380.00 setting up fake companies and collecting money Internet. Meracord is not licensed in the State of Maine. Check better busness . The att gerneral is working on mine. I am loosing my home because of them. All I asked was for mine money back. Now its personal now. I am going to the media with my story and proof I kept all my paperwork and my bank statements. I have hired an attoney I am going to sue for the house. It was put several disabled people home less and penniless. If this is a company that you put your money in you need help They haven't even responded to the paperwork that was sent to them from the Attorney General Office. They knew United Consultant was a fake company. They check them out before they agree to collect money for them. If this has happened to you go to your att general and go to the media."

k. "suray of United consultation was my contact person. suray sent me paperwork to mod my home, I wasn't behind but had high % rate. My mom had to move because of medical reasons so I was paying out all the income but 100 dollars, so surray was going to mod my mortgage to make it more comfortable and affordable. Meracod took over 2000 out of my account I thought it was going to my mortgage. Until they called me and we talked. MERACORD is also fake they just take your money, AND DO NOTHING. but help you loose your house. we are losing our home and I have gone to the media for help no else seems to really care, Meracord didn't stop practices with united Consultant until everyone started complaining. Don't they check their companies they work for!!!!!!!!!!!!!!!!!!!!! anyone dealing with these companies BEWARE their not what they seem. All I wanted was my money back now its personal. They won't even talk to me."

95.   Instead of investigating these complaints and returning the money wrongfully taken from consumers, Meracord devoted its energy to posting false and misleading rebuttals to these

CLASS ACTION COMPLAINT AND JURY DEMAND - 21

complaints. These rebuttals falsely claimed:

a. That Meracord "takes on the payment servicing obligations as an independent and objective company and does not act at the direction of the [debt relief companies]," despite the fact that Meracord withdrew fees from customer payments *at the behest of* its Front DRCs and then provided those fees to the Front DRCs;

b. That it was "not contracted with" its Front DRCs, despite the fact that Meracord and its Front DRCs entered into contracts related to the debt relief programs administered by both entities; and

c. That it "follows the instructions stated in the Meracord contract and at no time acts without authorization from the consumer," despite the facts that (1) many times the contracts signed by consumers did not contain clear or specific schedules of when fees will be withdrawn, and thus Meracord's withdrawal of fees must necessarily have been the result of separate (unilateral) instructions from the Front DRCs; and (2) Meracord facilitated the transfer of consumers' trust accounts from one Front DRC to another without authorization from those consumers.

96.    Meracord perpetuated the fraud by making false and misleading statements of its own through its website, emails and letters to customers, and the Sign-Up Agreements given to customers on behalf of Meracord by the Front DRCs. These statements included false assurances that customers were fully "in control" of their accounts, and that Meracord would not disburse any funds without the customer's permission, when in fact Meracord and its Front DRCs were in control of the debt settlement accounts, routinely disbursing money to themselves for unearned and illegal fees.

97.    Customers who discovered the fraudulent activities of the Meracord Enterprises found themselves fighting an uphill battle to disentangle the labyrinthine scheme and determine the party ultimately responsible for the scam. The ephemeral Front DRCs disappeared, stopped answering phone calls, disclaimed responsibility, or resorted to outright threats and intimidation; and Meracord also refused to admit any responsibility for the fraud in which it was complicit. Indebted consumers were thus left in *worse* positions than if they had never sought help at all, having often paid thousands of dollars in exorbitant and illegal fees that could have gone towards paying their debts.

98.    Meracord profited from the fees generated by each consumer enrolled by the Front DRC members of the Enterprise, knowing that the fees were generated by fraudulent and

CLASS ACTION COMPLAINT AND JURY DEMAND - 22

deceptive means, and knowing that often the fees charged were flatly illegal.

99.     The Front DRCs in the Meracord Enterprise included entities such as:

a.     Texas attorney Lloyd Ward and his various business entities (collectively, "Lloyd Ward"), whose debt settlement business was the subject of multiple lawsuits and government investigations, including: (1) a lawsuit by a Kansas consumer who was awarded $100,000 in damages against Ward for violation of Kansas consumer protection statutes; (2) an investigation by the Connecticut Department of Banking that resulted in a $500,000 civil penalty for violations of that state's statutory requirements for debt adjusters; and (3) an ongoing disciplinary petition filed by the Texas Commission for Lawyer Discipline, alleging six separate violations of the Texas Disciplinary Rules of Professional Conduct.

b.     Freedom Debt Relief, which had 251 complaints filed in three years with the Better Business Bureau and was the subject of an investigation by the Washington Attorney General which resulted in a March 3, 2011 consent decree. As a part of the consent decree, Freedom Debt Relief agreed to pay approximately $800,000 in restitution for Washington consumers, and was forbidden from contracting with new Washington customers without notifying the Attorney General's office.

c.     1st United and New Life Financial Solutions along with other associated companies were the subject of a suit by the Federal Trade Commission alleging twelve counts of violations of federal law stemming from the companies' deceptive practices. The complaint alleges:

> Defendants dupe distressed consumers into paying thousands of dollars based on false promises and misrepresentations. Defendants mislead consumers into thinking that their services come at little or no cost, and that consumers' payments will be held in escrow pending resolution of debt settlement agreements with their creditors. In reality, much, if not all, of these payments are taken by Defendants up-front, as their undisclosed fee. In the end, Defendants provide little, if any, meaningful assistance to resolve consumers' debt, and consumers are left worse off after signing up- and paying- for Defendants' services.

100.   The Front DRCs in the Meracord Enterprises profited from the fees generated by fraudulently inducing consumers to sign up for their debt relief "services," and profited from their association with the Meracord Enterprises by using Meracord to legitimize their services and by convincing consumers that their money would be safe in a Meracord account which only the consumer could control. In addition, because Meracord usually automatically deducted payments from the consumer's bank account, the Front DRCs were more likely to reap illicit gains from consumers automatically after signing them up, as opposed to a system in which consumers would later—after having reviewed and contemplated the "services" being offered—

CLASS ACTION COMPLAINT AND JURY DEMAND - 23

1    have to make a separate payment.

2        101.  In order to thwart regulatory actions, evade detection, and continue to victimize

3    financially distressed consumers, the Front DRCs that were members of the Meracord

4    Enterprises regularly entered into agreements between and among themselves to transfer

5    "portfolios" of victims. For example, in late 2010, Front DRC "The Debt Answer" faced

6    numerous complaints and regulatory issues, including an investigation by the Connecticut

7    Department of Banking. Instead of complying with the law, The Debt Answer sold its portfolio

8    of 3,407 "active" debt settlement victims' accounts to Front DRC Lloyd Ward on January 1,

9    2011. The Debt Answer itself had apparently earlier purchased an undisclosed number of these

10   victims' accounts from another Front DRC, Simon & Bocksch.

11       102.  On information and belief, Meracord facilitated these fraudulent "portfolio" transfers

12   by wiring the unlawful fees to the new entity without any authorization from the consumer

13   account holders, who generally remained unaware that their accounts had been transferred. In

14   fact, on at least several occasions, Meracord account representatives recommended such transfers

15   upon learning that a Front DRC had encountered legal issues and was "going to be closing the

16   doors." By facilitating—and in some cases recommending—these wholly fraudulent transfers of

17   "portfolios" of victims' accounts, Meracord ensured that its steady flow of unlawful fees

18   continued.

19       103.  Attorney-run Front DRCs had a special role in the Meracord Enterprises. By

20   marketing themselves as law firms, they were perceived by consumers as more trustworthy and

21   as more competent negotiators. Moreover, non-attorney Front DRC's often affiliated with an

22   attorney-run Front DRC in an attempt to evade regulations in states that prohibit debt settlement,

23   which often have exceptions for practicing attorneys. Thus, by spuriously affiliating itself with a

24   law firm, a non-attorney Front DRC might extend the period during which it could avoid

25   regulatory scrutiny.

26       104.  Front DRCs also coordinated and communicated directly with each other through the

27   formation of industry trade associations whose primary purpose was to spread misleading

28

CLASS ACTION COMPLAINT AND JURY DEMAND - 24

information about the debt relief industry and issue bogus "certifications" to Front DRCs. Front DRCs then use these bogus certifications to convince consumers that their activities are legitimate. The following was an actual Frequently Asked Question (FAQ) from the website of one of these bogus trade associations, the United States Organizations for Bankruptcy Alternatives, Inc.:

> Why do the Debt Settlement Companies I am researching seem to all have failing grades with the Better Business Bureau (BBB)?
>
> In an unfortunate turn of events, the BBB recently implemented a new 'scoring model'. This scoring model dictates that certain industries be graded as a whole. Unfortunately in the case of debt settlement companies, this model is quite severe, and has any company, regardless of their best-practices operations or good track record, restricted from achieving any rating above C-, USOBA supports theory behind the BBB; a consumer should have a resource to compare companies in any industry based on the company's merits alone. At this time, the BBB ratings of Debt Settlement companies tells a consumer little or nothing about a company's ethics or reputability. Several USOBA members and other Debt Settlement entities were asked to "give back" prestigious awards and achievements such as the BBB Accreditation and BBB Torch Award. Prior to the scoring model change, the companies were exemplary in the eyes of the BBB. If you wish to include the BBB in your research of a Debt Settlement provider, we suggest you look carefully at the complaint resolution and not the arbitrary score.

105.  As the above allegations make clear, the Front DRCs that were part of the Meracord Enterprise were directly connected to each other through bogus trade associations as well as the formal and informal agreements described above. Thus, the Meracord Enterprises involved relationships between Meracord and the individual Front DRCs as well as relationships between and among the Front DRCs themselves—all evidenced by both the participation of Meracord Enterprise members in industry-wide events and trade associations, as well as the formal and informal agreements made among those members.

106.  The Meracord conspiracies were classic hub-and-spoke conspiracies which also involved relationships between the various spokes. Meracord serves as the hub of the Meracord Enterprises, entering into bilateral relationships with each Front DRC through which Meracord both directly engaged in and facilitated the fraudulent and illegal activity of the Meracord Enterprises, as alleged herein. As discussed above, Meracord also caused and assisted the various

CLASS ACTION COMPLAINT AND JURY DEMAND - 25

"spokes"—the Front DRCs—in communicating with and conspiring with each other, all for the common benefit of the Meracord Enterprise and to the common detriment of its victims, whose accounts were involuntarily shifted from one dubious Front DRC to another, with Meracord's indispensable assistance, in order to hinder regulatory protective actions. These relationships between Front DRCs, many of which were facilitated by Meracord, benefitted and advanced the Meracord Enterprises as a whole. Other relationships between the Front DRCs included their bogus trade associations and countless conspiratorial interactions between Front DRCs at various debt relief industry functions, including those attended and sponsored by Meracord.

### 4. Injury to Plaintiffs and the Class

107.  The experiences of Plaintiffs are illustrative of the wrongful, unlawful, and fraudulent actions of Meracord and its Front DRC network.

108.  With knowledge of the fraudulent nature of the contracts between Class members and the Front DRCs, Meracord withdrew periodic payments from Class members' bank accounts; deducted exorbitant, illegal, and unearned fees; and failed to return those fees after Class members closed their accounts. Meracord's conduct violated federal and state law, including violating its fiduciary duties to Class members.

109.  As alleged below, Meracord's conduct as to 100% of Class members' accounts violated the Washington Debt Adjusting Act, resulting in Meracord's withdrawal of $484,757,939.30 in illegal fees from Class members' "trust" accounts, as detailed further in Appendix A.

110.  Meracord's violations of federal and state law as alleged below in Section VI.C, and the wrongful and fraudulent conduct underlying those violations, all independently and together constituted violations of the money transmitter statutes in each state where Meracord was licensed, and the Class member losses covered by the Bonds have exceeded the Bond Amounts in all but one state—all as alleged below in Section VI.A of this Complaint.

111.  The Sureties' bad-faith refusal to tender the Bonds, as described further below in Section IV.D of this Complaint, has caused additional injury to Class members, who have been

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

deprived of the time-value of the Bond Amounts due to them, as well as having incurred substantial fees through the continued litigation of the action.

112. **December Guzzo.** Plaintiff December Guzzo resided in Alabama during the relevant Bond Period. She made a total of $3,472.50 in payments into her Meracord account between July 23, 2009 and February 22, 2010, including a total of $3,472.50 in fees to Meracord and a Front DRC called EDS.

113. **Ben Parker.** Plaintiff Ben Parker resided in Alaska during the relevant Bond Period. He made a total of $6,342.87 in payments into his Meracord account between July 2, 2010 and March 29, 2013, including a total of $3,281.03 in fees to Meracord and a Front DRC called The Lloyd Ward Group.

114. **Cheryl Anderson.** Plaintiff Cheryl Anderson resided in Arizona during the relevant Bond Period. She made a total of $5,549.69 in payments into her Meracord account between April 5, 2010 and April 1, 2011, including a total of $3,482.69 in fees to Meracord and a Front DRC called The Lloyd Ward Group.

115. **Deborah Horton.** Plaintiff Deborah Horton ("Deborah") resided in Arkansas during the relevant Bond Period. She made a total of $2,022.00 in payments into her Meracord account between June 15, 2012 and November 7, 2012, including a total of $2,022.00 in fees to Meracord and a Front DRC called 1UC Inc.

    a. In May 2012, Deborah had lost her job and was struggling to make her mortgage payments. She received an unsolicited phone call from two men, Chris Chapman and Greg Gordon, who told her that they "worked with Meracord and Wells Fargo" and would help her modify the terms of her mortgage and lower her monthly payment. Deborah agreed to sign up with Meracord and Chapman and Gordon.

    b. At Chapman and Gordon's direction, Deborah stopped paying her monthly mortgage payment, and instead, she made four monthly payments of $674 to Meracord. She believed the payments would be used to pay her mortgage once it was modified.

    c. In September 2012, Deborah received notice that her mortgage was in default. Chapman and Gordon assured her that the payments she was making to Meracord would be reflected on her October mortgage statement. No payments were ever made to Deborah's mortgagor and by October, she could not reach Chapman or Gordon.

CLASS ACTION COMPLAINT AND JURY DEMAND - 27

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

    d.   Deborah then contacted Meracord. The representative told her that the company did not work with Chapman and Gordon. Deborah reported what happened to the Arkansas Attorney's General Office, but was told that while the office had attempted to contact Meracord, it did not get a response. Deborah lost the entire $2,696 she paid to Meracord.

116. **Richard Pierce.** Plaintiff Richard Pierce ("Richard") resided in California during the relevant Bond Period. He made a total of $9,896.00 in payments into his Meracord account between July 23, 2012 and October 4, 2012, including $7,876.50 in fees to Meracord and a Front DRC called 1st United Consultants.

    a.   Richard is self-employed in the construction business. The downturn in the economy hit his business particularly hard. Richard was in his 70s and lived with his wife in a house they have owned for over twenty years. They planned to stay in their home for the rest of their lives, but when Richard's business declined, they began having trouble making their mortgage payments. Although his mortgagor, Bank of America, agreed to reduce his mortgage payment for a limited time, Richard was unable to afford his payments without a permanent modification.

    b.   In July 2012, Richard was contacted by a representative of 1st United Consultants ("1st United"). The representative told Richard that 1st United could negotiate with Bank of America and reduce his mortgage payment from $3,113 to $1,530 per month. Richard agreed to make four monthly payments of $2,632 to Meracord while 1st United Consultants negotiated with his mortgagor.

    c.   After Meracord withdrew a total of $9,896 from Mr. Pierce's checking account, Richard was unable to get in touch with anyone at 1st United and his mortgage had not been modified.

    d.   Richard contacted Meracord. The Meracord representative told Richard that Meracord was no longer doing business with 1st United because 1st United had shut down and was being investigated by the federal government. Of the $9,896 that Meracord had withdrawn from Richard's bank account, Meracord agreed to return only $1,985 to Richard.

    e.   On February 15, 2013, Richard sent a letter to Meracord requesting a refund of $7,876.50 for the three regular payments that Meracord had withdrawn from his bank account and not returned.

    f.   On March 22, 2013, Meracord responded by letter from its General Counsel, telling Richard that the entire amount had been disbursed to 1st United and Meracord as fees. Meracord admitted that it was aware that 1st United had entered into a stipulated preliminary injunction as part of a case that the Federal Trade Commission filed against it and other defendants. On March 25, 2013, Meracord refunded to Richard $34.50, which it said represented the fees that had gone to Meracord.

117. **Carmen Alfonso.** Plaintiff Carmen Alfonso resided in Colorado during the relevant Bond Period. She made a total of $9,239.52 in payments into her Meracord account between

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

December 18, 2009 and October 5, 2010, including a total of $8,005.09 in fees to Meracord and a Front DRC called New Horizon Financial.

118. **Beth Jungen.** Plaintiff Beth Jungen resided in Connecticut during the relevant Bond Period. She made a total of $13,012.00 in payments into her Meracord account between February 17, 2009 and April 1, 2013, including a total of $6,888.62 in fees to Meracord and a Front DRC called Pacific Debt Inc.

119. **Tanya Gwathney.** Plaintiff Tanya Gwathney resided in Delaware during the relevant Bond Period. She made a total of $11,274.56 in payments into her Meracord account between July 30, 2009 and February 29, 2012, including a total of $8,073.41 in fees to Meracord and a Front DRC called DSS Support Services Inc.

120. **Bob & Amy Joyce.** Plaintiffs Bob and Amy Joyce ("Bob" and "Amy") resided in Florida during the relevant Bond Period. They made a total of $13,815.00 in payments into their Meracord account between September 26, 2012 and January 30, 2013, including a total of $11,100.50 in fees to Meracord and a Front DRC called Debt Life Solutions.

    a.    In September 2012, Bob and Amy received an unsolicited phone call from Debt Life Solutions ("DLS"). At the time, the Joyces had excellent credit scores; however, due to recent job losses and job changes, the Joyces were struggling to pay their mortgage and keep up with credit card payments. Their credit card debt totaled approximately $30,000.

    b.    According to the representative, DLS could settle their credit card debt for half of what they owed and lower the interest rate on their mortgage, which would result in significantly lower monthly payments. The Joyces agreed to sign up. The representative explained that while DLS negotiated for them, they would stop making their mortgage and credit card payments. Instead, they would make a monthly payment of $2,763 to Meracord.

    c.    From September 2012 to January 2013, the Joyces made monthly payments to Meracord. Then, in February, a friend of Amy's told her that she saw Amy's house listed online as in "pre-foreclosure." When Amy checked the balance in her Meracord account, the over $13,000 they had accumulated was gone. Bob and Amy also learned that DLS had not contacted their creditors.

    d.    After attempts to contact DLS were unsuccessful and its website was shutdown, Bob and Amy stopped the payments to Meracord through their bank. They filed a complaint with the Better Business Bureau and the New York Attorney General's Office.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

e. Bob and Amy made five payments of $2,763 to Meracord totaling $13,815. The Joyces' bank determined that the withdrawals were fraudulent and refunded three payments ($8,289). In response to a letter from the New York Attorney General, Meracord refunded $2,714.50, which was left in the Joyces' Meracord account after Meracord took $98.50 in fees and disbursed $11,002 to DLS.

f. Bob and Amy never recouped $2,811.50 of the total they paid and suffered devastating damage to their credit score.

121. **Erma Sue Clyatt.** Plaintiff Erma Sue Clyatt ("Sue") resided in Florida during the relevant Bond Period. She made a total of $917.23 in payments into her Meracord account between January 30, 2013 and March 6, 2013, including fees of $917.23 to Meracord and a Front DRC called Law Offices of Paul A. Herman / Esquire Litigation Support.

a. Sue resides in Florida, where she is retired and lives on a fixed income. She had struggled with overwhelming credit card debt for years and previously attempted debt settlement, but those attempts ended when Sue was unable to make her monthly payments.

b. On January 28, 2013, Sue received an unsolicited phone call from a man named Nicholas Paul. Paul told her that he worked with a "consulting firm" for the Law Offices of Paul A. Herman ("Herman Law Firm"). At the time of Paul's call, Sue, an asthmatic, was recovering from a lengthy illness that affected her breathing, and was still feeling physically weak and run down.

c. Paul told Sue that if she continued to leave her debts unpaid, her creditors could sue her and take her property, but assured her that the Herman Law Firm could dispute her credit card debt and negotiate with her creditors to lower her debt payments. Paul told her that she would have to pay approximately $305 twice per month. From their conversation, Sue understood that those payments would go toward paying off her debt. Sue agreed to sign up with Meracord and the Herman Law Firm.

d. Between February 11 and March 6, 2013, Meracord withdrew three payments totaling $917.23 from Sue's bank account.

e. During that time, Sue learned that her contract with the Herman Law Firm included fees that the representative never disclosed and that there were numerous complaints against the Herman Law Firm online. Sue cancelled her account with Herman Law Firm and was told that Meracord would stop taking payments from her bank account. Sue did not receive back any of the $917.23 that Meracord withdrew from her account, despite the fact that she never received any actual debt relief services.

122. **Kevin Deloach.** Plaintiff Kevin Deloach resided in Georgia during the relevant Bond Period. He made a total of $1,704.12 in payments into his Meracord account between March 5, 2012 and November 8, 2012, including a total of $431.59 in fees to Meracord and a Front DRC called Payless Debt LLC.

CLASS ACTION COMPLAINT AND JURY DEMAND - 30



123. **Scott Snoek.** Plaintiff Scott Snoek resided in Hawaii during the relevant Bond Period. He made a total of $29,046.40 in payments into his Meracord account between June 3, 2009 and February 7, 2013, including a total of $13,076.56 in fees to Meracord and a Front DRC called Loscalzo & Associates PLLC.

124. **Kelly Enders.** Plaintiff Kelly Enders resided in Idaho during the relevant Bond Period. She made a total of $37,609.68 in payments into her Meracord account between January 22, 2010 and May 9, 2013, including a total of $12,973.80 in fees to Meracord and a Front DRC called Legal Network of America.

125. **Thomas Ludwick.** Plaintiff Thomas Ludwick resided in Illinois during the relevant Bond Period. He made a total of $41,100.82 in payments into his Meracord account between December 9, 2009 and April 18, 2013 including a total of $15,251.82 in fees to Meracord and a Front DRC called EDS.

126. **Donald Bogan.** Plaintiff Donald Bogan resided in Indiana during the relevant Bond Period. He made a total of $12,945.48 in payments into his Meracord account between July 21, 2011 and March 22, 2013 including a total of $5,196.02 in fees to Meracord and a Front DRC called Next Generation Debt Settlement.

127. **Bill Kruse.** Plaintiff Bill Kruse resided in Iowa during the relevant Bond Period. He made a total of $5,552.96 in payments into his Meracord account between December 9, 2009 and March 31, 2011 including a total of $2,203.79 in fees to Meracord and a Front DRC called American Debt Settlement Solutions.

128. **Joyce Drummond.** Plaintiff Joyce Drummond resided in Kansas during the relevant Bond Period. She made a total of $3,620.60 in payments into her Meracord account between August 19, 2009 and September 29, 2010, including a total of $2,518.92 in fees to Meracord and a Front DRC called FBL Associates PC.

129. **Tamara Cooper.** Plaintiff Tamara Cooper resided in Kentucky during the relevant Bond Period. She made a total of $2,758.00 in payments into her Meracord account between January 22, 2013 and April 29, 2013, including a total of $1,291.20 in fees to Meracord and a

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Front DRC called Negotiation Credit Services.

130. **Debra Miller.** Plaintiff Debra Miller (Vandersnick) resided in Louisiana during the relevant Bond Period. She made a total of $16,829.40 in payments into her Meracord account between February 3, 2010 and December 28, 2011, including a total of $10,664.76 in fees to Meracord and a Front DRC called Support Services.

131. **George Lawrence.** Plaintiff George Lawrence resided in Maine during the relevant Bond Period. He made a total of $14,821.15 in payments into his Meracord account between September 28, 2009 and May 10, 2013, including a total of $6,785.14 in fees to Meracord and a Front DRC called DSS Support Services Inc.

132. **Cynthia Oxendine.** Plaintiff Cynthia Oxendine resided in Maryland during the relevant Bond Period. She made a total of $8,852.32 in payments into her Meracord account between October 6, 2009 and January 11, 2012, including a total of $3,407.72 in fees to Meracord and a Front DRC called Support Services.

133. **Karen Hea.** Plaintiff Karen Hea ("Karen") resided in Michigan during the relevant Bond Period. She made a total of $4,390.00 in payments into her Meracord account between September 13, 2012 and February 4, 2013, including a total of $3,560.50 in fees to Meracord and a Front DRC called Debt Life Solutions.

    a. In spring of 2012, Karen and her husband Philip were struggling financially and had fallen behind on all their other debts to stay current on their mortgage payments.

    b. Karen contacted their mortgagor, Citi Financial ("Citi"), hoping to skip a few payments and add them to the end of the loan, but Citi refused to help at all because Karen and Philip had stayed current on their payments. Even though their payments were current, however, Karen and Philip owed Citi more than double the current value of their home.

    c. In September 2012, after Karen responded to online advertisements to "lower your principal balance" and "lower your monthly payment," Philip received a phone call from David Stafford, a representative from Debt Life Solutions (DLS).

    d. Stafford told Karen and Philip that DLS provided *legal* representation to homeowners and would lower their mortgage payments by either renegotiating the interest rate or principal balance. He said the company worked with other homeowners who were "upside down," *i.e.*, those who, like Karen and Philip, owed more on their mortgages than the value of their home.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

e.  Stafford told Karen and Philip that they would make payments to a company called Meracord.

f.  Stafford promised that DLS would negotiate with Citi while Meracord withdrew the Heas' new monthly payment of $878.00. Between October 2012 and February 2013, the Heas made five monthly payments totaling $4,390.00. Stafford told them that their payments would be held in escrow until March, when DLS finalized the loan modification with Citi.

g.  Karen called again in February and spoke to Stafford's "assistant." Karen asked to verify that the payments she had made to DLS had gone to Citi. The assistant did not know what Karen was talking about. Karen said that she wanted to account for all mortgage payments before filing her 2012 income taxes. The assistant stumbled over his words and could not provide verification, and his hesitation and lack of information concerned Karen.

h.  Karen researched Meracord and DLS again. This time, she found complaints and lawsuits filed against Meracord. She also read accounts of the owners of companies offering mortgage modification services would shut down one company and then open another company using a different name. The information Karen found online terrified her, and the next morning, she called Citi from work.

i.  Citi's customer service representative told Karen that Citi had received no correspondence from anyone at DLS about her mortgage and had not received a payment since September. The Heas were thus six months behind on their mortgage payments.

j.  After finding out that DLS had never contacted Citi, Karen did not contact DLS and never attempted to contact Meracord. She was afraid that the companies were being investigated and did not want them to know she figured out that her mortgage modification "program" was a scam. Relying on the advice of a lawyer and friends in law enforcement, Karen considered the money the Heas had paid to Meracord gone forever, and turned her attention to trying to save their home.

134. **Martin Anderson.** Plaintiff Martin Anderson resided in Minnesota during the relevant Bond Period. He made a total of $14,641.89 in payments into his Meracord account between May 7, 2010 and May 13, 2013, including a total of $6,694.70 in fees to Meracord and a Front DRC called DSS Support Services Inc.

135. **Angela Ross.** Plaintiff Angela Ross resided in Mississippi during the relevant Bond Period. She made a total of $5,252.50 in payments into her Meracord account between March 20, 2012 and March 12, 2013, including a total of $1,683.10 in fees to Meracord and a Front DRC called Negotiation Credit Services.

136. **Andrea Topps.** Plaintiff Andrea Topps resided in Missouri during the relevant Bond Period. She made a total of $11,362.65 in payments into her Meracord account between January

CLASS ACTION COMPLAINT AND JURY DEMAND - 33

27, 2010 and March 22, 2011, including a total of $5,414.07 in fees to Meracord and a Front DRC called Support Services.

137. **Debra Finazzo.** Plaintiff Debra Finazzo resided in Nebraska during the relevant Bond Period. She made a total of $2,042.50 in payments into her Meracord account between August 6, 2012 and December 3, 2012, including a total of $1,133.00 in fees to Meracord and a Front DRC called Negotiation Credit Services.

138. **Sharron Black.** Plaintiff Sharron Black (Williams) resided in Nevada during the relevant Bond Period. She made a total of $13,608.69 in payments into her Meracord account between February 10, 2009 and April 16, 2010, including a total of $12,428.65 in fees to Meracord and a Front DRC called Support Services.

139. **Sylvia Hadcock.** Plaintiff Sylvia Hadcock resided in New Hampshire during the relevant Bond Period. She made a total of $1,822.40 in payments into her Meracord account between January 17, 2013 and May 6, 2013, including a total of $88.50 in fees to Meracord and a Front DRC called Premier Consultant Group LLC.

140. **Dawn Meade.** Plaintiff Dawn Meade ("Dawn") resided in New Jersey during the relevant Bond Period. She made a total of $2,781.00 in payments into her Meracord account between October 19, 2012 and June 28, 2013, including a total of $2,782.89 in fees to Meracord and Front DRCs called Delta Law Firm, August Belmont & Company, or Esquire Litigation Support.

    a.  In October 2012, Dawn received a phone call from a company called August Belmont & Company. The representative told Dawn—with little explanation—that they could settle or dispute her credit card debt. He also said they did better work than other companies that might call her.

    b.  Because Dawn expressed an interest in debt settlement, she received another call from Don Callahan, who said he was a paralegal from The Delta Law Firm. He was anxious for Dawn to sign up and make her first payment at the end of October. At the time, Dawn had about $30,000 in credit card debt. The Delta Law Firm offered to settle $25,000 of her debt for $6,000.

    c.  On October 19, 2012, Dawn signed up with Meracord and The Delta Law Firm. In the agreements, Dawn authorized Meracord to withdraw monthly payments of $272.72. However, Meracord actually withdrew $309.00 per month.

CLASS ACTION COMPLAINT AND JURY DEMAND - 34

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

d.   After Dawn thought she had made ten monthly payments, The Delta Law Firm called to tell her that by mistake, her last two payments were actually deposited into her account rather than withdrawn. He said that they would need to collect those payments. Later, Don Callahan called to tell Dawn that Meracord would no longer handle her payments. Instead a company named Harbinger Capital would start processing her payments. To make the two monthly payments that were not collected by mistake, Dawn needed to electronically sign new documents for Harbinger Capital.

e.   Dawn was concerned about the mistake and changes. She did internet research on the companies involved. She found litigation against Meracord and online complaints similar to her experience. She never signed up with Harbinger Capitol. No additional payments were deducted from her account; however, while reviewing her bank statement, Dawn saw that Harbinger was the company who deposited two payments in her account and not Meracord.

f.   Dawn had no further contact with The Delta Law Firm. About the same time she discovered the information online, Capital One was seeking a judgment against her. She did not tell The Delta Law Firm because by that time, she realized that it was not helping her.

g.   The Delta Law Firm never settled any of Dawn's debts. As a result, Capital One did receive a judgment and is now garnishing her wages. Additionally, her credit rating, which had been good because she had never defaulted on an account before, dropped to 520.

h.   Between October and June 2012, Dawn made a total of nine payments to Meracord totaling $2,782.08. In August and September 2012, Harbinger Capital made two deposits into her account totaling $618.24, but Dawn does not know whether those payments came from the money in her Meracord account.

i.   Dawn attempted to contact Meracord by phone and email to request a refund, but it appeared they had shut down.

141.   **Audrie Lawrence.** Plaintiff Audrie Lawrence (Poole) resided in New York during the relevant Bond Period. She made a total of $22,293.43 in payments into her Meracord account between June 5, 2009 and December 20, 2012, including a total of $5,788.94 in fees to Meracord and a Front DRC called FBL Associates PC.

142.   **Amrish Rajagopalan.** Plaintiff Amrish Rajagopalan ("Amrish") resided in North Carolina during the relevant Bond Period. He made a total of $8,531.82 in payments into his Meracord account between February 11, 2010 and September 22, 2011, including a total of $2,840.18 in fees to Meracord and a Front DRC called New Horizon Financial.

a.   Amrish accumulated most of his debt pursuing his education, which ended in 2004 with Amrish having accrued approximately $7,000 in credit card debt. After losing

CLASS ACTION COMPLAINT AND JURY DEMAND - 35

his job in 2006, Amrish had difficulty paying his debts, and the credit card accounts had accumulated substantial interest.

b. In 2009, Amrish found a debt settlement company called First Rate Debt Solutions ("FRDS") on the Internet and called the number provided. Amrish was convinced by the confident demeanor of the company's representative and relied on his assurances that the company would effectively and efficiently help him settle his debts. On May 14, 2010, Amrish agreed to sign up with FRDS, and to pay a monthly payment to Meracord of $753.65 for one year.

c. No settlements were ever negotiated on Amrish's behalf under the purported "debt settlement" program.

d. In October 2010, Amrish received a letter from P&E Solutions regarding his account. This letter was the first time Amrish had heard of P&E Solutions, and when he called the number listed on the letter, he was informed that P&E Solutions was the same as FBL Associates, another company he didn't recall ever hearing about.

e. Amrish assumed FBL Associates had taken over his account management, and asked why there had been no progress in settling his debts. The representative he spoke with told him that six months was "too early" to see any settlements, and that he should continue to wait.

f. Finally, however, after another four months had passed with no results, Amrish became seriously concerned. He once again called FRDS, only to be informed that FRDS was "simply an enrollment platform, [and] the actual process is being handled by Vertex in support of the ESP program as per your signed agreement." Thus "Vertex" was added to the list of different companies that were purported to be "handling" his debt settlement account.

g. The only company consistently involved in managing Amrish's debt settlement account was Meracord, but when Amrish contacted Meracord, expressing his dismay with the process and seeking a refund, Meracord told him it could only refund $5,424.97 of the $8,290.15 he had already paid into the program.

h. Meracord claimed that it had "earned" fees of $170.00 for "the handling of [Amrish's] money," and that the remaining amount Amrish had "paid towards [his] debt relief program was disbursed to [his debt relief service provider] as part of the fees [he] agreed to pay in exchange for their services." In addition to facilitating the Front DRC's fraudulent receipt of over $2,700 from Amrish, Meracord itself kept $170.00 in fraudulently and illegally obtained fees, and told Amrish that he should seek the remaining amount from his "debt relief service provider."

i. Emails from Meracord continued to claim, falsely, that Meracord was completely separate and independent from any of the other companies involved in the scheme; and that Meracord was not a debt settlement company or debt adjuster, despite the fact that Meracord's actions clearly fell within the meaning of the Washington Debt Adjusting Act.

j. Meracord sent Amrish an address for FBL Associates, but certified letters Amrish sent to the address were returned as undeliverable.

CLASS ACTION COMPLAINT AND JURY DEMAND - 36



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

k.   Amrish was thus left worse off than when he started, having paid approximately $2,870 in fees for debt relief services that were never provided.

143.  **Adam Ward.** Plaintiff Adam Ward resided in North Dakota during the relevant Bond Period. He made a total of $37,591.04 in payments into his Meracord account between June 10, 2008 and April 30, 2012 including a total of $18,600.72 in fees to Meracord and a Front DRC called DSS Support Services Inc.

144.  **Wahab Ekunsumi.** Plaintiff Wahab Ekunsumi resided in Ohio during the relevant Bond Period. He made a total of $24,885.60 in payments into his Meracord account between July 27, 2010 and April 17, 2013, including a total of $11,200.31 in fees to Meracord and a Front DRC called Waypoint Bay Financial.

a.   In 2010, Plaintiff Wahab Ekunsumi ("Wahab") owned a small business and was struggling financially. He owed about $45,000 in personal and business debt. Wahab saw a television advertisement for a debt settlement company called 42 Capital LLC. He called the number and spoke to a representative who offered him a 30 month plan with payments of $895.60. He promised to settle Wahab's nearly $45,000 in debt for only $26,868. Wahab agreed to sign up with 42 Capital and Meracord. On the contract, 42 Capital was identified as Waypoint Bay Financial ("Waypoint").

b.   Wahab made payments to Meracord in the amount of $24,885.60, but no debts were ever settled. In fact, one creditor sued Wahab. When Wahab reviewed his Meracord account online in April 2013, only $4,805.29 remained in the account.

c.   When Wahab contacted Waypoint to find out why his accounts were not settled and where the money in his Meracord had gone, he was told Waypoint would research his account and get back to him. Waypoint never did. For three weeks, Wahab called Waypoint several times. He got no answer. He left messages that were not returned.

d.   During the time Wahab made payments to Meracord, Meracord disbursed $8,880 to him. After Wahab closed his account and filed a complaint with the Ohio Attorney General's Office, Meracord refunded the $4,805.29 that remained in his account. Wahab lost a total of $11,200.31.

145.  **Ishula McConnell.** Plaintiff Ishula McConnell resided in Oklahoma during the relevant Bond Period. She made a total of $16,984.26 in payments into her Meracord account between December 15, 2008 and January 29, 2013, including a total of $6,581.32 in fees to Meracord and a Front DRC called DSS Support Services Inc.

146.  **Marie Johnson-Peredo.** Plaintiff Marie Johnson-Peredo ("Marie") resided in Pennsylvania during the relevant Bond Period. She made a total of $5,633.42 in payments into



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

her Meracord account between September 1, 2010 and October 6, 2011 including a total of $3,352.82 in fees to Meracord and a Front DRC called The Lloyd Ward Group.

a. In August 2010, Marie owed money on two credit cards—both with Discover Bank. Marie owed approximately $35,000, which she had accumulated over approximately five years of helping to support her family, including providing a substantial amount for her daughter's college tuition, room, and board. Marie, who works for the University of Pennsylvania Health Systems and makes less than $40,000 per year, knew it would take her many years to pay off the debt, and was desperate to find a way to relieve the emotional stress of her high debt burden.

b. Marie saw a television advertisement for debt consolidation services and began searching online for companies that might be able to help her pay off the overwhelming credit card debt she owed to Discover. During that search, she provided her name and contact information to a website, and as a result she was contacted by several individuals representing different companies wanting to sell her their debt relief services.

c. A woman named Rona Favreau called Marie on or about August 17, 2010, and identified herself as a representative of Lloyd Ward and Associates ("LWA"), a law firm specializing in debt settlement. Marie thought that perhaps LWA's status as a law firm set them apart from the other debt settlement companies, and gave them a special ability to deal with Discover despite the fact that others were unwilling to do so.

d. During this next phone call, Ms. Favreau told Marie that LWA could settle Marie's entire debt for $14,120 (approximately 40% of the total amount of the debt). Ms. Favreau told Marie that when she entered the program, she would stop paying that $600 to Discover, and would instead pay $433.34 to Meracord. Since this was a significant improvement on her monthly payment burden, Marie agreed to sign up with Meracord and LWA.

e. Between September 2010 and October 2011, Meracord deducted $5,633.42 from Marie's bank account.

f. Marie's debts with Discover were not settled, nor did she receive any indication from LWA that the firm was attempting to settle her debts. On October 2, 2011, she was served with two lawsuits filed against her by Discover. Marie was extremely upset emotionally by being served with a lawsuit on a Sunday while she was sitting at home, and she even worried whether she would be going to jail.

g. After LWA refused to help with the lawsuits and told her that Discover Bank—the *only* creditor for which Marie had signed up for LWA's settlement services— "doesn't settle," Marie demanded that LWA stop taking money out of her bank account and refund the money it had already taken. Of the $5,633.42 that had been deducted from her account, LWA told her she was "only entitled to" a refund of $2,280.60. He said that LWA and Meracord had "earned" the other $3,352.82, despite the fact that at that point absolutely nothing had apparently been done to settle Marie's debts.

CLASS ACTION COMPLAINT AND JURY DEMAND - 38

HAGENS BERMAN

h. After talking with LWA, Marie also contacted Meracord and requested a copy of her transaction history. In response, Meracord mailed her an empty envelope.

i. In addition to the $3,352.82 Meracord refused to return to Marie—in exchange for which she received no services—Marie was forced to pay an attorney to handle the lawsuits filed against her by Discover.

147. **Robert Hewson.** Plaintiff Robert Hewson ("Robert") resided in Pennsylvania during the relevant Bond Period. He made a total of $10,782.00 in payments into his Meracord account between September 14, 2009 and August 11, 2011, including a total of $3,625.00 in fees to Meracord and a Front DRC called FBL Associates PC.

a. In August 2009, Robert owed approximately $23,000 on two credit card accounts—one with Bank of America and the other with Chase. Both accounts were subject to high interest rates. At age sixty-three, Robert believed that he could not pay off the debt before he retired and worried about having debt after retirement.

b. In August 2009, feeling overwhelmed by his debts, Robert responded to a flyer posted at his workplace for a company called the Debt Relief Center, Inc. Because Robert is employed at a Merck Pharmaceutical site, where entry in and out of the facility requires a badge, he believed that businesses posting flyers at the facility— including the Debt Relief Center—would have to be legitimate businesses.

c. When Robert called the number on the flyer for the Debt Relief Center, he reached a company called SBL/Safeguard. He was told that Safeguard was previously known as Lifeguard. The representative, Carl, was a smooth talker who assured Robert that Safeguard could negotiate a good settlement for both of his debts.

d. During that call, Carl told Robert that he would be required to make eighteen monthly payments of $599.00, and that Safeguard would use that money to settle and pay his debts. Eighteen payments of $599.00 totaled $10,782.00 (approximately 46% of the debts to be settled). Based on Carl's representations, Robert agreed to sign up with Safeguard.

e. Carl never mentioned Meracord, but Robert later learned that Meracord withdrew his monthly payments. Between September 2009, and February 2011, Meracord withdrew 18 monthly payments of $599.00 from Robert's bank account.

f. After Robert had made eighteen payments, Robert was concerned about the lack of communication from Safeguard but did not panic because based on earlier communications, he thought that the company was working on at least one settlement, so he waited until April 2011 to contact Safeguard again.

g. When Robert attempted to contact Safeguard at the company's regular phone number in April 2011, no one returned his repeated calls and voicemails. He also attempted to call the Safeguard representative on the cell phone number he had provided to Robert, leaving three voicemails asking for a call back. The representative never responded. Robert never received any notice that either of his

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

debts had been settled; nor did he receive any notice or indication that Safeguard had even made any attempts to settle his debts.

h.   In May 2011, Robert called Meracord, either to confirm that there were settlements pending, or to close his account. The Meracord representative told Robert that the Debt Relief Center/Safeguard had been reorganized and that she would contact Safeguard and pass on his message. Robert never heard from Safeguard again.

i.   When Robert was unable to reach anyone at Safeguard, and Meracord refused to release any of his money without contact with Safeguard, Robert was forced to hire an attorney. In response to the attorney's phone call, Meracord refunded $7,157.00 of the $10,782.00 it had withdrawn from Robert's account. Meracord refused to refund the remaining $3,625.00, however, despite the fact that nothing had been done to settle Robert's debts.

148.   **Erica Chase.** Plaintiff Erica Chase (Moniz) resided in Rhode Island during the relevant Bond Period. She made a total of $1,581.96 in payments into her Meracord account between April 22, 2010 and October 5, 2010, including a total of $1,394.06 in fees to Meracord and a Front DRC called DSS Support Services Inc.

149.   **Stephen Younkins.** Plaintiff Stephen Younkins resided in South Dakota during the relevant Bond Period. He made a total of $2,082.00 in payments into his Meracord account between January 25, 2013 and April 29, 2013, including a total of $719.07 in fees to Meracord and a Front DRC called Negotiation Credit Services.

150.   **Dan Weddle.** Plaintiff Dan Weddle resided in Tennessee during the relevant Bond Period. He made a total of $4,399.72 in payments into his Meracord account between October 29, 2009 and October 21, 2010, including a total of $2,907.60 in fees to Meracord and a Front DRC called Support Services.

151.   **Alex Casiano.** Plaintiff Alex Casiano ("Alex") resided in Texas during the relevant Bond Period. He made a total of $5,178.24 in payments into his Meracord account between August 27, 2009 and March 16, 2011, including a total of $2,877.85 in fees to Meracord and a Front DRC called FBL Associates.

a.   In August 2009, Alex had approximately $25,000 in credit card debt, some of which was accumulated as a result of basic living expenses, and some as a result of costs associated with a lawsuit brought against him by a former employer.

HB   HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

b. Feeling overwhelmed by his debt load, Alex began searching online for debt relief options. Lifeguard Financial appeared at the top of his search results, and believing that the company looked legitimate, Alex called them to discuss his options.

c. Alex talked to a Lifeguard representative named Mike, who convinced Alex to sign up for a debt settlement service. Mike explained that Alex would make a monthly payment to Lifeguard, and that Lifeguard would negotiate with his creditors to reduce the amounts he owed. Mike suggested that Lifeguard "usually" was able to reduce customers' debts by 30-40%. He told Alex not to pay anything else to his creditors. He said Lifeguard would reach out to Alex's creditors, but that "just in case," if any creditors called, Alex should simply refer them to Lifeguard and they would "take care of it."

d. Mike took all of Alex's information over the phone, then sent Alex an email link to a pre-filled contract, which he asked Alex to sign electronically.

e. Between September 2009 and March 2011, Alex made 18 payments into his Meracord account, totaling $5,178, from his personal checking account.

f. Alex believed everything was going according to the promises that Lifeguard had made, until in approximately March 2011, when he was served with a lawsuit by one of his creditors.

g. When he attempted to contact Mike and Lifeguard by both phone and email about the lawsuit, he got no reply. He never again received any communication from the company.

h. After an online search revealed that Lifeguard was associated with FBL Associates, Alex also attempted to contact FBL, but again, he received no reply.

i. Finally, Alex contacted Meracord. A Meracord representative informed him that he could request a "full refund" of his money, but that some of the money in his account "belonged" to Lifeguard/FBL. The Meracord representative said Alex would consequently have to wait approximately 10 days after he submitted his refund request before receiving his money, in order to give Lifeguard/FBL time to request that their fees be disbursed before his refund was issued. Only after they paid Lifeguard/FBL its fees would Meracord refund Alex's money.

j. Lifeguard apparently did not respond to Meracord's communications, and Meracord refunded Alex the remaining balance in his account, which they represented as being a "full refund." In fact, however, Meracord only refunded $2,300 of the $5,178 Alex had paid into his account. The rest of the money had been disbursed as fees to Lifeguard and Meracord.

k. Alex never received the additional $2,878 that he had paid into his Meracord account.

152. **Stillman Parker.** Plaintiff Stillman Parker resided in Vermont during the relevant Bond Period. He made a total of $27,331.59 in payments into his Meracord account between August 7, 2009 and April 29, 2013, including a total of $6,803.50 in fees to Meracord and a

CLASS ACTION COMPLAINT AND JURY DEMAND - 41

Front DRC called Fidelity Debt Solutions.

153. **Tina Roberts-Ashby & Brandon Ashby.** Plaintiffs Tina Roberts-Ashby and Brandon Ashby resided in Virginia during the relevant Bond Period. They made a total of $9,186.12 in payments into their Meracord account between September 21, 2009 and March 10, 2011 including a total of $4,637.30 in fees to Meracord and a Front DRC called The Lloyd Ward Group PC.

154. **Traci McCormick.** Plaintiff Traci McCormick resided in Washington during the relevant Bond Period. She made a total of $899.64 in payments into her Meracord account between December 15, 2009 and October 14, 2010, including a total of $899.64 in fees to Meracord and a Front DRC called The Lloyd Ward Group.

155. **Donte Cheeks.** Plaintiff Donte Cheeks ("Donte") resided in the District of Columbia during the relevant Bond Period. He made a total of $3,770.82 in payments into his Meracord account between March 29, 2011 and October 13, 2011, including a total of $3,770.82 in fees to Meracord and a Front DRC called New Life Financial Solutions Inc.

    a. In early 2011, Donte signed up with Meracord and New Life Financial to settle credit card debt and a delinquent student loan.

    b. Between April and December 2011, Meracord withdrew nine monthly payments, totaling $3,770.82, from Donte's personal checking account.

    c. During the time Donte made payments to Meracord, he continued to receive phone calls from debt collectors. The debt collectors said that they never heard from New Life Financial.

    d. When Donte contacted New Life Financial, representatives told him that he did not "qualify" for its "program" but refused to refund the money he paid to Meracord.

    e. Donte sought help from the Legal Aid Society of D.C. The attorney helping him wrote a letter to Meracord demanding a refund of the $3,770.82 that Donte paid. Meracord never responded.

156. **Valerie Newsome.** Plaintiff Valerie Newsome resided in West Virginia during the relevant Bond Period. She made a total of $25,508.45 in payments into her Meracord account between June 5, 2010 and May 28, 2013, including a total of $8,587.65 in fees to Meracord and a Front DRC called Law Office of Michael Lupolover.

157. **Arthur Fuller.** Plaintiff Arthur Fuller ("Arthur") resided in Wisconsin during the

CLASS ACTION COMPLAINT AND JURY DEMAND - 42

relevant Bond Period. He made a total of $2,255.33 in payments into his Meracord account between June 8, 2010 and June 1, 2011, including a total of $1,791.91 in fees to Meracord and a Front DRC called E.M.A. Nationwide Inc.

    a.    Arthur is a retired Army veteran. He is 85 years old.

    b.    In 2010, Arthur and his wife owed approximately $12,000 in credit card debt to Discover and Capitol One. With income limited to Arthur's military retirement, they were having trouble making the monthly credit card payments and knew they would not be able to pay off the debts. Arthur began looking online for help with their debt. He found EMA, a company that claimed to settle debts for a fraction of the amount owed.

    c.    On April 28, 2010, after a phone call in which an EMA representative promised to settle Arthur's debt for about 50% of what he owed and that EMA's attorney would personally negotiate with Discover and Capitol One, Arthur agreed to sign up with EMA and make seventeen monthly payments of $204.39 and twenty-two payments of $181.19.

    d.    Initially, a company called Debt Pay Gateway withdrew his monthly payments, but on June 8, 2010, Arthur received an email from EMA informing him that his payment processor was changing to Meracord. He also received a link to sign new documents to sign up with Meracord.

    e.    On January 24, 2011, Arthur received a summons for a lawsuit filed by Capital One. Arthur called EMA and was advised to call the law firm representing Capital One and try to settle the lawsuit himself. On February 5, 2011, Arthur received a second summons for the lawsuit brought by Capitol One. Arthur contacted EMA again, but the representative refused to do anything. Eventually, Capitol One received a judgment against Arthur.

    f.    Arthur monitored his Meracord account through Meracord's online account access. In addition to EMA's failure to settle Arthur's debt to Capital One or help with the lawsuit, Arthur was concerned about the unexplained fees that Meracord was deducting from his payments. These fees were described as "Service Provider Maintenance Fee," "Service Provider Activation Fee," and "[Meracord] Processing Fee." To Arthur, these numerous and recurring fees were inconsistent with Meracord's purported limited function—to collect his payments, which EMA would use to pay settlements.

    g.    Arthur attempted to call EMA for answers. When he called, the phone usually just rang and rang. When someone did answer, they told Arthur that the representative he needed to speak to was not there. Arthur even asked to speak to EMA's staff attorney; however he was always told that the attorney was not available. Around this same time, Arthur found complaints about Meracord online.

    h.    Arthur had made eleven payments in the same amount to Meracord totaling $2,452.68. Before making his scheduled May 2011 payment to Meracord, Arthur instructed his bank to stop payments to Meracord and changed his bank account numbers.

CLASS ACTION COMPLAINT AND JURY DEMAND - 43



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

i.  Then Arthur called Meracord to cancel his account and demand a refund. Only after Arthur threatened to seek legal help, did Meracord refunded his account balance. Out of the $2,452.68 Arthur paid, only $463.42 remained in his Meracord account. Neither of Arthur's credit card accounts were settled.

158.  **Russel Tanner.** Plaintiff Russel Tanner resided in Wyoming during the relevant Bond Period. He made a total of $15,203.01 in payments into his Meracord account between August 18, 2010 and April 3, 2013, including a total of $5,508.22 in fees to Meracord and a Front DRC called Legal Network of America.

## B.  THE *MERACORD ACTION* AND JUDGMENT AGAINST MERACORD

159.  On June 26, 2011, suit was filed in this Court against Meracord (then called NoteWorld) on behalf of a class of individuals defrauded by Meracord during the course of its money transmission activities. The original complaint in the *Meracord Action* contained causes of action for (i) violations of the federal RICO act, (ii) violations of the Washington Debt Adjusting Act, (iii) violation of the Washington Consumer Protection Act, (iv) aiding and abetting the commission of unfair and deceptive business conduct, (v) breach of fiduciary duty, and (vi) unjust enrichment.

160.  On July 24, 2012, another suit was filed on behalf of a similar class of individuals against Meracord (and other entities subsequently dismissed). *Canada v. Meracord LLC,* No. 3:12-cv-05657 (Filed July 24, 2012).

161.  Over the course of several years of litigation, including the loss of an appeal by Meracord to the Ninth Circuit Court of Appeals, the two cases were eventually consolidated into *Rajagopalan et al. v. Meracord LLC*, No. 12-cv-05657-BHS ("*Meracord Action*"). After it became clear that Meracord's resources were exhausted and the only viable source of recovery for injured consumers was the Bonds, the plaintiffs in the *Meracord Action* ("*Meracord* Plaintiffs") filed their Second Consolidated Amended Complaint,[6] limiting the class to only individuals residing in Surety States.

162.  On March 10, 2015, the *Meracord* Plaintiffs moved for (1) class certification,[7] and (2)

---

[6]   *Meracord Action Dkt.* 251.

[7]   *Meracord Action Dkt.* 257 ("Class Certification Motion").

CLASS ACTION COMPLAINT AND JURY DEMAND - 44

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

partial summary judgment on their claims for (i) violations of Washington's Debt Adjusting Act, RCW §§ 18.28.010, et seq. ("DAA"); (ii) violations of Washington's Consumer Protection Act, RCW §§ 19.86.020, et seq. ("CPA"); (iii) aiding and abetting the Front DRC's violations of the DAA and CPA; (iv) unjust enrichment; and (v) breach of fiduciary duty.[8] The Summary Judgment Motion provided detailed evidence demonstrating Meracord's liability. Specifically, it contained detailed documentation of Meracord's knowledge and efforts to aid the illegal conduct of debt settlement companies. For example, internal emails demonstrate that Meracord knew certain debt settlement companies were unlawfully evading the FTC's prohibition on advance fees by concocting settlements for "one cent" and then withdrawing fees on the ground that debt had been settled.

163.  The *Meracord* Plaintiffs also attached to their Summary Judgment Motion a detailed expert declaration from a database expert who had reconstructed and queried Meracord's Customer Relationship Management (CRM) database, which recorded all transactions.

164.  In February 2015, the *Meracord* Plaintiffs reached a settlement agreement with the Remsbergs pursuant to which certain limited remaining assets were, pursuant to certain conditions, made available to the class ("Settlement"). Meracord's counsel subsequently withdrew from their representation of the company, which then defaulted by failing to answer the Second Consolidated Amended Complaint or Plaintiffs' pending Class Certification and Summary Judgment Motions.

165.  On April 16, 2015, the *Meracord* Plaintiffs moved for a default final judgment on all their claims with the exception of a claim for declaratory relief for violation of the state licensing statutes under which the Bonds were issued, which was withdrawn.[9]

166.  On May 14, 2015, this Court granted the Summary Judgment Motion, certified the requested class,[10] and entered final default judgment against Meracord. *Meracord Action* Dkt.

---

[8]   *Meracord Action* Dkt. 253 ("Summary Judgment Motion").

[9]   *Meracord Action* Dkt. 279 ("Motion for Entry of Final Default Judgment").

[10]   The Court appointed The Paynter Law Firm PLLC and Hagens Berman Sobol Shapiro LLP as Class Counsel.

CLASS ACTION COMPLAINT AND JURY DEMAND - 45

287 ("Final Judgment"). In the Final Judgment, the Court found actual damages of $484,757,939.30, which the Court trebled pursuant to RICO to $1,454,273,817.90. In addition to total damages, the Final Judgment listed state-by-state Damages, which are contained in Appendix A to this Complaint.

167.  Meracord has not paid the Final Judgment, and given that it is insolvent and no longer in operation, it is incapable of ever doing so.

## C.  MERACORD'S STATUTORY SURETY BONDS

168.  In order to obtain state licenses to do business as a money transmitter, Meracord was required to post the Bonds to insure its performance obligations under the relevant state statutes.

169.  The Bonds exist primarily to protect against precisely the situation described in this Complaint, in which a licensee harms consumers in the course of its business as a money transmitter, but is unwilling or unable to make its victims whole.

170.  The issuance of each Bond was conditioned on compliance with the applicable state licensing statutes and the terms described in the Bond.

171.  The Sureties issued the Bonds in 45 states. Appendix A lists all Bonds, their current amounts,[11] and other relevant information referenced throughout this Complaint.

172.  The vast majority of states in which the Sureties issued the Bonds provide for claimants to bring suit directly on the Bonds.

173.  The vast majority of the Bonds *do not* require a claimant on the Bond to obtain a legal judgment before pursuing a claim on the Bond. But in any case, the Class as defined in this Complaint has, as described herein, already obtained a Final Judgment against Meracord for nearly $1.5 billion.

174.  Meracord's conduct, as outlined in this Complaint, violates the conditions of all 45 Bonds (or their incorporated relevant licensing statutes), since all 45 Bonds fall into at least one of the following categories:

   a.   The relevant licensing statute specifically prohibits fraud, wrongful acts, misconduct, and/or misrepresentation;

---

[11]   Some Bonds have been amended over time to increase or decrease their amounts.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

b. The relevant licensing statute specifically uses language evincing the states' expectations that licensees act "honestly" or "faithfully" in the performance of their duties;

c. The relevant licensing statute covers "any liability arising out of" Meracord's money transmission services;

d. The Bond itself specifically prohibits fraud, wrongful acts, misconduct, and/or misrepresentation;

e. The Bond itself specifically uses language conditioning the Bond upon Meracord's "honestly" or "faithfully" performing its duties as a money transmitter;

f. The Bond itself covers "any liability arising out of" Meracord's money transmission services.

## D. SURETIES' BAD FAITH REFUSAL TO TENDER THE BONDS

175. On April 23, 2013, Class Counsel sued the Sureties in the Northern District of California in an action captioned *Cheeks v. Fidelity and Deposit Company of Maryland and Platte River Ins. Co., as sureties for Meracord LLC*, No. 4:13-cv-01854-DMR (N.D. Cal. Filed April 23, 2013) ("*Cheeks* action"). A copy of that complaint is attached hereto as Exhibit 1. The *Cheeks* complaint contained over one hundred paragraphs of detailed allegations regarding Meracord's fraudulent conduct and racketeering. The parties stayed the case in light of then-ongoing settlement discussions in the *Meracord Action*.

176. The *Cheeks* complaint defined the proposed class as:

[A]ll persons who, while residing in a Surety Bond State, established or on whose behalf was established an account with Meracord LLC (or any subsidiary thereof) from which Meracord processed any payments to any debt relief program. Surety Bond State means any State (including the District of Columbia) where Meracord obtained a surety bond from a Defendant in order to receive a license to act as an escrow agent or money transmitter and where this surety bond has not been cancelled.

The *Cheeks* complaint, therefore, included all members of the *Meracord Action* Class, and constituted a demand on the Bonds on behalf of those individuals.

177. In October 2013, the Sureties participated in a mediation scheduled in the *Meracord Action*. The Sureties rejected the *Meracord* Plaintiffs' offer to settle on behalf of the class in the *Meracord Action* ("*Meracord* Class") with the Sureties for only a small fraction of the outstanding bond amounts.

178. On information and belief, that rejection was made without reasonable investigation of

CLASS ACTION COMPLAINT AND JURY DEMAND - 47

the *Meracord* Class's claims.

179. On information and belief, following the receipt of the *Cheeks* complaint, the Sureties made no effort whatsoever to investigate the underlying factual allegations against Meracord and its owner Linda Remsberg.

180. Nor, following the filing of the *Cheeks* action, did the Sureties make any effort to obtain Meracord's customer relationship management (CRM) database from Meracord. That database recorded transaction data and transaction dates for each Meracord debt relief customer. The database also identified each customer's state of residence. In short, it contained all the information necessary to evaluate and calculate the *Meracord* Class's damages. Instead, the Sureties waited until after Class Counsel successfully compelled Meracord's production of the CRM database to then request and obtain Meracord's CRM database from Meracord in October 2014. In other words, rather than immediately request the CRM database from Meracord in order to investigate the *Meracord* Class's claims, the Sureties waited over a year from the time they were served with the *Cheeks* demand—during which period they took advantage of Meracord's obstructionist discovery tactics.

181. Even then, on information and belief, the Sureties made no effort to analyze the information contained in the database in order to evaluate the *Meracord* Class's claims on the Bonds. This failure was particularly unreasonable and malicious because, as Class Counsel repeatedly informed the Sureties' counsel, even a cursory review of the database would demonstrate that the *Meracord* Class's damages covered by the relevant Bonds vastly exceeded the Bond Amounts.

182. For example, the Florida Bond is for $800,000, but a quick review of the database indicates that Florida Class members paid over $46 million in illegal fees. And over half of Florida Class member accounts had no debts settled whatsoever. In short, the Sureties had no rational or reasonable basis to assume that the Florida Class members' damages did not vastly exceed the Bond amount. Yet the Sureties continued to refuse to tender that and other Bonds.

183. In December 2013, another action was filed in federal court in Arizona against

CLASS ACTION COMPLAINT AND JURY DEMAND - 48

Meracord and Fidelity, the issuer of the Arizona Bond. That action was captioned *Anderson v. Meracord LLC et al.,* No. 2:13-cv-02470-NVW (D. Ariz. Filed Dec. 3, 2013). A copy of the complaint is attached hereto as Exhibit 2. Like the *Cheeks* action, the *Anderson* complaint alleged a pattern of fraud and racketeering by Meracord, and requested that Fidelity tender the Arizona Bond.

184.  Fidelity moved to dismiss that action, arguing that the Arizona bond did "not cover violations of other laws, such as RICO, but is limited to injuries 'growing out of' transactions governed by the provisions of the escrow agent statutes." Exhibit 3 (Fidelity Mot. to Dismiss, *Anderson* Dkt. 11) at 4. That argument was flatly rejected by the *Anderson* Court:

> The Amended Complaint alleges that Meracord committed multiple wrongful acts, including violating the federal RICO act and breaching its fiduciary duties — violations growing out of its business as an escrow agent for the debt-relief industry. The terms of the bond do not preclude Anderson's recovery.

Exhibit 4 (Order Denying Fidelity's Mot. to Dismiss, *Anderson* Dkt. 32) at 4.

185.  Following that decision, Fidelity tendered the Arizona Bond, but failed to tender any other Bond even though the *Anderson* Court's reasoning squarely applied to its other Bonds as well.

186.  As discussed above in Section IV.B, on May 14, 2015 this Court certified the *Meracord* Class and entered the Final Judgment against Meracord. On May 15, 2015, Class Counsel again reiterated their demand that the Sureties tender the Bonds for equitable distribution to *Meracord* Class members. A copy of that demand is attached hereto as Exhibit 5.

187.  By letter dated May 29, 2015, attached hereto as Exhibit 6, the Sureties once again refused to tender the Bonds. The Sureties' letter falsely claimed that they had "insufficient information to evaluate coverage, liability and/or damages." Ex. 6 at 1.

188.  In fact, for several years the Sureties had possessed extremely detailed allegations of racketeering and fraud by Meracord and, on information and belief, had done nothing to investigate. Moreover, the Sureties possessed or had easy access to the entirety of the *Meracord* Plaintiffs' briefing on the Summary Judgment Motion, which substantiated these allegations with

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Meracord's own documents and expert analysis. Much of that analysis was also contained in the *Meracord* Plaintiffs' class certification briefing, which Class Counsel sent directly to the Sureties' Counsel by email in October 2014. *See* Exhibit 7. Last but not least, since October 2014, the Sureties possessed Meracord's entire CRM Database, which permitted them to easily conduct their own verification of the state-by-state damages calculations contained in the Second Consolidated Amended Complaint in the *Meracord Action*.

189.  In short, the Sureties' protestations that they had insufficient information to determine liability and/or damages were entirely pretextual and motivated only by a desire to avoid their financial obligations to the obligee Class members.

190.  Even more meritless was the Sureties' assertion that they lacked sufficient information to determine coverage. Again, the Sureties had all necessary information to determine the merits of the underlying claims against Meracord and establish Meracord's underlying liability. From there, coverage is determined simply by reference to the terms of the Bonds and their underlying statutes.

191.  On information and belief, the Sureties never conducted any coverage analysis for any individual Bond. If they did, they never shared any such analysis with Plaintiffs. The failure to either undertake coverage analysis or, if it was undertaken, to share it with Plaintiffs, represents bad faith.

192.  The Sureties' May 29, 2015 letter also falsely accused Class Counsel of assuming the existence of a "single unified bond" and making a "blanket" demand upon it. Ex. 6 at 1. In fact, the Sureties were well aware that the *Meracord* Class was seeking recovery on each state Bond individually. For example, Class Counsel had previously offered to provide the Sureties' counsel with "state by state information demonstrating that the liability during the bonding period vastly exceeds the bond amounts." *See* Exhibit 8 (Email Chain from S. Paynter to D. Veis). And Class Counsel later expressly clarified that they were requesting a state-by-state evaluation of their claims. Specifically, in an email to the Sureties' counsel, attached hereto as Exhibit 9, Class

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Counsel stated as follows:[12]

> [P]lease provide a state by state breakdown of your clients' basis for refusing to tender the Bonds of each Surety State (as that term is used in the final judgment). To the extent your client believes that some but not all of the bond amount is due for any particular state, we request tender of that amount to the Class.

The Sureties did not provide, and have never provided, such a "state-by-state breakdown"—in violation of their duties to the obligee Class members.

193.  By letter dated June 4, 2015, attached hereto as Exhibit 10, Class Counsel pointed out the false and misleading statements contained in the Sureties' rejection letter. Class Counsel highlighted the particular unreasonableness and bad faith in failing to tender the Washington State Bond. As Class Counsel pointed out, the Washington Bond runs for the benefit of "any person" injured—not simply Washington State residents. Therefore, the entire Class has a claim on the Washington Bond. Since the Washington Bond is less than $200,000, Class Counsel pointed out that it was "highly implausible" for Fidelity to claim that damages "do not exceed the bond amount."

194.  On Monday, June 8, 2015, Class Counsel provided to Fidelity by certified mail a copy of the *Meracord* Plaintiffs' "20 Day Notification Sheet" under the Washington Insurance Fair Conduct Act ("IFCA") filed with the Washington State Insurance Commissioner, indicating their intention to bring claims for violations of WAC 284-30-330, WAC 284-30-370, WAC 284-30-380, and an unfair claims settlement practice rule under the IFCA. *See* Exhibit 11.

195.  That letter was received by the Sureties' Counsel at 12:00pm on June 11, 2015. *See* Exhibit 12. Later that same day, Class Counsel received two letters from the Sureties' counsel. The first letter falsely claimed, among other things, that "the sureties have and continue to engage in good faith investigation and evaluation on a state by state basis to determine the procedures, standards and potential coverage under the various state statutory bonds." Exhibit 13. The second, on behalf of Fidelity, claimed to have "completed its investigation on the Washington bond," and offered to tender the Washington Bond. Exhibit 14.

---

[12] Class Counsel's email was sent at 11:05 am EST on May 29, 2015. The Sureties' rejection letter was received via email on May 29, 2015 at 4:51 pm EST. *See* Exs. 9 & 6.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

196.  These letters were the first time that the Sureties admitted they had sufficient information to determine their liability under the Washington Bond, or any other Bond.

**E.  THE MERACORD CLASS'S ACTION AGAINST THE SURETIES.**

197.  The *Meracord* Class filed suit against Fidelity and Deposit Company of Maryland and Platte River Insurance Company, as Sureties for Meracord LLC, on June 15, 2015. *Rajagopalan et al. on behalf of the [Meracord Class],* No. 2:15-cv-00957 ("*Surety I*").

198.  On September 30, 2015, this Court granted the parties' request to stay the proceedings as to Platte River in order to finalize a settlement agreement between the *Surety I* Class and Platte River.

199.  On December 8, 2015, the Court dismissed the Class's claims against Fidelity.

200.  Because the Court's basis for dismissal involved its jurisdiction over an action brought by a previously certified class, Plaintiffs are filing this Complaint to include additional plaintiffs and class allegations regarding the certification of a new class in this action.

## V.     CLASS ALLEGATIONS

201.  Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23(a),(b)(3), and (b)(1)(B) on behalf of the following Class:

> All persons in a Surety State[13] who established an account with Meracord LLC (formerly NoteWorld) or any subsidiary thereof from which Meracord processed any payments related to debt settlement, including MARS, within the Bond Period of their state of residence.

202.  Excluded from the Class are the Sureties, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which either Surety has or had a controlling interest.

203.  The members of the Class are so numerous that joinder is impracticable. Expert analysis of Meracord's customer database demonstrates that Meracord serviced almost 250,000 accounts.

204.  Plaintiffs' claims are typical of the claims of the members of the Class, as all members

---

[13]  A Surety State is any state listed in Appendix A.



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    of the Class are similarly affected by Defendant's conduct in violation of law that is complained

2    of herein.

3       205.  Plaintiffs will fairly and adequately protect the interests of the members of the Class

4    and have retained counsel competent and experienced in class action litigation.

5       206.  Certification under FED. R. CIV. P. 23(b)(3) is appropriate because common questions

6    of law and fact exist as to all members of the Class and predominate over any questions solely

7    affecting individual members. Among the questions of law and fact common to the Class are:

        a.    Whether Meracord or its Front DRCs were engaged in debt adjusting within the meaning of WASH. REV. CODE § 18.28 during the relevant time period or are otherwise subject to that statute;

        b.    Whether Class members' debt relief agreements with members of the Meracord Enterprises are *void ab initio*;

        c.    Whether RICO was violated by Meracord's acts and omissions as alleged herein;

        d.    Whether standardized fees charged by the Meracord Enterprises are unlawful or otherwise constitute an unfair or deceptive trade practice;

        e.    Whether Meracord's standardized practices with respect to the maintenance and management of Class members' debt settlement accounts violate WASH. REV. CODE § 18.28, or otherwise constitute unfair or deceptive business practices, and whether Meracord should be enjoined from such practices;

        f.    Whether Meracord violated WASH. REV. CODE § 18.28 as to 100% of Class member accounts;

        g.    Whether Meracord knowingly and substantially assisted its Front DRCs in violating WASH. REV. CODE § 18.28 and/or WASH. REV. CODE § 19.86;

        h.    Whether Meracord committed fraud;

        i.    Whether Meracord breached its fiduciary duties to Plaintiffs and Class members;

        j.    Whether Meracord was unjustly enriched;

        k.    Whether Meracord violated state licensing statutes;

        l.    Whether the statute of limitation for Plaintiffs' and Class members' claims should be properly tolled;

        m.    Whether the Sureties should be estopped from relying on the statute of limitation for Plaintiffs' claims;

        n.    Whether Meracord's and the Sureties' wrongful conduct resulted in economic damage to Class members, and the amount of said damages;

        o.    Whether the Sureties are liable on each of the Bonds as a result of Meracord's conduct, and whether the full amount of each Bond is due and owing to the Class;

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

p.     Whether the Sureties' refusal to tender the bonds was in bad faith under state common law and the state statutes alleged in Section VI.B below;

q.     Whether the Court can enter declaratory and injunctive relief; and

r.     The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution.

207.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

208.   Certification under Rule 23(b)(1) of the Federal Rules of Civil Procedure is appropriate because Meracord possesses no meaningful assets (including available insurance) that could be used to satisfy a judgment in this action. The only realistic sources of funds to satisfy any judgment are statutory surety bonds held by Meracord. Meracord has less than $20 million in outstanding bonds. As outlined in Appendix A, damages in this action exceed $484 million even before RICO trebling. Therefore, certification of a Rule 23(b)(1) class is necessary to ensure that any recovered funds are equitably distributed.

## VI.   CLAIMS FOR RELIEF

### A.  CLAIMS ON THE BONDS

#### COUNT I
#### CLAIM ON THE BONDS FOR DECLARATORY & INJUNCTIVE RELIEF
#### (28 U.S.C § 2201-2202)

#### (On Behalf of Entire Class)

209.   The Class has requested that the Sureties tender the Bonds described below. The Sureties have refused or, in the case of Arizona and Washington, have conditioned the tender on inappropriately broad releases. Therefore, an actual controversy exists between Plaintiffs and the Class, and the Sureties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

210.   The Class therefore requests a declaration that each and every Bond Amount described

CLASS ACTION COMPLAINT AND JURY DEMAND - 54

below, as listed in Appendix A, is due and owing to the Class, as well as an injunction requiring each Bond Amount described below to be paid to the Class. A state-by-state description of the basis for the requested declaratory relief is discussed below.

### 1.   ALABAMA

211.  In Alabama, Platte River issued Bond Number 41180191, in the amount of $10,000, signed July 24, 2009 ("the Alabama Bond"), on Meracord's behalf. The Alabama Bond is attached to this Complaint as Exhibit 17.

212.  The Alabama Bond was issued pursuant to the Alabama Sale of Checks Act, Ala. Code 1975 § 8-7-1 *et seq.* ("the Alabama Statute").

213.  The Alabama Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

214.  The Alabama Statute requires a bond:

> to secure the ***faithful performance*** of the obligations of the applicant and the agents and subagents of the applicant with respect to the receipt, transmission, and payment of money in connection with the sale or issuance or dispensing of checks or the payment of obligors' bills, invoices, or accounts.

Ala. Code § 8-7-7 (emphasis added).

215.  The Alabama Bond is issued:

> for the use and benefit of any creditor of [Meracord] for ***any liability incurred*** in connection with the transmission or payment of money . . . and for the use and benefit of ***any other person damaged*** by any failure to comply with the provisions of the Sale of Checks Act or by any breach of the conditions of this obligation.

Exhibit 17 (emphasis added).

216.  The Alabama Bond requires, in relevant part, that Meracord:

> ***faithfully conform*** to and abide by the provisions of [the Alabama Statute] and ***faithfully apply all funds received*** and perform all obligations and undertakings under [the Alabama Statute] and will pay . . . to any person all money that becomes due and owing . . . to such person . . . because of any . . . instruments for the transmission of money . . . .

Exhibit 17 (emphasis added).

217.  The Final Judgment is a "liability incurred in connection with [Meracord's]

CLASS ACTION COMPLAINT AND JURY DEMAND - 55



transmission or payment of money," and the Class is composed of "person[s] damaged" by Meracord's breach of its obligations under the Bond.

218.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully perform its obligations under the Alabama Statute and the Alabama Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

219.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Alabama in the amount of $8,401,551.06.

## 2.  **ALASKA**

220.  In Alaska, Platte River issued Bond Number 41180210, in the amount of $30,000, signed August 5, 2009 ("the Alaska Bond"), on Meracord's behalf. The Alaska Bond is attached to this Complaint as Exhibit 18.

221.  The Alaska Bond was issued pursuant to the Alaska Uniform Money Services Act, AS § 06.55.101 *et seq.* ("the Alaska Statute").

222.  The Alaska Statute allows expressly for a private right of action, providing that "[a] claimant against a money transmission licensee may maintain an action on the bond." AS § 06.55.104(c).

223.  The Alaska Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

224.  The Alaska Statute requires a bond:

> to secure the ***faithful performance*** of the obligations of the money transmission licensee with respect to money transmission.
> Alaska Stat. Ann. § 06.55.104 (emphasis added).

225.  The Alaska Bond provides that it:

> secures the faithful performance of the obligations of the [Meracord] as a money transmission licensee . . . with respect to Uniform Money Services Act.
> Exhibit 18 (emphasis added).

CLASS ACTION COMPLAINT AND JURY DEMAND - 56



226.  The Alaska Bond requires, in relevant part, that Meracord:

> fully conforms to and abides by the provisions of the [Alaska Statute] and . . . ***pay to any person or persons who may have a cause of action*** against the obligor of said bond under the provision of [that Alaska Statute] ***any and all moneys that may become due or owning*** [sic] . . . to such person or persons . . . under and by virtue of the provisions of [the Alaska Statute].

Exhibit 18 (emphasis added).

227.  The damages outlined in the Final Judgment are "moneys due and owing" to the class "under and by virtue of" Meracord's money transmission activities under the Alaska Statute.

228.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully perform its obligations under the Alaska Statute and the Alaska Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

229.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Alaska in the amount of $1,898,430.86. These damages, before any trebling, exceeded the penal limit of the Bond.

### 3.   ARIZONA[14]

230.  In Arizona, Fidelity issued Bond Number 8935314, in the amount of $100,000, effective November 29, 2008 ("the Arizona Bond"), on Meracord's behalf. The Arizona Bond is attached to this Complaint as Exhibit 19.

231.  The Arizona Bond was issued pursuant to Title 6, Chapter 7, Arizona Revised Statutes, A.R.S. § 6-801 *et seq.* ("the Arizona Statute"). The Arizona Statute allows implicitly for a private right of action, providing that the Bond is

> ***payable to any person injured by*** the failure of the licensee to comply with the requirements of this chapter or for the ***wrongful act, default, fraud or misrepresentation of the licensee*** or his employees and to this state for the benefit of the person injured.

---

[14] Fidelity has agreed to tender the Arizona bond but the parties disagree on the scope of an appropriate release. The parties are continuing to negotiate and, if an agreement is reached, it will moot this portion of the request for declaratory relief.

CLASS ACTION COMPLAINT AND JURY DEMAND - 57

A.R.S. § 6-814(C) (emphasis added).

232.  The Arizona Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

233.  The Arizona Bond is issued:

> for the use and benefit of any injured person . . . *to be paid to any person injured by the wrongful act, default, fraud or misrepresentation* of the licensee or his employees and to the State of Arizona for the benefit of the person injured . . . .

Exhibit 19 (emphasis added).

234.  The Arizona Bond requires, in relevant part, that Meracord:

> . . . *strictly, honestly and faithfully comply* with the provisions of [the Arizona Statute], *and* shall *pay all damages suffered by any person injured by the wrongful act, default, fraud or misrepresentation* of [Meracord] or [its] employees, or both, growing out of any transaction governed by the provisions of such statutes . . . .

Exhibit 19 (emphasis added).

235.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in "wrongful act[s]," "fraud," and "misrepresentation" under the Arizona Statute and the Arizona Bond, and failed to "strictly, honestly and faithfully" perform its obligations under the Arizona Statute and the Arizona Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

236.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Arizona in the amount of $16,968,239.23. These damages, before any trebling, exceeded the penal limit of the Bond.

### 4.   ARKANSAS

237.  In Arkansas, Platte River issued Bond Number 41201953, in the amount of $50,000, effective July 31, 2010 ("the Arkansas Bond"), on Meracord's behalf. The Arkansas Bond is attached to this Complaint as Exhibit 20.

238.  The Arkansas Bond was issued pursuant to the Arkansas Uniform Money Services Act, A.C.A. § 23-55-101 *et seq.* ("the Arkansas Statute"). The Arkansas Statute allows expressly

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

for a private right of action, providing that "[a] claimant against a licensee may maintain an action on the bond." A.C.A. § 23-55-204(c).

239. The Arkansas Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

240. The Arkansas Statute requires a bond:

> payable to the State **for the benefit of any claimant against the licensee** to secure the **faithful performance** of the obligations of the licensee with respect to money transmission.

> Ark. Code Ann. § 23-55-204 (emphasis added).

241. It is a violation of the Arkansas Statute if "the licensee engages in **fraud, intentional misrepresentation, or gross negligence**." A.C.A. § 23-55-801(a)(3) (emphasis added).

242. The Arkansas Bond is issued:

> for the use and benefits of claimants against [Meracord] . . . to secure the **faithful performance** of the obligations of the Principal for its conduct under [the Arkansas Statute].

Exhibit 20 (emphasis added).

243. The Arkansas Bond requires, in relevant part, that Meracord:

> fully complies with the provisions of [the Act] and pays and discharges **all amounts owed upon any judgment or order obtained in any court of competent jurisdiction** . . . by any person or persons who may be injured or damaged by [Meracord] conducting business as a Money Transmitter . . . including judgments in suits for the misappropriation of any funds paid into or deposited with the Principal.

Exhibit 20 (emphasis added).

244. The Final Judgment is an "amount owed upon any judgment obtained in any court of competent jurisdiction," and the Class is composed of "persons . . . injured or damaged by [Meracord] conducting business as a Money Transmitter."

245. By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully perform its obligations under the Arkansas Statute and the Arkansas Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

CLASS ACTION COMPLAINT AND JURY DEMAND - 59



246.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Arkansas in the amount of $3,741,038.29. These damages, before any trebling, exceeded the penal limit of the Bond.

## 5.  **CALIFORNIA**

247.  In California, Fidelity issued Bond Numbers 9076415 and 9076416, in the amounts of $2,000,000 and $500,000, respectively, effective April 15, 2012 (together, "the California Bond"), on Meracord's behalf. The California Bond is attached to this Complaint as Exhibit 21.

248.  The California Bond was issued pursuant to the California Money Transmission Act, Cal. Fin. Code § 2000 *et seq.* ("the California Statute"). The California Statute allows expressly for a private right of action, providing that "[s]uit to recover on any bond may be brought by ***any party aggrieved*** in a court of competent jurisdiction of any county in which the licensee has an agent." Cal. Fin. Code § 2037(g).

249.  The California Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

250.  The California Statute requires a bond:

> to secure the ***faithful performance*** of the obligations of the licensee with respect to money transmission in California.

Cal. Fin. Code. § 2037(a) (emphasis added).

251.  The California Statute is violated when "[t]he licensee engages in ***fraud, intentional misrepresentation, or gross negligence***." Cal. Fin. Code § 2149(a)(3).

252.  The California Bond requires, in relevant part, that Meracord "***faithfully perform*** the obligations of the licensee with respect to money transmissions in California and obligations arising from [the California Statute]." Exhibit 21 (emphasis added).[15]

253.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully perform its obligations under the California Statute and the California Bond. Tender of

---

[15]   Both California Bonds contain identical language.

CLASS ACTION COMPLAINT AND JURY DEMAND - 60



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

254.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of California in the amount of $43,310,443.64. These damages, before any trebling, exceeded the penal limit of the Bond.

## 6.  COLORADO

255.  In Colorado, Fidelity issued Bond Number 8935306, in the amount of $1,000,000, effective August 6, 2008 ("the Colorado Bond"), on Meracord's behalf. The Colorado Bond is attached to this Complaint as Exhibit 22.

256.  The Colorado Bond was issued pursuant to the Colorado Money Transmitters Act, Colo. Rev. Stat. Ann. § 12-52-101 *et seq.* ("the Colorado Statute"). The Colorado Statute allows implicitly for a private right of action, since it provides that after "pay[ing] any claim of judgment to . . . [a claimant against the licensee], the corporate surety shall give notice to the banking board . . . of such a payment." Colo. Rev. Stat. Ann. § 12-52-116(1).

257.  The Colorado Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

258.  The Colorado Statute requires that Meracord:

> *faithfully conform* to and abide by the provisions of this article and will *honestly and faithfully apply all funds received* for the performance of all obligations and undertakings for exchange issued and sold under this article and will *pay to* the state and to *any person all money that becomes due and owing* to the state or to such person under the provisions of this article because of any exchange sold or issued by such licensee.

C.R.S.A. § 12-52-107(1)(a) (emphasis added)

259.  The Colorado Statute provides that the Bond is "for the use and benefit of . . . any creditor of the licensee for *any liability incurred* on any exchange issued by the licensee."[16] Colo. Rev. Stat. Ann. § 12-52-107(1)(a).

260.  The Colorado Bond is issued:

---

[16] "'Exchange' means any check, draft, money order, or other instrument for the transmission or payment of money or credit." Colo. Rev. Stat. Ann. § 12-52-103.

CLASS ACTION COMPLAINT AND JURY DEMAND - 61

for the use and benefit of . . . ***any creditor of the licensee for any liability*** incurred on any exchange issued by the licensee under and by virtue of the provisions of the Money Transmitters Act (Act) of Colorado . . . .

Exhibit 22 (emphasis added).

261.  The Colorado Bond requires, in relevant part, that Meracord

***faithfully conform to and abide by*** the provisions of the [Colorado Statute] and . . . honestly and ***faithfully apply all funds received*** and perform all obligations . . . and will pay to . . . any person all money that becomes due and owing . . . because of any exchange sold or issued [by Meracord] . . . .

Exhibit 22 (emphasis added).

262.  The Final Judgment is a "liability incurred on [an] exchange issued by [Meracord]."

263.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully conform to and abide by the Colorado Statute, and failed to faithfully apply all funds received by Class members, in violation of the terms of the Colorado Statute and the Colorado Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

264.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Colorado in the amount of $8,363,590.85. These damages, before any trebling, exceeded the penal limit of the Bond.

## 7.   CONNECTICUT

265.  In Connecticut, Fidelity issued Bond Number 8935315, in the amount of $300,000, effective November 1, 2007 ("the Connecticut Bond"), on Meracord's behalf. The Connecticut Bond is attached to this Complaint as Exhibit 23.

266.  The Connecticut Bond was issued pursuant to the Connecticut Money Transmission Act, Conn. Gen. Stat. Ann. § 36a-595 *et seq.* ("the Connecticut Statute"). The Connecticut Statute allows expressly for a private right of action, providing that:

***Any person who may be damaged*** as a result of the failure by the licensee or the licensee's authorized delegates to perform obligations with respect to the licensee's money transmission business in this state ***may proceed against the licensee's bond*** to recover damages.

CLASS ACTION COMPLAINT AND JURY DEMAND - 62



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    Conn. Gen. Stat. Ann. § 36a-602(b).

2        267.   The Connecticut Statute does not require that a claimant obtain a legal judgment

3    before pursuing recovery on Bonds issued under the Statute.

4        268.   The Connecticut Statute requires a bond

5            conditioned upon the licensee and the licensee's authorized delegates
             ***faithfully performing all obligations*** with respect to the licensee's money
6            transmission business in this state and conducting such business in this
             state consistent with the provisions of [the Connecticut Statute] . . . . [and]
7            [t]he proceeds of the bond . . . shall be deemed by operation of law to be
             ***held in trust for the benefit of any claimants*** against the licensee ***to serve***
8            ***the faithful performance of the obligations*** of the licensee . . . with
             respect to the licensee's money transmission business in
9            [Connecticut] . . . .

10   Conn. Gen. Stat. Ann. § 36a-602(a)–(b).

11       269.   The Connecticut Statute is violated by a licensee " engaging in ***fraud, intentional***

12   ***misrepresentation or gross negligence***." Conn. Gen. Stat. Ann. § 36a-608(b) (emphasis added).

13       270.   The Connecticut Bond is issued "for the use of the people of the State and the

14   [Banking] Commissioner, as Obligees," and requires, in relevant part, that Meracord

15           ***faithfully perform [its] obligations*** . . . with respect to the receipt,
             handling, transmission or payment of money in connection with the . . .
16           transmission of money.

17   Exhibit 23 (emphasis added).

18       271.   By the conduct outlined in this Complaint—including, but not limited to, racketeering,

19   fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to

20   faithfully perform its obligations under the Connecticut Statute and the Connecticut Bond.

21   Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to

22   Class members under the Statute.

23       272.   Meracord's conduct as alleged above resulted in actual damages to Class members

24   resident of Connecticut in the amount of $7,496,231.23. These damages, before any trebling,

25   exceeded the penal limit of the Bond.

26

27                                **8.   <u>DELAWARE</u>**

28       273.   In Delaware, Platte River issued Bond Number 41180316, in the amount of $25,000,

CLASS ACTION COMPLAINT AND JURY DEMAND - 63

signed September 21, 2009 ("the Delaware Bond"), on Meracord's behalf. The Delaware Bond is attached to this Complaint as Exhibit 24.

274.  The Delaware Bond was issued pursuant to the Delaware Sale of Checks Act, Del. Code Ann. tit. 5, § 2301 *et seq.* ("the Delaware Statute").

275.  The Delaware Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

276.  The Delaware Statute required Meracord to conduct its business "***honestly, fairly, equitably***, carefully and efficiently within the purposes of the intent of [the Delaware Statute] and ***in the manner commanding the confidence and trust of the community***." Del. Code. Ann. tit. 5, § 2305(2) (emphasis added).

277.  The Delaware Statute is violated if the licensee engages in

> business activities or practices . . . which could be deemed ***unfair or deceptive*** by nature of intent . . . . [including] the use of ***tactics which mislead*** the consumer, ***misrepresent*** the consumer transaction or any part thereof, or otherwise ***create false expectations*** on the part of the consumer.

Del. Code Ann. tit. 5, § 2315(a)(3).

278.  The Delaware Bond is issued:

> for the benefit of all consumers injured by any ***wrongful act, omission, default, fraud or misrepresentation*** by a licensee in the course of its activity as a licensee.

Exhibit 24 (emphasis added).

279.  The Delaware Bond requires, in relevant part, that Meracord "***faithfully comply*** with and abide by the provisions of [the Delaware Statute] and will commit no ***wrongful act, default, fraud or misrepresentation***." Exhibit 24 (emphasis added).

280.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in wrongful acts, fraud, and misrepresentation, failed to conduct its business honestly and fairly, and failed to faithfully comply with the terms of the Delaware Statute and the Delaware Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to

CLASS ACTION COMPLAINT AND JURY DEMAND - 64



Class members under the Statute.

281.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Delaware in the amount of $1,706,170.25. These damages, before any trebling, exceeded the penal limit of the Bond.

### 9.  FLORIDA

282.  In Florida, Platte River issued Bond Number 41167020, in the amount of $800,000, effective February 1, 2009 ("the Florida Bond"), on Meracord's behalf. The Florida Bond is attached to this Complaint as Exhibit 25.

283.  The Florida Bond was issued pursuant to Title 33, Chapter 560, Florida Statutes, Fla. Stat. Ann. § 560.203 *et seq.* ("the Florida Statute"). The Florida Statute allows expressly for a private right of action, providing that "[c]laimants against the applicant [for a money transmitter license] may bring suit directly on the corporate surety bond." Fla. Stat. Ann. § 560.209(3)(a)

284.  The Florida Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

285.  The Florida Statute requires a bond:

> for the benefit of *any claimants in this state* against the applicant . . . to secure the *faithful performance of the obligations* of the applicant and its vendors with respect to the receipt, handling, transmission, and payment of funds.

Fla. Stat. Ann. § 560.209(3)(a) (emphasis added).

286.  The Florida Bond is issued "for the use and benefit of any claimant in the State of Florida." Exhibit 25.

287.  The Florida Bond provides, in relevant part, that it is "conditioned on conformance with [the Florida Statute]," and that "*any claimant may bring an action* in a proper court on this bond resulting from the failure of [Meracord] to *faithfully perform obligations* with respect to the receipt, handling, transmission, and payment of funds. Exhibit 25 (emphasis added).

288.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment— Meracord failed to

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

faithfully perform its obligations under the Florida Statute and the Florida Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

289.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Florida in the amount of $46,680,334.98. These damages, before any trebling, exceeded the penal limit of the Bond.

## 10.  <u>GEORGIA</u>

290.  In Georgia, Fidelity issued Bond Number 8935329, in the amount of $55,000, effective January 12, 2009 ("the Georgia Bond"), on Meracord's behalf. The Georgia Bond is attached to this Complaint as Exhibit 26.

291.  The Georgia Bond was issued pursuant to the Title 7, Chapter 1, Article 4, Code of Georgia Annotated, O.C.G.A. 7-1-680 *et seq.* ("the Georgia Statute"). The Georgia Statute allows expressly for a private right of action, providing that "[c]laimants against the licensee may bring an action directly on the surety bond. Ga. Code Ann. § 7-1-683.2(c)."

292.  The Georgia Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

293.  The Georgia Statute requires a bond

> for the benefit of ***any person damaged*** by noncompliance of a licensee with [the Georgia Statute] or to ***pay any and all moneys that may become due and owing*** any . . . claimant against the licensee arising out of the licensee's . . . money transmission in this state . . . .

Ga. Code Ann. § 7-1-683.2(c) (emphasis added).

294.  The Georgia Statute is violated if the "licensee . . . has . . . [c]ommitted any ***fraud***, engaged in ***dishonest activities***, or made any ***misrepresentation***." Ga. Code Ann. § 7-1-692(a)(1) (emphasis added).

295.  The Georgia Bond is issued "for the use and benefit of the State and of ***any claimant*** against [Meracord]." Exhibit 26 (emphasis added).

296.  The Georgia Bond requires, in relevant part, that Meracord:

CLASS ACTION COMPLAINT AND JURY DEMAND - 66

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

comply with the provisions of the [Georgia Statute] . . . **and all other laws applicable to the conduct of its business**, . . . and shall **pay any and all monies that may become due and owing any person** due to the violation of any such laws and regulations by [Meracord] through its own acts or the acts of any agent of [Meracord] . . . .

Exhibit 26 (emphasis added).

297.  In addition, the Final Judgment constitutes "monies . . . due and owing" due to Meracord's violation of "laws applicable to the conduct of its business" and "arising out of" Meracord's money transmission in Georgia.

298.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in fraud, dishonest activities, and misrepresentation, and failed to comply with the provisions of the Georgia Statute and the terms of the Georgia Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

299.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Georgia in the amount of $188,360.75. These damages, before any trebling, exceeded the penal limit of the Bond.

## 11.  <u>HAWAII</u>

300.  In Hawaii, Platte River issued Bond Number 41180155, in the amount of $10,000 effective July 9, 2009 ("the Hawaii Bond"), on Meracord's behalf. The Hawaii Bond is attached to this Complaint as Exhibit 27.

301.  The Hawaii Bond was issued pursuant to the Money Transmitters Act, Haw. Rev. Stat. § 489D-1 *et seq.* ("the Hawaii Statute"). The Hawaii Statute allows expressly for a private right of action, providing "Claimants against the licensee may bring suit directly on the security device." Haw. Rev. Stat. § 489D-7.

302.  The Hawaii Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

303.  The Hawaii Statute requires a bond "for the benefit of **any claimants** against the licensee to secure the faithful performance of the obligations of the licensee relating to the

CLASS ACTION COMPLAINT AND JURY DEMAND - 67

receipt, handling, transmission, and payment of money in connection with the sale and issuance of payment instruments or transmission of money." Haw. Rev. Stat. § 489D-7 (emphasis added).

304.  The Hawaii Statute provides that it is a violation of the Statute for a licensee to:

> (1) Directly or indirectly *employ any scheme, device, or artifice to defraud or mislead* any person, including, but not limited to, bait and switch advertising or sales practices;
>
> (2) Directly or indirectly engage in any *unfair or deceptive act or practice* toward any person, including but not limited to any false or deceptive statement about fees or other terms of a money transmission or currency exchange;
>
> (3) Directly or indirectly obtain property by *fraud or misrepresentation*;
>
> (4) Knowingly make, publish, or disseminate any *false, deceptive, or misleading information* in the provision of money services;

Haw. Rev. Stat. § 489D-23.

305.  The Hawaii Bond requires, in relevant part, that Meracord "*fully and faithfully comply* with [the Hawaii Statute]," and provides that "*any person who has been or claims to have been injured* by the breach of the above-mentioned conditions shall have a right of action to recover on this bond in his own name." Exhibit 27 (emphasis added).

306.  The Class is composed of persons injured and claiming to have been injured by Meracord's breach of its obligations under the Bond.

307.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in schemes to defraud and mislead; unfair and deceptive acts; fraud, misrepresentation; and the dissemination of misleading information; and failed to fully and faithfully perform its obligations under the Hawaii Statute, in violation of the Hawaii Statute and the terms of the Hawaii Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

308.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Hawaii in the amount of $2,885,833.25. These damages, before any trebling, exceeded the penal limit of the Bond.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## 12.  **IDAHO**

309.  In Idaho, Platte River issued Bond Number 41180203, in the amount of $15,000 effective August 3, 2009 ("the Idaho Bond"), on Meracord's behalf. The Idaho Bond is attached to this Complaint as Exhibit 28.

310.  The Idaho Bond was issued pursuant to the Idaho Money Transmitters Act, Idaho Code Ann. § 26-2901 ("the Idaho Statute"). The Idaho Statute allows expressly for a private right of action, providing "[c]laimants against the licensee or its authorized representatives may themselves bring suit directly on the security device . . ." I.C. § 26-2908(1).

311.  The Idaho Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

312.  The Idaho Statute requires a bond:

> for the benefit of *any claimants* against the licensee to *secure the faithful performance* of the obligations of the licensee with respect to the receipt, handling, transmission, and payment of money in connection with either the sale and issuance of payment instruments and the transmission of money.

Idaho Code Ann. § 26-2908 (emphasis added).

313.  The Idaho Statute required Meracord to conduct its business "*honestly, fairly, and in a manner commanding the confidence and trust of the community*." Idaho Code Ann. § 26-2910 (emphasis added).

314.  The Idaho Bond requires, in relevant part, that Meracord:

> *faithfully perform* its obligations with respect to the receipt, handling, transmission, and payment of money in connection with . . . the transmission of money pursuant to [the Idaho Statute]

Exhibit 28 (emphasis added).

315.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to conduct its business honestly, fairly, and in a manner commanding the confidence and trust of the community; and failed to faithfully perform its obligations under the Idaho Statute, in violation of the Idaho Statute and the terms of the Idaho Bond. Tender of the Bond is necessary

to secure Meracord's faithful performance of its obligations to Class members under the Statute.

316.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Idaho in the amount of $3,652,248.65. These damages, before any trebling, exceeded the penal limit of the Bond.

### 13.  ILLINOIS

317.  In Illinois, Platte River issued Bond Number 41214981, in the amount of $2,000,000, effective October 27, 2010 ("the Illinois Bond"), on Meracord's behalf. The Illinois Bond is attached to this Complaint as Exhibit 29.

318.  The Illinois Bond was issued pursuant to the Illinois Transmitters of Money Act, 205 ILCS 657/1 *et seq.* ("the Illinois Statute"). The Illinois Statute allows expressly for a private right of action, providing that "[a] claimant damaged by a breach of the conditions of a bond shall have a right to action upon the bond for damages suffered thereby and may bring suit directly on the bond." 205 ILCS 657/30(c).

319.  The Illinois Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

320.  The Illinois Statute requires a bond:

> for the benefit of ***any claimant*** against the applicant . . . with respect to the receipt, handing, transmission, and payment of money by the licensee . . . .

205 ILCS 657/30(c) (emphasis added).

321.  The Illinois Statute required Meracord to show that its "general fitness . . . and its management are such as to ***justify the confidence of the public***," and that it was "fit, willing, and able to carry on the proposed business in a ***lawful*** and ***fair*** manner. 205 ILCS 657/20(a)(5) (emphasis added).

322.  The Illinois Statute prohibits a licensee from "allow[ing] a person to act as its authorized seller until all applicable requirements of this Act have been complied with," provides that "an authorized seller has an affirmative duty not to . . . commit ***fraud*** or ***misrepresentation***," and requires a licensee to report "when it has probable cause to believe an authorized seller has

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

violated [that] affirmative duty." 205 Ill. Comp. Stat. Ann. 657/75. Front DRCs operating in Illinois were "authorized sellers" under the Illinois Statute, and Meracord had probable cause to believe they had engaged in fraud or misrepresentation.

323.  The Illinois Bond is issued "for the use of the State and of any person or persons who may have a cause of action against [Meracord]

Exhibit 29 (emphasis added).

324.  The Illinois Bond requires, in relevant part, that Meracord:

> *faithfully conform* to and abide by each and every provision of [the Illinois Statute] . . . and . . . pay to . . . any person *any and all moneys that may [become] due and owing* . . . to such person . . . under and by virtue of the provisions of [the Illinois Statute].

Exhibit 29 (emphasis added).

325.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to carry on its business in a lawful and fair manner and to justify the confidence of the public, and failed to faithfully conform to the Illinois Statute and the terms of the Illinois Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

326.   In addition, the Final Judgment constitutes "moneys . . . due and owing" to the Class by virtue of Meracord's money transmission business, carried on under the provisions of the Illinois Statute.

327.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Illinois in the amount of $16,376,224.92. These damages, before any trebling, exceeded the penal limit of the Bond.

## 14.  **INDIANA**

328.  In Indiana, Fidelity issued Bond Number 8935336, in the amount of $210,000, effective February 2, 2009 ("the Indiana Bond"), on Meracord's behalf. The Indiana Bond is attached to this Complaint as Exhibit 30.

CLASS ACTION COMPLAINT AND JURY DEMAND - 71

329.  The Indiana Bond was issued pursuant to the Indiana Money Transmitters Act ("the Indiana Statute"), Ind. Code Ann. § 28-8-4-1. The Indiana Statute allows expressly permits a private right of action, providing that a claimant may file "suit against the surety bond." Ind. Code Ann. § 28-8-4-54.

330.  The Indiana Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

331.  The Indiana Statute requires the bond run for the benefit of "individuals who reside in Indiana when they agree to receive money transmission services from the licensee." Ind. Code Ann. § 28-8-4-27. Bond payment is "conditioned upon the licensee's or any of the licensee's employees' or agents' noncompliance with or violation of this chapter or other ***applicable federal or state laws or regulations***." Ind. Code Ann. § 28-8-4-27 (emphasis added).

332.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment, Meracord failed to comply with the Indiana Money Transmitters Act and the federal RICO act. Fidelity is therefore liable to Indiana Class members. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

333.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Indiana in the amount of $13,372,177.89. These damages, before any trebling, exceeded the penal limit of the Bond.

### 15.  **IOWA**

334.  In Iowa, Platte River issued Bond Number 41167053, in the amount of $60,000, effective March 1, 2009 ("the Iowa Bond"), on Meracord's behalf. The Iowa Bond is attached to this Complaint as Exhibit 31.

335.  The Iowa Bond was issued pursuant to Iowa Uniform Money Services Act, I.C.A. § 533c.101 *et seq.* ("the Iowa Statute"). The Iowa Statute allows expressly for a private right of action, providing "[a] claimant against a licensee may maintain an action on the bond." I.C.A. § 533C.203(3).



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

336.  The Iowa Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

337.  The Iowa Statute requires a bond "*for the benefit of any claimant* against the licensee to *secure the faithful performance* of the obligations of the licensee with respect to money transmission. Iowa Code Ann. § 533C.203(2) (emphasis added).

338.  It is a violation of the Iowa Statute for the licensee to engage in "*fraud, intentional misrepresentation, or gross negligence*." Iowa Code Ann. § 533C.701(1)(c).

339.  The Iowa Bond requires, in relevant part, that Meracord:

> faithfully conform[] to and abides by the provisions of [the Iowa Statute] . . . and . . . satisfy *any loss or damages suffered by . . . any person(s) who may have a cause of action against [Meracord],*

and further provides that "any person(s) suffering such loss or damages shall have a right to bring an action on this bond against the . . . surety." Exhibit 31 (emphasis added).

340.  Class members are persons who have suffered loss and damage and have a cause of action against Meracord, and the Final Judgment represents such loss and damage.

341.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in fraud, intentional misrepresentation, and gross negligence, failed to satisfy the loss and damages suffered by the Class, and failed to faithfully perform its obligations under the Iowa Statute, in violation of the Iowa Statute and the terms of the Iowa Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

342.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Iowa in the amount of $6,248,808.75. These damages, before any trebling, exceeded the penal limit of the Bond.

## 16. **KANSAS**

343.  In Kansas, Platte River issued Bond Number 4110154, in the amount of $200,000, effective July 15, 2009 ("the Kansas Bond"), on Meracord's behalf. The Kansas Bond is attached to this Complaint as Exhibit 32.

CLASS ACTION COMPLAINT AND JURY DEMAND - 73



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

344.  The Kansas Bond was issued pursuant to the Kansas Money Transmitter Act, K.S.A. § 9-508 *et seq.* ("the Kansas Statute"). The Kansas Statute permits "***any aggrieved party***" to "enforce claims against [the] surety bond." Kan. Stat. Ann. § 9-509 (emphasis added).

345.  The Kansas Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

346.  It is a violation of the Kansas Statute to engage in any "transaction, practice or business conduct that is ***fraudulent or deceptive*** in connection with the business of money transmission" or to violate "***any other state or federal law*** applicable to money transmission." Kan. Stat. Ann. § 9-513a (emphasis added).

347.  The Kansas Bond is issued "***for the protection of those for whom such Principal has agreed to act*** as agent ill the transmission of monetary value and to ***secure the faithful performance*** of the obligations of the principal ill respect to the receipt, handling, transmission and payment of monetary value." Exhibit 32 (emphasis added).

348.  Kansas Class members are aggrieved parties within the meaning of the Kansas Statute.

349.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment, Meracord has violated the Kansas Statute by engaging in transactions, practices and business conduct that are fraudulent or deceptive in connection with the business of money transmission state and by violating federal and state law, including the federal RICO act. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

350.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Kansas in the amount of $2,151,401.30. These damages, before any trebling, exceeded the penal limit of the Bond.

## 17.  **KENTUCKY**

351.  In Kentucky, Platte River issued Bond Number 41186147, in the amount of $500,000, effective October 19, 2009 ("the Kentucky Bond"), on Meracord's behalf. The Kentucky Bond is

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   attached to this Complaint as Exhibit 33.[17]

2   352.   The Kentucky Bond was issued pursuant to the Kentucky Money Transmitters Act of

3   2006, KRS § 286.11-001 *et seq.* ("the Kentucky Statute"). The Kentucky Statute allows

4   expressly for a private right of action, providing that "[a] claimant may maintain a civil action on

5   the surety bond . . . in any . . . court of competent jurisdiction, either in one (1) action or in

6   successive actions." KRS § 286.11-013(3).

7   353.   The Kentucky Statute does not require that a claimant obtain a legal judgment before

8   pursuing recovery on Bonds issued under the Statute.

9   354.   The Kentucky Statute requires a bond:

10   for the benefit of ***any claimants*** against the licensee to ***secure the faithful
11   performance*** of the obligations of the licensee with respect to the receipt,
     handling, transmission, and payment of money in connection with . . .
     money transmissions by the licensee and its agent.

12   Ky. Rev. Stat. Ann. § 286.11-013(2) (emphasis added).

13   355.   The Kentucky Statute is violated if:

14   (f) The licensee engages in an ***unfair and deceptive act or practice***; (g)
15   The licensee engages in ***fraud, intentional misrepresentation, or gross
     negligence***; . . . (n) The competence, experience, character, financial
16   condition, or responsibility of the licensee indicates that it is not in the
     public interest to permit the licensee to continue to provide money
17   transmission services . . . .

18   Ky. Rev. Stat. Ann. § 286.11-039 (emphasis added).

19   356.   The Kentucky Bond requires, in relevant part, that Meracord:

20   principal, and its . . . agents . . . shall . . . ***faithfully conform to and abide
     by*** each and every provision of [the Kentucky Statute] . . ., and shall
21   ***reimburse all persons who suffer loss*** by reason of a violation of [the
     Statute] or rules adopted thereunder.

22   Exhibit 33 (emphasis added).

23   357.   By the conduct outlined in this Complaint—including, but not limited to, racketeering,

24   fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in

25

26   _____

27   [17]   In addition to Platte River's Bond, Fidelity also issued Bond # 9076441in Kentucky, in the
     amount of $500,000, effective September 5, 2012. The language of the Bonds is identical, and the Class
     seeks recovery on both Bonds for their respective Bond Periods, which can be determined upon further
28   discovery. Both Bonds are attached as Exhibit 33.[17]

HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

fraud, intentional misrepresentation, and gross negligence, and failed to faithfully conform to and abide by the Kentucky Statute, in violation of the Kentucky Statute and the terms of the Kentucky Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

358.   In addition, the Final Judgment represents losses suffered by reason of Meracord's failure to faithfully conform to the Kentucky Statute, and Meracord has failed to reimburse the Class for those losses.

359.   Meracord's conduct as alleged above resulted in actual damages to Class members resident of Kentucky in the amount of $4,086,811.33. These damages, before any trebling, exceeded the penal limit of the Bond.

### 18.  **LOUISIANA**

360.   In Louisiana, Platte River issued Bond Number 41167088, in the amount of $350,000, effective March 20, 2009 ("the Louisiana Bond"), on Meracord's behalf. The Louisiana Bond is attached to this Complaint as Exhibit 34.

361.   The Louisiana Bond was issued pursuant to the Louisiana Sale of Checks and Money Transmission Act, La. Rev. Stat. Ann. 6:1031 *et seq.* ("the Louisiana Statute"). Pursuant to the Statute, the Louisiana Bond is issued "for the use and benefit of . . . ***creditors of the licensee*** . . . for ***any liability incurred on any money transferred or check issued by the licensee or agent***." La. Rev. Stat. Ann. 6:1037 (emphasis added).

362.   The Louisiana Statute allows expressly for a private right of action providing that "[p]ersons who have claims against the licensee or his agents may bring suit directly on the bond." La. Rev. Stat. Ann 6:1037(C)."

363.   Louisiana prohibits all for-profit debt adjusting. *See* La. Rev. Stat. Ann. 14:331.

364.   The Louisiana Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

365.   Under the Louisiana Statute, Meracord is liable for all "money [it] is obligated to transmit." La. Rev. Stat. Ann. 6:1042.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

366.  The Louisiana Bond is issued "for the use of . . . any person who may have a cause of action against the principal under the [Louisiana Statute]." R.S. 6: 1 031, *et seq.* Exhibit 34.

367.  The Louisiana Bond requires, in relevant part, that Platte River "shall ***pay . . . to any person or persons any and all monies that may be due and owing*** to . . . to such person or persons from the Principal-Licensee." Exhibit 34 (emphasis added).

368.  The claims that form the Final Judgment are "claims against the licensee," Meracord, within the meaning of the Louisiana Statute. The claims that form the Final Judgment arise out of monies that Meracord was obligated and did transmit from Class members accounts and then fraudulently misappropriated for the benefit of itself and its co-conspirators. Class members are creditors of Meracord within the meaning of the Louisiana Statute and the Final Judgment represents "liability incurred on . . . money transferred . . . by the licensee" Meracord or its agents, the Front DSCs.

369.  The Final Judgment represents "moneys due and owing" to Class members by virtue of the provisions of the Louisiana Bond, since Meracord engaged in the wrongful conduct alleged above in the performance of its duties under the Louisiana Statute. La. Rev. Stat. Ann. 6:1037. Among other things, Meracord performed debt adjusting for profit in violation of La. Rev. Stat. Ann. 14:331.

370.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, violations of La. Rev. Stat. Ann. 14:331, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in wrongful acts, fraud, and misrepresentation, failed to pay all moneys due to the Class, and failed generally to faithfully perform its obligations under the Louisiana Statute, in violation of the Louisiana Statute and the terms of the Louisiana Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

371.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Louisiana in the amount of $8,293,679.83. These damages, before any trebling, exceeded the penal limit of the Bond.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

19.  **MAINE**

372.  In Maine, Platte River issued Bond Number 41180190, in the amount of $100,000, effective July 24, 2009 ("the Maine Bond"), on Meracord's behalf. The Maine Bond is attached to this Complaint as Exhibit 35.

373.  The Maine Bond was issued pursuant to the Maine Money Transmitters Act, Me. Rev. Stat. tit. 32, § 6101 *et seq.* ("the Maine Statute").

374.  The Maine Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

375.  The Maine Statute requires that the required bond "run to the administrator ***for the benefit of any claimants against the licensee to secure the faithful performance of the obligations of the licensee*** with respect to the receipt, handling, transmission and payment of money in connection with the sale and issuance of payment instruments and transmission of money." Me. Rev. Stat. tit. 32, § 6107 (emphasis added).

376.  The Maine statute prohibits a licensee from "conducting its business in an ***unsafe or unsound manner***," Me. Rev. Stat. tit. 32, § 6119(1)(B), and subjects a licensee to liability for "***gross negligence or intentional acts that result in harm*** to a person" who transmits money. Me. Rev. Stat. tit. 32, § 6120 (emphasis added).

377.  The Maine Bond provides that it is "for use of any person or persons who may have a cause of action against the Principal of this bond under the provisions of the [Maine Money Transmitter Act]" Exhibit 35.

378.  Through the Maine Bond, Platte River guaranteed that Meracord would "***faithfully perform*** the duties and obligations pertaining to the transmission of money." Exhibit 35 (emphasis added).

379.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment, Meracord failed to faithfully perform its duties and obligations as a money transmitter, conducted its business in an unsafe and unsound manner and intentionally defrauded the Maine Class members, all in

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

violation of the Maine Statute and the terms of the Maine Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

380. Meracord's conduct as alleged above resulted in actual damages to Class members resident of Maine in the amount of $2,369,514.51. These damages, before any trebling, exceeded the penal limit of the Bond.

## 20. <u>MARYLAND</u>

381. In Maryland, Fidelity issued Bond Number 8935326, in the amount of $1,000,000, effective January 1, 2009 ("the Maryland Bond"), on Meracord's behalf. The Maryland Bond is attached to this Complaint as Exhibit 36.

382. The Maryland Bond was issued pursuant to the Maryland Money Transmission Act, MD Code, Financial Institutions, § 12-401, *et seq.* ("the Maryland Statute").

383. The Maryland Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

384. The Maryland Statute requires a bond:

> for the benefit of ***any individual who has been damaged*** by a violation of State law or regulation governing the business of money transmission committed by a licensee or an authorized delegate of a licensee. . . . [and that] shall be conditioned so that the licensee and any authorized delegate of the licensee shall comply with all State and federal laws and regulations governing the business of money transmission and shall ***fulfill all obligations to all parties*** to a money transmission.

Md. Code Ann., Fin. Inst. § 12-412(c) (emphasis added).

385. The Maryland Statute is violated if the licensee

> [c]ommits a ***fraud***; . . . [e]ngages in an ***illegal or dishonest activity***; . . . [v]iolates [the Maryland Statute] . . . or any other law regulating the business of money transmission; or . . . [o]therwise demonstrates ***unworthiness, bad faith, dishonesty,*** or any other quality that indicates that the business of the licensee has not been or will not be conducted ***honestly, fairly***, equitably, and efficiently. . . .

Md. Code Ann., Fin. Inst. § 12-426(a) (emphasis added).

386. The Maryland Bond requires, in relevant part, that Meracord:

CLASS ACTION COMPLAINT AND JURY DEMAND - 79

*faithfully conforms* to and abides by *each and every provision of applicable laws* and regulations while engaging in the business to which this bond applies; then this obligation is to be void.

Exhibit 36 (emphasis added).

387.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in fraud, illegal or dishonest activity; demonstrated unworthiness, bad faith, dishonesty, and other qualities indicating its business was not conducted honestly or fairly; and failed to faithfully conform to applicable laws and regulations, all in violation of the Maryland Statute and the terms of the Maryland Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

388.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Maryland in the amount of $15,776,570.67. These damages, before any trebling, exceeded the penal limit of the Bond.

## 21.  **MICHIGAN**

389.  In Michigan, Fidelity issued Bond Number 8966789, in the amount of $500,000 effective December 31, 2010 ("the Michigan Bond"), on Meracord's behalf. The Michigan Bond is attached to this Complaint as Exhibit 37.

390.  The Michigan Bond was issued pursuant to the Michigan Money Transmission Services Act, M.C.L.A. 487.1001, *et seq.* ("the Michigan Statute").

391.  The Michigan Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

392.  The Michigan Statute requires a bond:

*for the benefit of* any individuals who are Michigan residents and who are creditors or *claimants* of the applicant and its authorized delegates through purchase of a payment instrument from the applicant . . ., and *secures the faithful performance* of the obligations of the applicant and its authorized delegates with respect to the receipt of money in connection with the conduct of its money transmission services business.

M.C.L.A. 487.1013(5)(c) (emphasis added).

393.  The Michigan Statute is violated if "[t]he licensee engages in *fraud, intentional*

CLASS ACTION COMPLAINT AND JURY DEMAND - 80

*misrepresentation, or gross negligence.*" Mich. Comp. Laws Ann. § 487.1041(1) (emphasis added).

394.  The Michigan Bond is issued "for the use of . . . *any person or persons who may have a cause of action* against the above principal under the provisions of [the Michigan Statute]." Exhibit 37 (emphasis added).

395.  The Michigan Bond requires, in relevant part, that Meracord:

> *conform to and comply with each and every provision of the act* and all rules and regulations lawfully promulgated thereunder by the Commissioner . . ., and will *pay* to . . . such persons or persons, *any and all moneys that may become due or owing* . . . to such person or persons . . . by virtue of the provisions of [the act] . . . ."

Exhibit 37 (emphasis added).

396.  The Final Judgment represents moneys due and owing to Michigan Class members by virtue of the provisions of the Michigan Statute, since Meracord engaged in the wrongful conduct alleged above in the performance of its duties under the Michigan Statute.

397.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in fraud, intentional misrepresentation, and gross negligence, failed to pay all moneys due to the Class under the provisions of the Michigan Statute, and failed generally to faithfully perform its obligations under the Michigan Statute, in violation of the Michigan Statute and the terms of the Michigan Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

398.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Michigan in the amount of $14,222,259.40. These damages, before any trebling, exceeded the penal limit of the Bond.

## 22.  <u>MINNESOTA</u>

399.  In Minnesota, Platte River issued Bond Number 41167031, in the amount of $25,000 effective February 13, 2009 ("the Minnesota Bond"), on Meracord's behalf. The Minnesota Bond is attached to this Complaint as Exhibit 38.



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

400. The Minnesota Bond was issued pursuant to the Minnesota Money Transmitters Act, Minn. Stat. Ann. § 53B.01, *et seq.* ("the Minnesota Statute"). The Minnesota Statute allows expressly for a private right of action, providing "Claimants against the licensee may themselves bring suit directly on the security device or the commissioner may bring suit on behalf of these claimants, either in one action or in successive actions. Minn. Stat. Ann. § 53B.08(subd. 1).

401. The Minnesota Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

402. The Minnesota Statute requires a bond:

> for the benefit of any claimants against the licensee to **secure the faithful performance** of the obligations of the licensee with respect to the receipt, handling, transmission, and payment of money in connection with the sale and issuance of payment instruments or transmission of money.

Minn. Stat. Ann. § 53B.08(subd. 1) (emphasis added).

403. The Minnesota Bond is issued:

> to **secure the compliance** of the Principal with the terms of [the Minnesota Statutes] and **any other legal obligations arising out of the Principal's conduct as a Money Transmitter**[, and is] **for the benefit of . . . any person suffering damages** by reason of the Principal's failure to comply with [the Minnesota Statute] or other legal obligation arising out of Principal's conduct as a Money Transmitter.

and further provides that "any person damaged as a result of such violation, shall have, in addition to all other legal remedies, a right of action on this bond in the name of the injured party for loss sustained by the injured party." Exhibit 38 (emphasis added).

404. By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully perform its obligations under the Minnesota Statute and other legal obligations arising out of Meracord's conduct as a money transmitter, in violation of the Minnesota Statute and the terms of the Minnesota Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

405. Meracord's conduct as alleged above resulted in actual damages to Class members resident of Minnesota in the amount of $11,326,539.60. These damages, before any trebling,

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

exceeded the penal limit of the Bond.

### 23. **MISSISSIPPI**

406.  In Mississippi, Platte River issued Bond Number 41174171, in the amount of $500,000, effective May 5, 2009 ("the Mississippi Bond"), on Meracord's behalf. The Mississippi Bond is attached to this Complaint as Exhibit 39.

407.  The Mississippi Bond was issued pursuant to the Mississippi Money Transmitters Act, Miss. Code. Ann. § 75-15-1 *et seq.* ("the Mississippi Statute"). The Mississippi Statute allows expressly for a private right of action, providing that *"[a]ny claimants against the applicant* or his agents may themselves bring suit directly on the bond." Miss. Code Ann. § 75-15-11(b).

408.  The Mississippi Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

409.  The Mississippi Statute requires a bond:

> for the use and benefit of . . . any claimants against the applicant or his agents to *secure the faithful performance* of the obligations of the applicant and his agents with respect to the receipt, handling, transmission and payment of money in connection with money transmissions in Mississippi.

Miss. Code. Ann. § 75-15-11(b) (emphasis added).

410.  The Mississippi Bond provides that "any person . . . aggrieved by the misconduct of [the] Principal, . . . may upon recovering judgment . . . maintain any action upon the bond . . . provided the Commissioner, Department of Banking and Consumer Finance, assents thereto." Exhibit 39.

411.  The Mississippi Bond requires, in relevant part, that Meracord:

> *comply with and abide by* the provisions of the [Mississippi Statute] and . . . will *pay* . . . to any other person *under the provisions of [the Statute]* or of any check, draft, money order, personal money order, or other instrument for the transmission or payment of money issued by the Principal within this State . . . .

Exhibit 39 (emphasis added).

412.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to pay

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   under the provisions of the Mississippi Statute, and failed generally to faithfully perform its

2   obligations under the Mississippi Statute, in violation of the Mississippi Statute and the terms of

3   the Mississippi Bond. Tender of the Bond is necessary to secure Meracord's faithful performance

4   of its obligations to Class members under the Statute.

5        413.  Meracord's conduct as alleged above resulted in actual damages to Class members

6   resident of Mississippi in the amount of $2,729,093.96. These damages, before any trebling,

7   exceeded the penal limit of the Bond.

8        414.  Plaintiffs have received authorization to proceed with this suit from the Mississippi

9   Department of Banking and Consumer Finance, as required by the terms of the Mississippi

10   Bond.

## 24.  MISSISSIPPI


## 24.  MISSOURI

11        415.  In Missouri, Fidelity issued Bond Number 8966777, in the amount of $1,000,000,

12   effective October 10, 2010 ("the Missouri Bond"), on Meracord's behalf. The Missouri Bond is

13   attached to this Complaint as Exhibit 40.

14        416.  The Missouri Bond was issued pursuant to the Missouri Sale of Checks Law,

15   V.A.M.S. § 361.700 *et seq.* ("the Missouri Statute").

16        417.  The Missouri Statute does not require that a claimant obtain a legal judgment before

17   pursuing recovery on Bonds issued under the Statute.

18        418.  The Missouri Statute requires a bond:

> to secure the ***faithful performance*** of the obligations of the applicant . . .
> with respect to the receipt, transmission, and payment of money in
> connection with the sale or issuance of checks . . . .

Mo. Ann. Stat. § 361.711 (emphasis added).

        419.  The Missouri Statute required Meracord to conduct its business "***honestly*** and

efficiently," and be "in ***compliance with all other applicable state and federal laws***." Mo. Ann.

Stat. § 361.715.

        420.  The Missouri Bond is issued:

CLASS ACTION COMPLAINT AND JURY DEMAND - 84



for the use and benefit of the State and of **any creditor of a licensee** for **any liability** incurred on any check issued by the licensee under and by virtue of the provisions of the sale of checks law . . . .

Exhibit 40 (emphasis added).

421.   The Missouri Bond requires, in relevant part, that Meracord:

*faithfully conform* to and abide by the provisions of this statute and will *honestly and faithfully apply all funds received* and perform all obligations and undertakings under the aforesaid statute and will **pay to . . . any person all money that becomes due and owing** . . . to such person under the provisions of the aforesaid statute . . . .

Exhibit 40 (emphasis added).

422.   By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in dishonest conduct; failed to faithfully conform to the Missouri Statute; and failed to faithfully apply all funds received from the Class; and failed to pay to the Class all money due and owing, all in violation of the Missouri Statute and the terms of the Missouri Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

423.   Meracord's conduct as alleged above resulted in actual damages to Class members resident of Missouri in the amount of $9,430,734.00. These damages, before any trebling, exceeded the penal limit of the Bond.

## 25.  **NEBRASKA**

424.   In Nebraska, Platte River issued Bond Number 41174223, in the amount of $100,000 effective May 29, 2009 ("the Nebraska Bond"), on Meracord's behalf. The Nebraska Bond is attached to this Complaint as Exhibit 41.

425.   The Nebraska Bond was issued pursuant to the Nebraska Money Transmitters Act, Neb. Rev. Stat. § 8-2701 *et seq.* ("the Nebraska Statute"). The Nebraska Statute allows expressly for a private right of action, providing "[a]ny claimant against the licensee may bring suit directly on the bond." Neb. Rev. Stat. § 8-2727(1)(a).

426.   The Nebraska Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

CLASS ACTION COMPLAINT AND JURY DEMAND - 85



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

427. The Nebraska Statute requires a bond:

> for the benefit of ***any claimants against the licensee*** to secure the ***faithful performance*** of the obligations of the licensee with respect to the receipt, handling, transmission, and payment of money in connection with money transmission.

Neb. Rev. Stat. § 8-2727(1)(a) (emphasis added).

428. The Nebraska Statute required Meracord to conduct its business "***honestly***, ***fairly***, and ***in a manner commanding the confidence and trust of the community***." Neb. Rev. Stat. § 8-2726.

429. The Nebraska Bond requires, in relevant part, that Meracord:

> ***faithfully perform*** [its] obligations . . . with respect to the receipt, handling, transmission and payment of money in connection with the license and shall ***strictly comply*** with the provisions of the [Nebraska Statute] . . . . [and] shall ***satisfy any loss or damage suffered by . . . any person dealing with [Meracord] resulting from [Meracord's] violation*** of any provision of the [Statute], [and further provides that] . . . ***any person suffering such loss or damage, has the right to bring an action on this bond*** against the . . . Surety.

Exhibit 41 (emphasis added).

430. By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to conduct its business honestly, fairly, and in a manner commanding the confidence and trust of the community, failed to satisfy loss and damage suffered by the Class as a result, and failed to faithfully perform its obligations under the Nebraska Statute, in violation of the Nebraska Statute and the terms of the Nebraska Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

431. Meracord's conduct as alleged above resulted in actual damages to Class members resident of Nebraska in the amount of $3,508,251.64. These damages, before any trebling, exceeded the penal limit of the Bond.

## 26. **NEVADA**

432. In Nevada, Platte River issued Bond Number 41174170, in the amount of $10,000, effective May 5, 2009 ("the Nevada Bond"), on Meracord's behalf. The Nevada Bond is attached

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

to this Complaint as Exhibit 42.

433.  The Nevada Bond was issued pursuant to Title 55, Chapter 671, Nevada Rev. Stat., Nev. Rev. Stat. Ann. § 671.010 *et seq.* ("the Nevada Statute").

434.  The Nevada Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

435.  The Nevada Statute requires a bond to "***secure the faithful performance*** of the obligations of the licensee respecting the sale or issuance of checks and receipt for transmission or transmission of money." Nev. Rev. Stat. Ann. § 671.100 (emphasis added).

436.  The Nevada Statute required Meracord to conduct its business "***lawfully, honestly, fairly*** and efficiently," and not "in such a ***manner as to render the licensee's further operations hazardous to the public***." Nev. Rev. Stat. Ann. § 671.160 (emphasis added).

437.  The Nevada Bond requires, in relevant part, that Meracord "***faithfully perform*** the obligations of [the Nevada Statute]." Exhibit 42 (emphasis added).

438.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to conduct its business lawfully, honestly, and fairly, and failed generally to faithfully perform its obligations under the Nevada Statute, in violation of the Nevada Statute and the terms of the Nevada Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

439.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Nevada in the amount of $8,622,199.63. These damages, before any trebling, exceeded the penal limit of the Bond.

## 27.  **NEW HAMPSHIRE**

440.  In New Hampshire, Fidelity issued Bond Number 8935323, in the amount of $100,000, effective November 30, 2008 ("the New Hampshire Bond"), on Meracord's behalf. The New Hampshire Bond is attached to this Complaint as Exhibit 43.

441.  The New Hampshire Bond was issued pursuant to Title XXXVI, Chapter 399-G, New

CLASS ACTION COMPLAINT AND JURY DEMAND - 87

Hampshire Revised Statutes, N.H. Rev. Stat. § 399-G:1 *et seq.* ("the New Hampshire Statute").

442.  The New Hampshire Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

443.  The New Hampshire Bond requires, in relevant part, that Meracord "***faithfully comply*** with any and all provisions of [the New Hampshire Statute]," and specifically "provides for suit [on the bond] by ***any person who has a cause of action*** under [the New Hampshire Statute]." Exhibit 43 (emphasis added).

444.  The New Hampshire Statute requires a bond "***for the benefit of any person who is damaged by any violation*** of this chapter." N.H. Rev. Stat. § 399-G:5(II)(c) (emphasis added).

445.  The New Hampshire Statute provides:

> It is unlawful for any person, in connection with the solicitation, offer, or transaction of money transmission, directly or indirectly: (a) To employ ***any device, scheme, or artifice to defraud***; (b) To make ***any untrue statement of a material fact*** or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice, or course of business which operates or would operate as a ***fraud or deceit*** upon any person.

N.H. Rev. Stat. Ann. § 399-G:18-a (emphasis added).

446.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—committed each of the acts cited in the previous paragraph, in violation of the New Hampshire Statute and the terms of the New Hampshire Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

447.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of New Hampshire in the amount of $1,602,750.07. These damages, before any trebling, exceeded the penal limit of the Bond.

## 28.  **NEW JERSEY**

448.  In New Jersey, Fidelity issued Bond Number 8935317, in the amount of $150,000 effective November 30, 2008 ("the New Jersey Bond"), on Meracord's behalf. The New Jersey

CLASS ACTION COMPLAINT AND JURY DEMAND - 88

1   Bond is attached to this Complaint as Exhibit 44.

2   449.  The New Jersey Bond was issued pursuant to the New Jersey Money Transmitters Act,

3   N.J.S.A. § 17:15C-1 *et seq.* ("the New Jersey Statute").

4   450.  The New Jersey Statute requires a bond:

5   for the benefit of any person injured by a wrongful act, default, fraud or
    misrepresentation of the licensee, . . . to secure the ***faithful performance***

6   of the obligations of the licensee with respect to the receipt, handling,
    transmission, and payment of money in connection with the . . .

7   transmission of money . . . .

8   N.J. Stat. Ann. § 17:15C-8 (emphasis added).

9   451.  Under New Jersey law, an "obligee for whose benefit the obligor obtains a surety bond

10  may proceed on the bond when the obligor defaults." *New Jersey Div. of Taxation v. Selective*

11  *Ins. Co. of Am.*, 944 A.2d 667, 672 (App. Div. 2008). Meracord has defaulted on its obligations,

12  including by among other things failing to pay the Final Judgment.

13  452.  The New Jersey Bond provides that it is "for the use and benefit of ***any person***

14  ***injured*** by the licensee or its employees under and by virtue of the provision of the Money

15  Transmitters Act." Exhibit 44 (emphasis added).

16  453.  Through the New Jersey Bond, Fidelity guaranteed that Meracord would

17  ***faithfully comply*** with and abide by the provisions of [the Money
    Transmitters Act] and all rules and regulations promulgated or to be

18  promulgated pursuant thereto and [would] commit ***no wrongful act,***
    ***default, omission, fraud or misrepresentation*** and perform all obligations

19  and undertakings ***honestly, fairly***, equitably and efficiently when engaging
    in the Money Transmitter . . . business in this State by virtue of the

20  provisions of [the New Jersey Statute].

21  Exhibit 44 (emphasis added).

22  454.  By the conduct outlined in this Complaint—including, but not limited to, racketeering,

23  fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in

24  wrongful acts, default, fraud and misrepresentations, failed to pay all moneys due to the Class,

25  and failed generally to faithfully, honestly, fairly, and equitably perform its obligations under the

26  New Jersey Statute, in violation of the New Jersey Statute and the terms of the New Jersey Bond.

27  Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to

28
    CLASS ACTION COMPLAINT AND JURY DEMAND - 89

Class members under the Statute.

455.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of New Jersey in the amount of $19,610,666.43. These damages, before any trebling, exceeded the penal limit of the Bond.

## 29.  **NEW YORK**

456.  In New York, Fidelity issued Bond Number 8935347, in the amount of $500,000 effective July 2, 2009 ("the New York Bond"), on Meracord's behalf. The New York Bond is attached to this Complaint as Exhibit 45.

457.  The New York Bond was issued pursuant to N.Y. Banking Law § 643 *et seq.* ("the New York Statute"). The New York Statute allows expressly for a private right of action, providing

> in the event that a judgment recovered against the licensee . . . by any such purchaser or holder on a claim arising or a transaction entered into during the life of the bond shall remain unsatisfied after the expiration of thirty days . . . then *an action may be maintained against the corporate surety* under the terms of the bond . . . by such purchaser or holder for the amount of such judgment not exceeding the amount of the bond . . .[18]

N.Y. Banking Law § 643(2) (emphasis added).

458.  The New York Statute provides that

> each bond shall constitute a *trust fund for the exclusive benefit of* the purchasers and holders of the New York instruments . . .[19]

N.Y. Banking Law § 643(1) (McKinney) (emphasis added).

459.  The New York Statute required Meracord to conduct its business "*honestly, fairly, equitably*, carefully and efficiently within the purposes and intent of this article, and *in a manner commanding the confidence and trust of the community*." N.Y. Banking Law § 642(1) (emphasis added).

460.  The New York Bond is issued for "the benefit of . . . *any person or persons who may*

---

[18]    Identical language is contained in the Bond. *See* Exhibit 45.

[19]    "'Payment instrument' means any check, draft, money order, or other instrument or order for the transmission or payment of money, whether or not such instrument or order is negotiable, and sold to one or more persons. N.Y. Banking Law § 640(5).

CLASS ACTION COMPLAINT AND JURY DEMAND - 90

***have a cause of action against the Principal*** for ***failure to carry out the terms*** of any New York instrument which the Principal shall have issued or sold," and "[t]he proceeds of [the Bond] . . . constitute a ***trust fund*** for the exclusive benefit of the purchasers and holders of the licensee's New York instruments." Exhibit 45 (emphasis added).

461.  The New York Bond requires, in relevant part, that Meracord:

> comply with and abide by the provisions of [the New York Statute] . . . and will ***honestly and faithfully perform*** all obligations and undertakings in connection with the issuance, sale, and payment of any New York Instruments issued or sold . . . and ***will pay . . . to any person(s) all money that becomes due and owing*** to . . . such person(s) under the [Statute], because of any New York instrument issued or sold . . . .

Exhibit 45 (emphasis added).

462.  The Final Judgment constitutes a judgment on a claim arising or a transaction entered into during the life of the Bond.

463.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to conduct its business honestly, fairly, and equitably, and failed generally to honestly and faithfully perform its obligations under the New York Statute, in violation of the New York Statute and the terms of the New York Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

464.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of New York in the amount of $43,671,792.60. These damages, before any trebling, exceeded the penal limit of the Bond.

## 30.  **NORTH CAROLINA**

465.  In North Carolina, Platte River issued Bond Number 41167067, in the amount of $150,000 effective March 5, 2009 ("the North Carolina Bond"), on Meracord's behalf. The North Carolina Bond is attached to this Complaint as Exhibit 46.

466.  The North Carolina Bond was issued pursuant to the North Carolina Money Transmitters Act, N.C.G.S. § 53-208.1 *et seq.* ("the North Carolina Statute"). The North Carolina

CLASS ACTION COMPLAINT AND JURY DEMAND - 91

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Statute allows expressly for a private right of action, providing that "[c]laimants against the licensee may themselves bring suit directly on the security bond." N.C.G.S. § 53-208.8(a).

467.  The North Carolina Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

468.  The North Carolina Statute requires a bond "to secure the **faithful performance** of the obligations of the licensee with respect to the receipt, handling, transmission, and payment of money or monetary value in connection with the . . . transmission of money." N.C.G.S. § 53-208.8(a) (emphasis added).

469.  The North Carolina Statute required Meracord to conduct its business "**honestly**, **fairly**, and in a **manner commanding the confidence and trust of the community**." N.C.G.S. § 53-208.10 (emphasis added).

470.  The North Carolina Bond is issued:

> **for the use and benefit of claimants against the Principal** . . ., to secure the faithful performance of the obligations of the Principal with respect to the receipt, handling, transmission, or payment of money . . . in connection with . . . transmissions of money by the Principal . . . under the [North Carolina Statute] . . . .

Exhibit 46 (emphasis added).

471.  The North Carolina Bond requires, in relevant part, that Meracord:

> **faithfully perform** all the obligations under the Act with respect to the receipt, handling, transmission, and payment of money . . . in connection with . . . transmissions of money, **and will pay . . . to any person entitled thereto, all money that becomes due and owing** . . . to such person, because of any . . . transmission of money issued or transacted by the Principal . . . under the [North Carolina Statute] . . . .

Exhibit 46 (emphasis added).

472.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to conduct its business honestly, fairly, and in a manner commanding the confidence and trust of the community; failed to pay all moneys due to the Class because of Meracord's money transmissions, and failed generally to faithfully perform its obligations under the North Carolina Statute, in violation of the North Carolina Statute and the terms of the North Carolina Bond.

CLASS ACTION COMPLAINT AND JURY DEMAND - 92

Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

473.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of North Carolina in the amount of $9,732,260.47. These damages, before any trebling, exceeded the penal limit of the Bond.

## 31.  <u>NORTH DAKOTA</u>

474.  In North Dakota, Platte River issued Bond Number 41180314, in the amount of $150,000, effective September 23, 2009 ("the North Dakota Bond"), on Meracord's behalf. The North Dakota Bond is attached to this Complaint as Exhibit 47.

475.  The North Dakota Bond was issued pursuant to Title 13, Chapter 13-09, North Dakota Century Code, NDCC, 13-09-01 *et seq.* ("the North Dakota Statute"). The North Dakota Statute allows expressly for a private right of action, providing that "[c]laimants against the licensee may themselves bring suit directly on the security device . . . ." NDCC, 13-09-05(1).

476.  The North Dakota Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

477.  The North Dakota Statute requires a bond:

> for the benefit of ***any claimants*** against the licensee to secure the ***faithful performance*** of the obligations of the licensee with respect to the receipt, handling, transmission, and payment of money in connection with . . . transmission of money.

NDCC, 13-09-05(1) (emphasis added).

478.  The North Dakota Bond requires, in relevant part, that Meracord "***faithfully perform*** its obligations with respect to the receipt, handling, transmission, and payment of money in connection with . . . the transmission of money pursuant to [the North Dakota Statute]," and that in the event of a violation, the Bond will be "paid to . . . a claimant or authorized representative of a claimant." Exhibit 47 (emphasis added).

479.  It is a violation of the North Dakota Statute for a licensee to knowingly:

> 2. ***Directly or indirectly, employ any device, scheme, or artifice to defraud or mislead any person***.



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

3. Directly or indirectly, *make any untrue statement of a material fact or to omit to state a material fact*.

4. Engage in any *unfair or deceptive practice* toward any person. . . .

6. Fail to make disclosures as required by this chapter and any other applicable state or federal law and regulations.

7. Fail to comply with this chapter or rules adopted under this chapter or *fail to comply with any other state or federal law*, including the rules and regulations thereunder, applicable to any business authorized or conducted under this chapter.

8. Make, in any manner, *any false or deceptive statement or representation*. . . .

11. *Fail to truthfully account for moneys* belonging to or collected from another.

N.D. Cent. Code Ann. § 13-09-25.

480.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—committed each of the acts cited in the previous paragraph, in violation of the North Dakota Statute and the terms of the North Dakota Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

481.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of North Dakota in the amount of $817,831.82. These damages, before any trebling, exceeded the penal limit of the Bond.

## 32.  <u>OHIO</u>

482.  In Ohio, Fidelity issued Bond Number 8935340, in the amount of $2,000,000, effective April 1, 2009 ("the Ohio Bond"), on Meracord's behalf. The Ohio Bond is attached to this Complaint as Exhibit 48.

483.  The Ohio Bond was issued pursuant to the Title 13, Chapter 1315, Ohio Revised Code, R.C. § 1315.01 *et seq.* ("the Ohio Statute"). The Ohio Statute allows expressly for a private right of action, providing that the Superintendent of the Ohio Division of Financial Institutions "may authorize claimants to bring their own actions on the bond." R.C. 1315.07(A)(2). The Superintendent has provided such authorization for this action. *See* Exhibit 15, Letter from C. Dolezal to S. Paynter (Dec. 19, 2014).

CLASS ACTION COMPLAINT AND JURY DEMAND - 94



484.  The Ohio Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

485.  The Ohio Statute requires a bond:

> for the benefit of ***any claimants*** against the licensee, to secure the ***faithful performance*** of the obligations of the licensee with respect to its receipt of money from persons in this state for transmission.

R.C. § 1315.07(A)(2) (emphasis added).

486.  The Ohio Bond is issued "for the benefit of persons who shall deposit money . . . with [Meracord] . . . for transmission of money." Exhibit 48.

487.  The Ohio Bond requires, in relevant part, that Meracord:

> ***faithfully hold and transmit*** all money . . . which shall be delivered to or deposited with [Meracord] for money transmission in accordance with the laws of the State of Ohio . . . .

Exhibit 48 (emphasis added).

488.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully hold and transmit money belonging to the Class in accordance with the laws of the State of Ohio (in addition to its common law fraud and breach of fiduciary duty, Meracord violated the Ohio Debt Adjuster Act, R.C. § 4710.01, by, among other things, failing to make timely distributions to creditors and charging illegal fees under the Act); and failed to faithfully perform its obligations under the Ohio Statute and the terms of the Ohio Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

489.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Ohio in the amount of $26,807,867.56. These damages, before any trebling, exceeded the penal limit of the Bond.

490.  Plaintiffs have received authorization to proceed with this suit from the Ohio Department of Commerce, Division of Financial Institutions, as required by R.C. § 1315.07(A)(2).

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

### 33. **OKLAHOMA**

491.  In Oklahoma, Platte River issued Bond Number 41167077, in the amount of $50,000 effective March 23, 2009 ("the Oklahoma Bond"), on Meracord's behalf. The Oklahoma Bond is attached to this Complaint as Exhibit 49.

492.  The Oklahoma Bond was issued pursuant to the Oklahoma Financial Transaction Reporting Act, Okla. Stat. Ann. tit. 6, § 1511 *et seq.* ("the Oklahoma Statute").

493.  The Oklahoma Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

494.  The Oklahoma Bond binds the surety "unto . . . money transmission customers of [Meracord] . . . for ***all obligations and liabilities incurred with respect to any money transmission business*** provided by [Meracord] under the [Oklahoma Statute]." Exhibit 49 (emphasis added).

495.  The Oklahoma Bond requires, in relevant part, that Meracord:

> ***faithfully perform*** all duties, obligations and requirements under the [Statute] and the terms of any agreement with their customers for the transmission of money under the [Statute], and shall faithfully account for and promptly pay over to those entitled thereto all amounts or sums of money due under the terms of such agreements and [the Statute] . . . .

Exhibit 49 (emphasis added).

496.  The Final Judgment is a "liability incurred with respect to . . . money transmission business provided by [Meracord]."

497.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully perform its obligations under the Oklahoma Statute, in violation of the Oklahoma Statute and the terms of the Oklahoma Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

498.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Oklahoma in the amount of $5,752,789.17. These damages, before any trebling, exceeded the penal limit of the Bond.

CLASS ACTION COMPLAINT AND JURY DEMAND - 96



### 34. **PENNSYLVANIA**

499.  In Pennsylvania, Fidelity issued Bond Number 8935304, in the amount of $1,000,000, effective June 27, 2008 ("the Pennsylvania Bond"), on Meracord's behalf. The Pennsylvania Bond is attached to this Complaint as Exhibit 50.

500.  The Pennsylvania Bond was issued pursuant to Title 7 P.S., Chapter 53, Pennsylvania Statutes and Consolidated Statutes, 7 P.S. § 6101 *et seq.* ("the Pennsylvania Statute").

501.  The Pennsylvania Statute requires a bond

> for the use of . . . ***any person or persons who may have a cause of action against the licensee*** for failure to carry out the terms of any transmittal instrument which the licensee shall have issued . . . .

7 P.S. § 6106(a)(3) (emphasis added)

502.  The Pennsylvania Statute requires as a condition of the Bond that

> the ***licensee will comply with and abide by the provisions of this act*** . . . and that the licensee will pay . . . to any . . . person any moneys that may become due from the licensee . . . under the provisions of this act . . .

7 P.S. § 6106(a)(3) (emphasis added).

503.  The Pennsylvania Statute allows an action upon the Pennsylvania Bond for "any person . . . aggrieved by the ***misconduct*** of any licensee." 7 P.S. § 6106(a)(3) (emphasis added).

504.  The Pennsylvania Statute required Meracord "to operate [its] business ***honestly***, ***fairly*** and in accordance with [the Pennsylvania Statute]." 7 P.S. § 6104 (emphasis added).

505.  The Pennsylvania Bond is issued:

> for the use of . . . any person or persons who may have a cause of action against the licensee for failure to carry out the terms of any transmittal instrument

Exhibit 50 (emphasis added).

506.  The Pennsylvania Bond requires, in relevant part, that Meracord:

> comply with and abide by the provisions of this act . . . and that the licensee will ***pay to . . . any other person any moneys that may become due*** from the licensee to . . . any other person under the provisions of this act or of any transmittal instrument

Exhibit 50 (emphasis added).

507.  The Pennsylvania Bond allows an action upon it for "any person . . . aggrieved by the

CLASS ACTION COMPLAINT AND JURY DEMAND - 97

*misconduct* of any licensee." Exhibit 50 (emphasis added).

508.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in misconduct, failed to pay moneys due to the Class, and failed to conduct its business honestly and fairly, all in violation of the Pennsylvania Statute and the terms of the Pennsylvania Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

509.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Pennsylvania in the amount of $37,269,259.79. These damages, before any trebling, exceeded the penal limit of the Bond.

510.  Plaintiffs have received authorization to proceed with this suit from the Pennsylvania Department of Banking and Securities, as required by 7 P.S. § 6106(a)(3).

## 35.  RHODE ISLAND

511.  In Rhode Island, Platte River issued Bond Number 41174262, in the amount of $50,000, effective June 23, 2009 ("the Rhode Island Bond"), on Meracord's behalf. The Rhode Island Bond is attached to this Complaint as Exhibit 51.

512.  The Rhode Island Bond was issued pursuant to the Title 19, Chapters 14 and 14.3 of the General Laws of Rhode Island 1956, R.I. Gen. Laws Ann. § 19-14-1, *et seq.* & R.I. Gen. Laws Ann. § 19-14.3-1 *et seq.* ("the Rhode Island Statute"). The Rhode Island Statute allows expressly for a private right of action, providing "[e]very person who has . . . deposited money . . . to be forwarded to a foreign correspondent, who has acquired any judgment, debt, claim, or demand relating to the transaction against any person named as principal in any bond . . ., arising from defalcation, embezzlement, negligence, breach of contract, or violation of any duty required under this title, shall have a cause of action upon the bond for all damages sustained." R.I. Gen. Laws § 19-14.3-3.3.

513.  The Rhode Island Statute requires a bond:

> *for the use . . . of any person who may have a cause of action* against the obligor of the bond *under the provisions of this title* . . . . The bond shall

CLASS ACTION COMPLAINT AND JURY DEMAND - 98

be conditioned upon the obligor **faithfully conforming** to, and abiding by, the provisions of this title and of all rules and regulations lawfully made, and the obligor will pay to . . . any person **any and all money that may become due or owing** . . . to the person from the obligor under, and by virtue of, the provisions of this title.

R.I. Gen. Laws Ann. § 19-14-6(c) (emphasis added).

514.  The Rhode Island Statute is violated if "[t]he licensee has committed any **fraud, engaged in any dishonest activities, or made any misrepresentation**; (5) The licensee has violated any provisions of this title or any regulation issued pursuant to this title; . . . or (7) The licensee has demonstrated incompetency or **untrustworthiness** to act as a licensee pursuant to this chapter." R.I. Gen. Laws Ann. § 19-14-13 (emphasis added).

515.  The Rhode Island Bond is issued:

for the use of . . . any person or persons, who may have a cause of action against the principal for failure to pay any . . . instrument for the transmission of payment . . . issued or received in connection with the electronic transfer of funds in the State of Rhode Island under and by virtue of the provisions of [the Rhode Island Statute].

Exhibit 51 (emphasis added).

516.  The Rhode Island Bond requires, in relevant part, that Meracord:

**conform and abide by each and every provision** of [the Rhode Island statute] . . . and shall **pay to . . . any such person or persons any and all monies that may become due or owing** . . . to such person . . . under and by virtue of the provisions of [the Statute] upon any . . . instrument for the transmission or payment of money issued by or received in connection with the electronic transfer of funds by the principal . . . within this State.

Exhibit 51 (emphasis added).

517.  The Final Judgment represents "moneys due and owing" to Class members by virtue of the provisions of the Statute, since Meracord engaged in the wrongful conduct alleged above in the performance of its duties under the Statute.

518.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in fraud, dishonest activities, and misrepresentation; demonstrated untrustworthiness to act as a licensee; failed to pay all monies due to the Class, and failed to faithfully perform its obligations under the Rhode Island Statute, in violation of the Rhode Island Statute and the terms of the

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Rhode Island Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

519. Meracord's conduct as alleged above resulted in actual damages to Class members resident of Rhode Island in the amount of $2,575,094.09. These damages, before any trebling, exceeded the penal limit of the Bond.

## 36. **SOUTH DAKOTA**

520. In South Dakota, Platte River issued Bond Number 41180209, in the amount of $100,000, effective August 5, 2009 ("the South Dakota Bond"), on Meracord's behalf. The South Dakota Bond is attached to this Complaint as Exhibit 52.

521. The South Dakota Bond was issued pursuant to Title 51a, Chapter 51A-17, South Dakota Codified Laws, SDCL § 51A-17-a *et seq.* ("the South Dakota Statute"). The South Dakota Statute allows expressly for a private right of action, providing "[a]ny claimant against the licensee may bring suit directly on the security device." SDCL § 51A-17-8.

522. The South Dakota Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

523. The South Dakota Statute requires a bond "*for the benefit of any claimants* against the licensee to secure the *faithful performance* of the obligations of the licensee with respect to the receipt, handling, transmission, and payment of money in connection with . . . the transmission of money." S.D. Codified Laws § 51A-17-8 (emphasis added).

524. The South Dakota Statute required Meracord to conduct its business "*honestly, fairly, and in a manner commanding the confidence and trust of the community*," S.D. Codified Laws § 51A-17-17 (emphasis added).

525. The South Dakota Bond is issued:

> *for the use and benefit of any claimant* of the Licensee for *any liability* incurred with respect to any and all moneys that may become due and owing any claimant of the Licensee arising out of the Licensee's business in the State of South Dakota as a Money Transmitter . . . .

and provides further that

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

In the event that a ***judgment recovered against the Licensee . . . by any such claimant*** on a claim arising or a transaction entered into during the life of the Bond . . . shall remain unsatisfied after the expiration of thirty days from the [judgment] . . . ., then . . . [s]uch claimants may bring suit directly against the Surety . . . .

Exhibit 52 (emphasis added).

526.   The South Dakota Bond requires, in relevant part, that Meracord:

***faithfully conform to and abide by*** the provisions of [the South Dakota Statute] and will ***pay to any claimant of the Licensee all moneys that become due and owing*** to such claimant because of any . . . instrument for the transmission or payment of money issued and sold by Licensee . . . in the State of South Dakota . . . .

Exhibit 52 (emphasis added).

527.   The Final Judgment represents "moneys due and owing" to Class members because of Meracord's money transmission services in the South Dakota, since Meracord engaged in the wrongful conduct alleged above in the performance of its duties as a money transmitter under the Statute.

528.   By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to conduct its business honestly, fairly, and in a manner commanding the confidence and trust of the community; failed to pay all moneys due to the Class; and failed generally to faithfully perform its obligations under the South Dakota Statute, in violation of the South Dakota Statute and the terms of the South Dakota Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

529.   Meracord's conduct as alleged above resulted in actual damages to Class members resident of South Dakota in the amount of $1,004,159.76. These damages, before any trebling, exceeded the penal limit of the Bond.

## 37.  <u>TENNESSEE</u>

530.   In Tennessee, Fidelity issued Bond Number 8966774, in the amount of $60,000, effective September 22, 2010 ("the Tennessee Bond"), on Meracord's behalf. The Tennessee Bond is attached to this Complaint as Exhibit 53.

CLASS ACTION COMPLAINT AND JURY DEMAND - 101



531.  The Tennessee Bond was issued pursuant to the Tennessee Money Transmitter Act of 1994, Tenn. Code Ann. § 45-7-201 *et seq.* ("the Tennessee Statute"). The Tennessee Statute allows expressly for a private right of action, providing "[c]laimants against the licensee or its authorized agents may themselves bring suit directly on the security device." Tenn. Code Ann. § 45-7-208(a).

532.  The Tennessee Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

533.  The Tennessee Statute requires a bond:

> ***for the benefit of any claimants*** against the licensee to ***secure the faithful performance*** of the obligations of the licensee with respect to the receipt, handling, transmission, and payment of money in connection with the . . . transmission of money . . . .

Tenn. Code Ann. § 45-7-208(a) (emphasis added).

534.  The Tennessee Bond is issued:

> ***for the use and benefit of*** . . . ***any creditor*** of a licensee . . . ***for any liability incurred*** with respect to the receipt, handling, transmission, or payment of money on any . . . instrument for the transmission or payment of money issued by [Meracord] under and by virtue of the provisions of [the Tennessee Statute].

Exhibit 53 (emphasis added).

535.  The Tennessee Bond requires, in relevant part, that Meracord:

> ***conform to and comply*** with each and every provision of the [Tennessee Statute] . . . and . . . ***honestly and faithfully apply all funds received*** and perform all obligations in connection with [its money transmission services under the Statute] . . . and ***will pay . . . to any person entitled thereto all money that becomes due and owing*** . . . to such person under the provision of the [Statute] because of any . . . instrument for the transmission of payment of money issued by [Meracord] . . . .

Exhibit 53 (emphasis added).

536.  The Final Judgment is a "liability incurred" under the meaning of the Bond language, and represents "money due and owing" to Class members by under the provisions of the Statute, since Meracord engaged in the wrongful conduct alleged above in the performance of its duties under the Statute.

537.  By the conduct outlined in this Complaint—including, but not limited to, racketeering,

fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—failed to pay all moneys due to the Class, failed to honestly and faithfully apply all funds received from Class members, and failed to faithfully perform its obligations under the Tennessee Statute, in violation of the Tennessee Statute and the terms of the Tennessee Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

538.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Tennessee in the amount of $6,507,283.81. These damages, before any trebling, exceeded the penal limit of the Bond.

## 38.  **TEXAS**

539.  In Texas, Fidelity issued Bond Number 8935318, in the amount of $500,000, effective October 3, 2007 ("the Texas Bond"), on Meracord's behalf. The Texas Bond is attached to this Complaint as Exhibit 54.

540.  The Texas Bond was issued pursuant to the Texas Money Services Act, V.T.C.A., Finance Code § 151.001 *et seq.* ("the Texas Statute"). The Texas Statute allows expressly for a private right of action, providing "[a] claimant may bring suit directly on the security." Tex. Fin. Code Ann. § 151.308(d).

541.  The Texas Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

542.  The Texas Statute requires a bond:

> be ***payable to any claimant*** . . . for ***any liability arising out of*** the license holder's money transmission business in this state, incurred under, subject to, or by virtue of this chapter . . . .

Tex. Fin. Code Ann. § 151.308 (emphasis added).

543.  The Texas Bond is issued:

> for the use and benefit of ***any such customer of the license holder for any liability incurred*** with respect to any . . . money transmission business conducted . . . under, subject to, or by virtue of the provisions of [the Texas Statute].

CLASS ACTION COMPLAINT AND JURY DEMAND - 103

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    Exhibit 54 (emphasis added).

2        544.  The Texas Bond requires, in relevant part, that Meracord:

3        *faithfully conform* to and abide by the provisions of [the Texas Statute]
        and will ***honestly and faithfully apply all funds received*** and perform all
4        obligations and undertakings in connection with any . . . money
        transmission business . . . and will pay . . . to any customer . . . ***all money***
5        ***that becomes due and owing*** . . . to such person under the provisions of
        the [Statute] because of any such business by the license holder under and
6        by virtue of the provisions of the [Statute] . . . .

7    Exhibit 54 (emphasis added).

8        545.  The Final Judgment is a "liability arising out of [Meracord's] money transmission

9    business" in Texas, and represents "moneys due and owing" to Class members by virtue of the

10   provisions of the Statute, since Meracord engaged in the wrongful conduct alleged above in the

11   performance of its duties under the Statute.

12       546.  By the conduct outlined in this Complaint—including, but not limited to, racketeering,

13   fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to pay

14   all moneys due to the Class, failed to honestly and faithfully apply all funds received from the

15   Class, and failed to faithfully perform its obligations under the Texas Statute, in violation of the

16   Texas Statute and the terms of the Texas Bond. Tender of the Bond is necessary to secure

17   Meracord's faithful performance of its obligations to Class members under the Statute.

18       547.  Meracord's conduct as alleged above resulted in actual damages to Class members

19   resident of Texas in the amount of $53,460,876.24. These damages, before any trebling,

20   exceeded the penal limit of the Bond.

21
                              **39.  <u>VERMONT</u>**
22
23       548.  In Vermont, Platte River issued Bond Number 41180315, in the amount of $100,000

24   effective September 21, 2009 ("the Vermont Bond"), on Meracord's behalf. The Vermont Bond

25   is attached to this Complaint as Exhibit 55.

26       549.  The Vermont Bond was issued pursuant to Title 8, Chapter 79, Vermont Statutes, Vt.

27   Stat. Ann. tit. 8, § 2505 *et seq.* ("the Vermont Statute"). The Vermont Statute allows expressly

28   for a private right of action, providing that "[a] claimant against a licensee or its authorized

CLASS ACTION COMPLAINT AND JURY DEMAND - 104

delegate may maintain an action directly against the bond." Vt. Stat. Ann. tit. 8, § 2507(d).

550.  The Vermont Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

551.  The Vermont Statute requires a bond *"for the benefit of any claimant* against the licensee and its authorized delegates to *secure the faithful performance* of the obligations of the licensee and its authorized delegates with respect to money transmission." Vt. Stat. Ann. tit. 8, § 2507 (emphasis added).

552.  The Vermont Bond requires, in relevant part, that Meracord:

> *faithfully conform* to [the Vermont Statute] . . . and will pay . . . to any person or persons having a right of action against [Meracord] any and all *monies that may become due and owing* . . . to such person or persons . . . under and by virtue of the provisions of [the Vermont Statute] . . . .

and further provides that *"[a]ny person who may be damaged by neglect, default or wrongful act* of a licensee may proceed on this bond against the Principal or Surety hereon or both to recover damages." Exhibit 55 (emphasis added).

553.  The Final Judgment represents "moneys due and owing" to Class members by virtue of the provisions of the Statute, since Meracord engaged in the wrongful conduct alleged above in the performance of its duties under the Statute.

554.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in neglect, default, and wrongful acts that damaged the Class; failed to pay all moneys due to the Class; and failed to faithfully perform its obligations under the Vermont Statute, in violation of the Vermont Statute and the terms of the Vermont Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

555.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Vermont in the amount of $682,327.37. These damages, before any trebling, exceeded the penal limit of the Bond.

## 40.  <u>VIRGINIA</u>

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

556. In Virginia, Platte River issued Bond Numbers 41180261 and 41224500, in the amount of $475,000, earliest effective August 27, 2009 ("the Virginia Bond"), on Meracord's behalf. The Virginia Bond is attached to this Complaint as Exhibit 56.

557. The Virginia Bond was issued pursuant to the Virginia money transmitter law, VA Code Ann. § 6.2-1900 *et seq.* ("the Virginia Statute").

558. The Virginia Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

559. The Virginia Statute requires a bond "for the benefit of purchasers of money transmission services." Va. Code Ann. § 6.2-1904.

560. The Virginia Statute required Meracord to conduct its business "***efficiently and fairly, in the public interest***, and ***in accordance with applicable law and regulations***." Va. Code Ann. § 6.2-1906 (emphasis added).

561. The Virginia Statute provides for revocation of a license upon:

> (a) Any ground for denial of a license under this chapter; (b) Any violation of the provisions of this chapter . . . or ***any other law or regulation applicable to the conduct of the licensee's business***; . . . [or] (d) Entry of a ***judgment against such licensee involving fraud, misrepresentation, or deceit***;

Va. Code Ann. § 6.2-1907 (emphasis added).

562. The Virginia Bond requires, in relevant part, that Meracord:

> ***strictly comply*** with the provisions of [the Virginia Statute] and all regulations duly promulgated thereunder, and ***fulfill its obligations*** to . . . persons initiating or receiving money transmissions, . . . and shall ***pay and satisfy all loss, damage, and liability*** suffered by or owing to . . . any persons dealing with the principal on account of its violation of any such laws, regulations, and obligations . . . .

Exhibit 56 (emphasis added).

563. By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to operate its business fairly, in the public interest, or in accordance with applicable laws and regulations; failed to strictly comply with the Virginia Statute; failed to fulfil its obligations to the Class; and failed to satisfy the losses, damages, and liability suffered by the Class, in

violation of the Virginia Statute and the terms of the Virginia Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

564.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Virginia in the amount of $141,593.26.

### 41.  <u>WASHINGTON</u>[20]

565.  In Washington, Fidelity issued Bond Number 8935316, in the amount of $160,000, effective September 29, 2008 ("the Washington Bond"), on Meracord's behalf. The Washington Bond is attached to this Complaint as Exhibit 57.

566.  The Washington Bond was issued pursuant to the Washington Uniform Money Services Act, RCW § 19.230.005 *et seq.* ("the Washington Statute"). The Washington Statute allows expressly /for a private right of action, providing that "[a] claimant against a money transmitter licensee may maintain an action on the bond." RCW § 19.230.050(2).

567.  The Washington Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

568.  The Washington Statute requires the Bond to "run to the benefit of the state and ***any person or persons who suffer loss*** by reason of a licensee's or licensee's authorized delegate's violation of this chapter or the rules adopted under this chapter." RCW § 19.230.050(2) (emphasis added).

569.  The Washington Bond requires, in relevant part, that Meracord:

> ***faithfully conform to and abide by each and every provision*** of [the Washington Statute] . . ., and shall reimburse all persons who suffer loss by reason of a violation of [the Washington Statute] . . . .

Exhibit 57 (emphasis added).

570.  The Washington Statute provides:

---

[20]   By its June 11, 2015 letter, Fidelity offered to tender the Washington Bond, but subject to the qualification that its tender was "in exchange for an appropriate release and/or order of the court eliminating exposure to multiple liabilities." Ex. 14. The claim on the Washington Bond will become moot if the parties reach an agreement as to the scope of any release in exchange for the Washington Bond penalty amount.

CLASS ACTION COMPLAINT AND JURY DEMAND - 107

> It is a violation of this chapter for any licensee, . . . in connection with the provision of money services to:
>
> (1) Directly or indirectly employ any **scheme, device, or artifice to defraud or mislead any person**, including but not limited to engaging in bait and switch advertising or sales practices;
>
> (2) Directly or indirectly engage in any **unfair or deceptive act or practice** toward any person, including but not limited to any false or deceptive statement about fees or other terms of a money transmission or currency exchange;
>
> (3) Directly or indirectly **obtain property by fraud or misrepresentation**;
>
> (4) Knowingly make, publish, or disseminate any **false, deceptive, or misleading information** in the provision of money services; . . .

Wash. Rev. Code Ann. § 19.230.340.

571.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, violations of Washington Debt Adjusting Act and Washington Consumer Protection Act, breaches of fiduciary duty, and failure to pay the Final Judgment—committed each of the acts cited in the previous paragraph, in violation of the Washington Statute and the terms of the Washington Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

572.  Meracord's conduct as alleged above resulted in actual damages to Class members in the amount of $484,757,939.30. These damages, before any trebling, exceeded the penal limit of the Bond.

## 42.  <u>WASHINGTON, D.C.</u>

573.  In D.C., Platte River issued Bond Number 41186148, in the amount of $60,000, effective October 19, 2009 ("the D.C. Bond"), on Meracord's behalf. The D.C. Bond is attached to this Complaint as Exhibit 58.

574.  The D.C. Bond was issued pursuant to Title 26, Chapter 10, D.C. Code, DC ST § 26-1001 *et seq.* ("Money Transmissions") ("the D.C. Statute"). The D.C. Statute allows expressly for a private right of action, providing "[c]laimants against the licensee may themselves bring suit directly on the security device." D.C. Code § 26-1007(a).

575.  The D.C. Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

CLASS ACTION COMPLAINT AND JURY DEMAND - 108



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

576.  The D.C. Statute requires a bond "for the benefit of ***any claimants against the licensee*** to se***cure the faithful performance*** of the obligations of the licensee in respect to the receipt, handling, transmission, or payment of money in connection with the . . . transmission of money." D.C. Code § 26-1007(a) (emphasis added).

577.  The D.C. Bond is issued "for the use and benefit of . . . any creditor or claimant against the principal," and defines its requirements by reference to the D.C. Statute. Exhibit 58 (emphasis added).

578.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord failed to faithfully perform its obligations under the D.C. Statute, in violation of the D.C. Statute and the terms of the D.C. Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

579.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of D.C. in the amount of $644,912.56. These damages, before any trebling, exceeded the penal limit of the Bond.

### 43.  <u>WEST VIRGINIA</u>

580.  In West Virginia, Platte River issued Bond Number 41167087, in the amount of $300,000, effective March 20,2009 ("the West Virginia Bond"), on Meracord's behalf. The West Virginia Bond is attached to this Complaint as Exhibit 59.

581.  The West Virginia Bond was issued pursuant to Article 2, Chapter 32A, of the Code of West Virginia, W. Va. Code § 32A-2-1 *et seq.* ("the West Virginia Statute"). The West Virginia Statute allows expressly for a private right of action, providing that a "claimant damaged by a breach of the conditions of the bond or deposit shall, upon the assent of the commissioner, have a right of action against the bond or deposit for damages suffered thereby and may bring suit directly thereon." W. Va. Code § 32A-2-10(c).

582.  The West Virginia Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

583.  The West Virginia Statute requires that the bond be issued "for the benefit and protection of ***any claimant*** against the . . . licensee with respect to the receipt, handling, transmission, and payment of money by the licensee or authorized delegate in connection with the licensed operations in this state." W. Va. Code § 32A-2-10(c) (emphasis added).

584.  The West Virginia Statute requires that the bond "be conditioned upon compliance with the provisions" of the West Virginia Statute. W. Va. Code § 32A-2-10(c). The West Statute prohibits "***fraudulent practice*** in the conduct of the licensee's business." W. Va. Code § 32A-2-22(a)(2) (emphasis added). The West Virginia Statute further requires that a licensee "conduct its authorized business ***within the bounds of state and federal law***," which would include the federal RICO Act. W. Va. Code § 32A-2-8(d)(3) (emphasis added).

585.  The West Virginia Bond requires Meracord to "***conform to and abide by*** the provisions of [the West Virginia Statute] and of all rules and orders lawfully made or issued by the Commissioner of Banking thereunder." Exhibit 59 (emphasis added).

586.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment, Meracord has violated the West Virginia Statute, and the terms of the West Virginia Bond. Specifically, among other violations, Meracord has engaged in fraudulent practice in the conduct of its business and has failed to conduct its money transmission business within the bounds of state and federal law. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

587.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of West Virginia in the amount of $2,060,221.61. These damages, before any trebling, exceeded the penal limit of the Bond.

588.  Plaintiffs have received authorization to proceed with this suit from the West Virginia Division of Financial Institutions, as required by W. Va. Code Ann. § 32A-2-10(c).

## 44.  **WISCONSIN**

589.  In Wisconsin, Platte River issued Bond Number 41174234, in the amount of $10,000

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

effective June 3, 2009 ("the Wisconsin Bond"), on Meracord's behalf. The Wisconsin Bond is attached to this Complaint as Exhibit 60.

590.  The Wisconsin Bond was issued pursuant to the Wisconsin Seller of Checks Law, Wis. Stat. Ann. § 217.01 *et seq.* ("the Wisconsin Statute"). The Wisconsin Statute allows expressly for a private right of action, providing "claimants against the applicant . . . may themselves bring suit directly on the bond." Wis. Stat. Ann. § 217.06.

591.  The Wisconsin Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

592.  The Wisconsin Statute requires a bond:

> *for the benefit of any claimants* against the applicant or the applicant's agents to *secure the faithful performance* of the obligations of the applicant and the applicant's agents with respect to the receipt, handling, transmission and payment of money in connection with the sale of checks.

Wis. Stat. Ann. § 217.06 (emphasis added).

593.  The Wisconsin Bond is issued "for the benefit of any creditors of the principal for any act or omission of the principal covered by this bond." Exhibit 60 (emphasis added).

594.  The Wisconsin Bond requires, in relevant part, that Meracord "*shall comply* with [the Wisconsin Statute], . . . and shall pay and turn over to or for the person . . . who may have a cause of action against the principal for failure to pay any . . . instrument for the transmission of money." Exhibit 60 (emphasis added). The Bond also provides that "*any person . . . aggrieved by the misconduct of any licensee* . . . may bring suit directly upon the bond." *Id.*

595.  By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in misconduct and failed to faithfully perform its obligations under the Wisconsin Statute, in violation of the Wisconsin Statute and the terms of the Wisconsin Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

596.  Meracord's conduct as alleged above resulted in actual damages to Class members resident of Wisconsin in the amount of $7,571,680.50. These damages, before any trebling,

HB  HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

exceeded the penal limit of the Bond.

## 45. __WYOMING__

597. In Wyoming, Fidelity issued Bond Number 9076442, in the amount of $400,000, effective October 22, 2009 ("the Wyoming Bond"), on Meracord's behalf. The Wyoming Bond is attached to this Complaint as Exhibit 61.

598. The Wyoming Bond was issued pursuant to the Wyoming Money Transmitters Act, W.S.1977 § 40-22-106 *et seq.* ("the Wyoming Statute"). The Wyoming Statute allows expressly for a private right of action, providing that "[c]laimants against the licensee may bring suit directly on the security device. . . ." W.S.1977 § 40-22-106(a).

599. The Wyoming Statute does not require that a claimant obtain a legal judgment before pursuing recovery on Bonds issued under the Statute.

600. The Wyoming Statute requires a bond:

> to secure the ***faithful performance*** of the obligations of the licensee with respect to the receipt, handling, transmission and payment of money in connection with the sale and issuance of payment instruments or transmission of money . . . .

W.S.1977 § 40-22-106 (emphasis added).

601. The Wyoming statute required Meracord to act "***honestly, fairly*** and in a manner commanding the confidence and trust of the community." W.S.1977 § 40-22-110(a) (emphasis added).

602. The Wyoming Bond requires, in relevant part, that Meracord:

> ***faithfully perform*** its obligations with respect to the receipt, handling, transmission, and payment of money in connection with . . . the transmission of money pursuant to [the Wyoming Statute] . . . [and that] the surety shall indemnify and pay to . . . a claimant or authorized representative of a claimant ***all costs and damages*** by reason of principals failure to so perform . . . .

Exhibit 61 (emphasis added).

603. By the conduct outlined in this Complaint—including, but not limited to, racketeering, fraud, breaches of fiduciary duty, and failure to pay the Final Judgment—Meracord engaged in wrongful acts, fraud, and misrepresentation, failed to pay all moneys due to the Class, and failed

CLASS ACTION COMPLAINT AND JURY DEMAND - 112

generally to faithfully perform its obligations under the Wyoming Statute, in violation of the Wyoming Statute and the terms of the Wyoming Bond. Tender of the Bond is necessary to secure Meracord's faithful performance of its obligations to Class members under the Statute.

604. Meracord's conduct as alleged above resulted in actual damages to Class members resident of Wyoming in the amount of $988,125.14. These damages, before any trebling, exceeded the penal limit of the Bond.

**B. BAD FAITH CLAIMS**

    **1. Washington State Law Claims**

<div align="center">

**COUNT II**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

**(As Against Fidelity)**
**(On Behalf of the Class)**

</div>

605. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

606. Fidelity issued the Washington Bond pursuant to the Washington Statute.

607. As a result of Meracord's conduct as alleged above, Class members suffered a loss covered by the Washington Bond, as described in more detail above in Section VI.A.

608. Despite numerous requests to tender the Bond as described in Section IV.D, Fidelity did not offer to tender the Bond amount to the Class until June 11, 2015.

609. Fidelity only offered to tender the bond after receiving a copy of Plaintiffs' notice to the Washington Insurance Commissioner of the imminent filing of the *Surety I* Complaint.

610. Fidelity has a duty to conduct a reasonable investigation of Plaintiffs' and Class members' claims.

611. Fidelity's delay in conducting an investigation was unreasonable, frivolous and unfounded.

612. By the conduct alleged above, Fidelity breached its duty of good faith by its delay in investigating the claims of Plaintiffs and Class members.

613. As a direct result of Fidelity's breach of its duty of good faith and fair dealing, Plaintiffs and Class members have been damaged in that they have not been compensated for

HB HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

their injuries, and additionally have incurred substantial attorneys' fees in additional litigation resulting from Fidelity's failure to tender the Bond.

<div align="center">

**COUNT III**
**VIOLATION OF THE INSURANCE FAIR CONDUCT ACT,**
**RCW § 48.30.015**
**AND UNFAIR SETTLEMENT PRACTICES REGULATIONS,**
**WAC § 284-30-300 *ET SEQ*.**

**(As Against Fidelity)**
**(On Behalf of Plaintiffs and the Class)**

</div>

614.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

615.  Class members are first-party claimants asserting a right to coverage under the Washington Bond. As described in more detail in Section IV.D, Fidelity unreasonably denied Class members' claims for coverage or payment of benefits pursuant to the Washington Bond.

616.  Despite possessing all the necessary information to process Plaintiffs' and Class members' claims, as described in more detail in Section IV.D, Fidelity unreasonably denied Plaintiffs' and Class members' claims for coverage or payment of benefits pursuant to the Washington Bond.

617.  Despite numerous requests to tender the Washington Bond as described in Section IV.D, Fidelity did not offer to tender the bond amount to Class members until June 11, 2015.

618.  Fidelity only offered to tender the bond after receiving a copy of the notice to the Washington Insurance Commissioner of the imminent filing of the *Surety I* Complaint.

619.   Fidelity has committed unfair settlement practices described in WAC § 284-30-330, including failing to pay claims without conducting a reasonable investigation and failing to act in good faith to effectuate prompt, fair and equitable settlements of Class members' claims where liability has become reasonably clear.

620.  As described in Section IV.D, Fidelity has been on notice of Class members' claims pursuant to the Washington Bond since, at the latest, the filing of the *Cheeks* complaint on April 23, 2013. Fidelity failed to complete an investigation into Class members' claims within 30 days after notification of the claim, in violation of WAC § 284-30-370.

CLASS ACTION COMPLAINT AND JURY DEMAND - 114

621.  By letter dated May 29, 2015, the Sureties conceded that they had done virtually nothing to investigate Class members' claims.

622.  A violation of WAC §§ 284-30-330, 284-30-370, or 284-30-380 is a violation of RCW § 48.30.015.

623.  On Monday, June 8, 2015, Fidelity and the Washington State Insurance Commissioner were provided notice by certified mail of the basis for this cause of action.

624.  As a direct result of Fidelity's violation of the Insurance Fair Conduct Act and the Unfair Settlement Practices Regulations, Class members have been damaged in that they have not been compensated for their injuries, and additionally have incurred substantial attorneys' fees in additional litigation resulting from Fidelity's failure to tender the Bond.

### 2.  Other State Law Claims

## COUNT IV
## COMMON LAW BAD FAITH

### (As Against Defendants Fidelity and Platte River)
### (On Behalf of Alaska, Alabama, Arkansas, Colorado, Connecticut, Delaware, Hawaii, Iowa, Idaho, Indiana, Kentucky, Michigan, Mississippi, North Dakota, Nebraska, New Jersey, Ohio, Oklahoma, Rhode Island, South Dakota, Tennessee, Virginia, Washington, West Virginia, and Wyoming Class Members)

625.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

626.  The Sureties issued the Bonds in each state listed in this Count as described in Appendix A.

627.  The Sureties had a duty to act in good faith in responding to the claims of Class members, who were the obligees under each of the Bonds listed in Appendix A.

628.  Class members have made several demands on the Bonds, as described in Section IV.D.

629.  The Sureties failed to properly investigate the claims of Class members by conducting a reasonably prompt investigation of relevant facts.

630.  After receiving the demands, the Sureties made no effort to evaluate Class members' claims under the Bonds listed in Appendix A.

CLASS ACTION COMPLAINT AND JURY DEMAND - 115

631. As described in the Section IV.D, the Sureties have possessed all the information necessary to evaluate and calculate Class members' damages. Despite possessing this information, the Sureties failed to investigate Class members' claims.

632. By letter dated May 29, 2015, the Sureties conceded that they had done virtually nothing to investigate Class members' claims.

633. The Sureties further acted in bad faith by denying, failing to process, or failing to pay the claims made by Class members under the Bonds listed in Appendix A.

634. The Sureties' conduct was unreasonable because there was no reasonable basis in law or fact for denying and failing to process or pay the claims.

635. The Sureties knew or recklessly disregarded the fact that their conduct was unreasonable.

636. As a direct result of the Sureties' breach of their duty to act in good faith, Class members have not been compensated for the injuries caused to them by Meracord.

637. As a direct result of the Sureties' breach of their duty of good faith and fair dealing, Class members have been damaged in that they have not been compensated for their injuries, and additionally have incurred substantial attorneys' fees in additional litigation resulting from the Sureties failure to tender the Bonds.

### COUNT V
### STATUTORY BAD FAITH, IMPROPER DENIAL OF CLAIMS
### IN VIOLATION OF COLORADO R.S.A. § 10-3-1115 AND § 10-3-1116

#### (As Against Fidelity)
#### (On behalf of Colorado Class members)

638. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

639. Colorado Class members are first-party claimants asserting a claim under the Colorado Bond issued by Fidelity.

640. As a result of Meracord's conduct as alleged above, Colorado Class members suffered a loss covered by the Colorado Bond issued by Fidelity.

641. As described in Section IV.D, Fidelity made no effort to evaluate the claims brought on behalf of Colorado Class members under the Colorado Bond.

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

642.  As described in Section IV.D, Fidelity possessed all the information necessary to evaluate and calculate the Colorado Class members' damages. Despite possessing this information, Fidelity failed to investigate Class members' claims, and has claimed that they have insufficient information to evaluate the claims.

643.  Fidelity delayed or denied authorizing payment of a claim for the benefit of the Colorado Class members without a reasonable basis for that action.

644.  The Colorado Class members request an award pursuant to Colorado R.S.A. § 10-13-1116 in the amount of two times Colorado Bond Amount as listed in Appendix A, plus attorneys' fees and court costs.

## COUNT VI
### VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT AND CONNECTICUT UNFAIR INSURANCE PRACTICES ACT, CONN. GEN. STAT. § 42–110A *ET SEQ.* AND § 38A–815 *ET. SEQ.*

**(As Against Fidelity)**
**(On behalf of the Connecticut Class members)**

645.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

646.  Connecticut Class members are the obligees under the Connecticut Bond issued by Fidelity.

647.  As a result of Meracord's conduct as alleged above, Connecticut Class members suffered a loss covered by the Connecticut Bond issued by Fidelity.

648.  Fidelity has committed unfair claim settlement acts by refusing to pay Connecticut Class members' claims under the Connecticut Bond without conducting a reasonable investigation, as described in Section IV.D.

649.  Although Fidelity has possessed all the information necessary to evaluate and calculate the Connecticut Class members' damages, Fidelity has not attempted in good faith to effectuate prompt, fair, and equitable settlements of Connecticut Class members' claims for which liability has become reasonably clear.

650.  In addition to the Connecticut Bond, Fidelity has failed to investigate and failed to effectuate good faith settlements on the other bonds listed on Appendix A, and these unfair and

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

deceptive acts in the business of insurance have been committed by Fidelity with such frequency as to indicate a general business practice.

651.  By the conduct alleged above, Fidelity's unfair practice in the business of insurance deprived Connecticut Class members of the benefits to which they were entitled under the Connecticut Bond.

652.  As described in Section IV.D and alleged above, Fidelity's conduct caused substantial injury to Connecticut Class members.

653.  As a direct result of Fidelity's breach of its duty of good faith and fair dealing, the Class has been damaged in that it has not been compensated for its injuries, and additionally has incurred substantial attorneys' fees in additional litigation resulting from Fidelity's failure to tender the Bond.

## COUNT VII
### BAD FAITH IN VIOLATION OF FLA. STAT. ANN. § 624.155
**(As Against Platte River)**
**(On Behalf of Florida Class members)**

654.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

655.  Platte River issued the Florida Bond for the benefit of Florida Class members.

656.  Despite numerous requests, as described in Section IV.D, Platte River has refused to tender the Bond amount to the Class.

657.  Platte River has not undertaken a reasonable investigation to determine whether the claims of Florida Class members are valid.

658.  As described in Section IV.D, Platte River's liability under the Florida Bond has become reasonably clear, but it has continued its bad faith refusal to tender the Bond.

659.  By the conduct alleged above, Platte River has failed to diligently investigate the claims of Florida Class members in good faith.

660.  By the conduct alleged above, Platte River has failed in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward Florida Class members and with due regard for their interests. Instead, Platte

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

River has placed its own pecuniary interests ahead of those of Florida Class members.

661.  As a result of Platte River's bad faith, Florida Class members have received no compensation for the injuries caused to them by Meracord.

662.  As a direct result of Platte River's breach of its duty of good faith and fair dealing, the Class has been damaged in that it has not been compensated for its injuries, and additionally has incurred substantial attorneys' fees in additional litigation resulting from Fidelity's failure to tender the Bond.

663.  Pursuant to Fla. Stat. Ann. § 624.155(3)(a), Plaintiffs filed a "Civil Remedy Notice of Insurer Violations" with the Florida Department of Financial Services on June 11, 2015, and send a copy of that filing to the Sureties' counsel via certified mail.

<div align="center">

**COUNT VIII**
**BAD FAITH IN VIOLATION OF GEORGIA STATUTE § 33-4-6**
**(As Against Fidelity)**
**(On behalf of Georgia Class members)**

</div>

664.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

665.  Fidelity issued the Georgia Bond for the benefit of Georgia Class members.

666.  As a result of Meracord's conduct as alleged above, Georgia Class members suffered a loss covered by the Georgia Bond issued by Fidelity.

667.  As described in Section IV.D, Georgia Class members made several demands to Fidelity for payment on the Georgia Bond, including the filing of the *Cheeks* complaint on April 23, 2013.

668.  Fidelity has refused pay on the Georgia Bond within 60 days of those demands, and lacked a reasonable basis for failing to pay the claim.

669.  Fidelity acted in bad faith by refusing to pay the claim.

670.  Georgia Class members request damages in the amount of the Georgia Bond Amount listed in Appendix A, plus the statutory penalty under Ga. Stat. § 33-4-6, costs and attorney's fees.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**COUNT IX**
**VIOLATION OF ILLINOIS INSURANCE CODE,**
**215 ILL. COMP. STAT. ANN. 5/155**

**(As Against Platte River)**
**(On Behalf of Illinois Class members)**

671.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

672.   As a result of Meracord's conduct as alleged above, Illinois Class members suffered a loss covered by the Illinois Bond issued by Platte River.

673.   Class Counsel sent a demand on the Illinois Bond via email to Platte River on November 23, 2013, noting that the claims brought on behalf of Illinois Class members would exceed the amount of the Illinois Bond. *See* Exhibit 16 (Email Chain from S. Paynter to D. Veis). Despite receiving this information over 18 months ago, Platte River has continued to refuse to tender the Illinois Bond.

674.   Thus, Platte River's liability under the Illinois Bond has become reasonably clear, but Platte River has unreasonably and vexatiously continued to dispute liability.

675.   As described above, Illinois Class members have made demands for payment to Platte River, and these demands included the fact that claims brought on behalf of Illinois Class members exceed the amount of the Illinois Bond.

676.   Despite receiving that information, Platte River has unreasonably and vexatiously continued to delay in settling the Illinois Class members' claims.

677.   As a direct result of Platte River's violation of Section 155 of the Illinois Insurance Code, the Class has been damaged in that it has not been compensated for its injuries, and additionally has incurred substantial attorneys' fees in additional litigation resulting from Platte River's failure to tender the Bond.

**COUNT X**
**BAD FAITH IN VIOLATION OF LA. REV. STAT. ANN. § 22:1973 AND § 22:1892**

**(As Against Platte River)**
**(On behalf of Louisiana Class members)**

678.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

679.   Louisiana Class members are first-party claimants asserting a right to coverage under

CLASS ACTION COMPLAINT AND JURY DEMAND - 120

the Louisiana Bond issued by Platte River.

680.  As a result of Meracord's conduct as alleged above, Louisiana Class members suffered a loss covered by the Louisiana Bond issued by Platte River.

681.  Platte River has a duty of good faith and fair dealing and has an affirmative duty to adjust claims fairly and promptly and to make reasonable efforts to settle claims with the Louisiana Class members.

682.  Platte River received proof of the Louisiana Class members' losses as described in Section IV.D, and this information was sufficient to apprise Platte River of the Louisiana Class members' claims.

683.  Despite receiving this information, Platte River failed to pay the claim within 30 days, as prescribed § 22:1892, or within 60 days, as prescribed by § 22:1973.

684.  As described in Section IV.D, Platte River lacked a reasonable basis for its failure to pay, and its conduct was arbitrary, capricious, or without probable cause.

685.  As a direct result of Platte River's violation of La. Rev. Stat. Ann. § 22:1973 and § 22:1892, the Class has been damaged in that it has not been compensated for its injuries, and additionally has incurred substantial attorneys' fees in additional litigation resulting from Platte River's failure to tender the Bond.

## COUNT XI
## VIOLATION OF UNFAIR CLAIMS SETTLEMENT PRACTICES UNDER MAINE REV. STAT. ANN. § 2436-A
### (As Against Platte River)
### (On behalf of Maine Class members)

686.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

687.  Maine Class members are first-party claimants asserting a right to coverage under the Maine Bond issued by Platte River.

688.  As a result of Meracord's conduct as alleged above, Maine Class members suffered a loss covered by the Maine Bond issued by Platte River.

689.  As discussed above in Section IV.D, Platte River received written notice of Maine Class members' claims under the Maine Bond, but have failed to investigate and review the

CLASS ACTION COMPLAINT AND JURY DEMAND - 121

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  claims.

2      690.  Platte River received proof of Maine Class members' losses as described in Section

3  IV.D, and this information was sufficient to apprise Platte River of the claims and liability under

4  the Maine Bond.

5      691.  Even though Platte River's liability under the Maine Bond has become reasonably

6  clear, Platte River has failed to effectuate prompt, fair, and equitable settlement of Maine Class

7  members' claims, without just cause.

8      692.  As a direct result of Platte River's violation of Maine Rev. Stat. Ann. § 2436-A, the

9  Class has been damaged in that it has not been compensated for its injuries, and additionally has

10  incurred substantial attorneys' fees in additional litigation resulting from Platte River's failure to

11  tender the Bond.

**COUNT XII**
**VIOLATION OF UNIFORM TRADE PRACTICE ACT,**
**MCL § 500.2001,** *ET SEQ.*

**(as against Fidelity)**
**(On behalf of Michigan Class members)**

16      693.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

17      694.  As a result of Meracord's conduct as alleged above, Michigan Class members suffered

18  a loss covered by the Michigan Bond issued by Fidelity.

19      695.  Michigan Class members are first-party claimants asserting a right to coverage under

20  the Michigan Bond issued by Fidelity.

21      696.  As discussed above in Section IV.D, Fidelity received written notices of Michigan

22  Class members' claims and a demand for payment under the Michigan Bond and has been on

23  notice of the Class's claims since, at the latest, the filing of the *Cheeks* complaint on April 23,

24  2013.

25      697.  This notice was sufficient to fully apprise Fidelity of Michigan Class members'

26  claims.

27      698.  Fidelity have failed pay these claims within 60 days as required by MCL § 500.2006.

28      699.  Accordingly, Michigan Class members request damages in the amount of the

CLASS ACTION COMPLAINT AND JURY DEMAND - 122

Michigan Bond listed in Appendix A, plus penalty interest under MCL § 500.2006.

## COUNT XIII
## VEXATIOUS REFUSAL TO PAY
## IN VIOLATION OF MO. STAT. § 375.420

**(As Against Fidelity)**
**(On behalf of Missouri Class members)**

700.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

701.   Missouri Class members are obligees under the Missouri Bond issued by Fidelity.

702.   As a result of Meracord's conduct as alleged above, Missouri Class members suffered a loss covered by the Missouri Bond issued by Fidelity.

703.   Missouri Class members made a demand for payment pursuant to the Missouri Bond, which Fidelity has refused to pay.

704.   Fidelity's refusal to pay the Missouri Class members' losses under the Missouri Bond, as described in Section IV.D, is vexatious and without reasonable cause or excuse.

705.   Missouri Class members request the amount of the Missouri Bond as listed in Appendix A and interest, plus statutory penalties under Mo. Rev. Stat. § 375.420 and attorneys' fees.

## COUNT XIV
## VIOLATIONS OF RHODE ISLAND GEN. LAWS § 9-1-33

**(As Against Platte River)**
**(On behalf of the Rhode Island Class members )**

706.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

707.   Rhode Island Class members are obligees under the Missouri Bond issued by Platte River.

708.   As a result of Meracord's conduct as alleged above, Rhode Island Class members suffered a loss covered by the Rhode Island Bond issued by Platte River.

709.   Platte River wrongfully and in bad faith refused to pay Rhode Island Class members' claims made pursuant to the Rhode Island Bond.

710.   As described in Section IV.D, Platte River wrongfully and in bad faith refused to timely perform its obligations under the Rhode Island Bond, including failing to investigate the

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

claims of Rhode Island Class members and to make payment on claims where liability was clear.

711.  Platte River lacked a reasonable basis for its failure to pay and perform its obligations under the Rhode Island Bond.

712.  As a direct result of Platte River's violation of R.I. Gen. Laws. § 9-1-33, the Class has been damaged in that it has not been compensated for its injuries, and additionally has incurred substantial attorneys' fees in additional litigation resulting from Platte River's failure to tender the Bond.

### COUNT XV
### VIOLATIONS OF TENN. CODE ANN. § 56-7-105

**(As Against Fidelity)**
**(On behalf of Tennessee Class members)**

713.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

714.  As a result of Meracord's conduct as described above, Tennessee Class members suffered losses covered by the Tennessee Bond issued by Fidelity.

715.  Tennessee Class members have made several demands for payment as described in Section IV.D.

716.  As described in Section IV.D, Fidelity has been on notice of the Tennessee Class members' claims pursuant to the Tennessee Bond since, at the latest, the filing of the *Cheeks* complaint on April 23, 2013.

717.  Fidelity failed to pay the Tennessee Class members' claims within 60 days after notification of the claim, in violation of Tenn. Code Ann. § 56-7-105.

718.  Fidelity's failure to pay was in bad faith because Fidelity had no reasonable basis for its failure to pay.

719.   Fidelity's failure to pay inflicted additional expense, loss, or injury, including attorneys' fees, upon the Tennessee Class members.

720.  As a direct result of Fidelity's violation of the Tennessee Insurance Code, the Class has been damaged in that it has not been compensated for its injuries, and additionally has incurred substantial attorneys' fees in additional litigation resulting from Fidelity's failure to

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

tender the Bond.

<div align="center">

**COUNT XVI**
**UNFAIR CLAIM SETTLEMENT PRACTICES**
**IN VIOLATION OF W. VA. CODE ANN. § 33-11-1 *ET SEQ.***

**(As Against Platte River)**
**(On behalf of West Virginia Class members)**

</div>

721. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

722.  As described in Section IV.D, Platte River has refused to pay the claims of West Virginia Class members without conducting a reasonable investigation.

723. Platte River possesses all the information necessary to evaluate and calculate the West Virginia Class members' damages, as described in Section IV.D.

724. Although liability has become reasonably clear, Platte River has not attempted in good faith to effectuate prompt, fair, and equitable settlements of West Virginia Class members' claims.

725. Platte River has committed multiple violations of W. Va. Code Ann. § 33-11-4(9) in refusing to pay West Virginia Class members' claims, which indicates a general business practice.

726. In addition to the West Virginia Bond, Platte River has failed to investigate and failed to effectuate good faith settlements on the other Bonds listed on Appendix A, and these unfair and deceptive acts in the business of insurance have been committed with such frequency as to indicate a general business practice.

727. As a direct result of Platte River's violation Chapter 33 of the West Virginia Insurance Code, the Class has been damaged in that it has not been compensated for its injuries, and additionally has incurred substantial attorneys' fees in additional litigation resulting from Platte River's failure to tender the Bond.

## C. DECLARATORY RELIEF ON UNDERLYING CLAIMS

728. Plaintiffs have requested that the Sureties tender the Bonds described in Appendix A. Many of the Licensing Statutes under which the Bonds are issued provide that a licensee's violation of other federal and/or state laws constitutes a violation of the Licensing Statute. The

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Sureties have taken the position that they may relitigate Meracord's underlying liability. Plaintiffs disagree and seek immediate tender of the Bonds. Therefore, an actual controversy exists between the Plaintiffs and the Sureties, within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. To the extent the Court holds that the Final Judgment does not establish, as against the Sureties, Meracord's liability for the claims in the Final Judgment, Plaintiffs seeks declaratory relief establishing that liability, as outlined below. For each of the Counts below, a statement of damages, by state, within each Bond Period, is contained in Appendix A to this Complaint.

### COUNT XVII
### FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201, THAT MERACORD VIOLATED THE WASHINGTON DEBT ADJUSTING ACT

729.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

730.  Meracord was a for-profit debt adjuster under the meaning of WASH. REV. CODE § 18.28 (prior to June 7, 2012), because it engaged in the business of receiving funds for the purpose of distributing said funds among creditors in payment or partial payment of obligations of a debtor.

731.  Although Meracord claimed that it was not a debt settlement company, the online account management tool that Meracord made available specifically had a section entitled "Settlements," where customers could "get more details about [pending settlement agreements] and . . . approve or decline the proposed agreement[s]."

732.  Meracord is liable under the Debt Adjusting Act for post-June 7, 2012 conduct because it did not act *independently* of Front DRCs.

733.  According to Meracord's customer database, Meracord established nearly 250,000 trust accounts, over 130,000 of which belonged to Class members, who deposited over $1 billion into those accounts.

734.  According to the database, in 100% of accounts belonging to Class members, Meracord and the Meracord Enterprises charged excessive and unreasonable fees for debt

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

adjustment services, in violation of the Debt Adjusting Act, specifically:

a. In 97.8% of Class member accounts Meracord collected fees exceeding 15% of any single deposit in violation of WASH. REV. CODE § 18.28.080(1);

b. In 96.3% of Class member accounts, Meracord collected an initial fee greater than $25 in violation of WASH. REV. CODE § 18.28.080(1);

c. In 100% of Class member accounts, Meracord and the Front DRCs failed to distribute to creditors within 40 days at least 85% of each payment received from the debtor, in violation of WASH. REV. CODE §18.28.100(4).

735.  With respect to nearly half of Class member accounts, ***not a single distribution*** was ever made to creditors.

736.  In addition, Meracord failed to institute any safeguards whatsoever to ensure compliance with the DAA even though Meracord's software system could have been configured to comply with the Act, and Meracord ignored obvious signs of fraud on the part of the Front DRCs, all the while continuing to willingly process payments for them.

737.  Because Meracord violated the Debt Adjusting Act in 100% of Class member accounts, the contracts for those accounts are void in their entirety, and pursuant to WASH. REV. CODE § 18.28.090, Meracord must "return to the debtor the amount of all payments received from the debtor . . . and not distributed to creditors."

738.  A statement of damages, by state, within each Bond Period, is contained in Appendix A to this Complaint.

739.  Meracord failed to comply with other requirements of the Debt Adjusting Act, including:

a. Failing to return to Class members the amount of all payments received, despite knowing that their debt adjustment contracts were illegal and *void ab initio* under WASH. REV. CODE § 18.28.090;

b. Failing to notify Class members' creditors that it had been engaged as a debt adjuster, as required by WASH. REV. CODE § 18.28.080(2) before a debt adjuster may retain *any* fees;

c. In violation of WASH. REV. CODE § 18.28.100, failing to disclose in precise terms the rate and amount of all fees to be charged under its debt relief contracts; failing to include in the contracts the "Notice to Debtor" required by the statute; and failing to adequately disclose the true nature of the relationships between all of the entities involved in the contracts, which was necessary for the protection of the Class;

CLASS ACTION COMPLAINT AND JURY DEMAND - 127



d.   Failing to distribute at least eighty-five percent (85%) of each payment received from Class members to their creditors within forty days after receipt of the payment, as required by WASH. REV. CODE § 18.28.110(4);

e.   Permitting the debt adjusting services in which they participated to be advertised by its Front DRCs in false, misleading, or deceptive statements or representations, in violation of WASH. REV. CODE § 18.28.120(6); and

f.   Receiving fees from its Front DRCs in connection with its debt adjusting services, in violation of WASH. REV. CODE § 18.28.120(8).

**COUNT XVIII**
**FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201,**
**THAT MERACORD VIOLATED**
**THE WASHINGTON CONSUMER PROTECTION ACT,**
**WASH. REV. CODE § 19.86**

740.   The Class incorporates by reference all preceding paragraphs as if fully set forth herein.

741.   The Class members are persons within the meaning and coverage of the Washington Consumer Protection Act, RCW 19.86 (the "CPA").

742.   The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of commerce." RCW 19.86.020.

743.   Meracord, for compensation, received and managed funds of Class members for the purported purposes of distributing said funds among creditors in partial satisfaction of obligations of Class members' debts.

744.   Meracord and the Front DRC members of the Meracord Enterprises qualified as debt adjusters and were otherwise engaged in debt adjusting within the meaning of WASH. REV. CODE § 18.28 for some or all time periods relevant to this Complaint.

745.   As described above in Count XVII, in carrying out the Meracord Schemes, Meracord violated WASH. REV. CODE § 18.28.

746.   Meracord's conduct, as detailed above, constitutes unfair and deceptive acts and practices in violation of the CPA. Pursuant to WASH. REV. CODE. § 18.28.185, any violation of the Debt Adjusting Act automatically constitutes a violation of the CPA.

747.   Meracord's conduct occurred in the conduct of trade or commerce.

748.   Meracord's deceptive acts or practices impact the public interest and have the capacity

CLASS ACTION COMPLAINT AND JURY DEMAND - 128

to deceive a substantial portion of the public. The acts were committed in the course of Meracord's business; the acts are part of a pattern or generalized course of business; the acts were committed repeatedly.

749. Meracord's unfair and deceptive acts and practices have directly and proximately caused damage to Class members. But for Meracord's unfair and deceptive acts and practices, Class members would not have suffered such injury.

<div align="center">

**COUNT XIX**
**FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201,**
**THAT MERACORD AIDED AND ABETTED**
**THE COMMISSION OF UNFAIR AND**
**DECEPTIVE BUSINESS CONDUCT**

</div>

750. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

751. Meracord knowingly aided and abetted its Front DRCs in the commission of criminal, unfair, and deceptive practices, including practices violating WASH. REV. CODE §§ 18.28 & 19.86, by giving substantial assistance that proximately caused harm to Class members in their business and property. Such assistance included, *inter alia*:

    a.    Offering to serve and serving as a processor of debt settlement and MARS funds procured by illegal debt settlement and MARS contracts;

    b.    Promoting illegal debt settlement and MARS programs to consumers and contracting with consumers for such illegal debt settlement and MARS programs;

    c.    Violating the Debt Adjusting Act as to 100% of Class member accounts, as described above in Count XVII;

    d.    Offering to assume authority, assuming authority, and exercising authority to transfer Class members' funds to Meracord's debt settlement and MARS accounts for the purpose of paying illegal and unearned fees;

    e.    Paying illegal, unfair, deceptive, and unearned fees from those debt settlement and MARS accounts; and

    f.    Offering to assume authority, assuming authority, and exercising authority to transfer consumers' debt settlement and MARS funds out of the state of Washington.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

752.  At the time that assistance was rendered, Meracord was aware of its role in these wrongful activities.

753.  Meracord and Sureties are liable for the entire loss suffered by the Class.

### COUNT XX
### FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201,
### OF MERACORD'S FRAUD

754.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

755.  Meracord knowingly made false representations about existing and material facts to Class members, including, but not limited to:

    a.  Representing that it acted independently from Front DRCs;

    b.  Failing to disclose its true relationship with Front DRCs;

    c.  Failing to disclose that its due diligence procedures were inadequate;

    d.  Failing to disclose to Class members that fees being paid from their debt settlement and MARS accounts were illegal and unearned;

    e.  Failing to disclose that in nearly half of customer accounts no distributions were ever made to creditors.

756.  Meracord knew these misrepresentations were false when it made them.

757.  Meracord made false representations and failed to disclose information with the intent to induce Class members to sign up for its services and the services of Front DRCs.

758.  Class members were ignorant of the falsity of Meracord's representations. Class members relied, and had a right to rely on Meracord's false representations and were induced to act based on Meracord's false representations. Class members would not have entered into debt relief contracts had they been truthfully informed that Meracord (i) was not an independent entity; (ii) had extensive relationships with Front DRCs, including awarding top performers with VIP events; (iii) conducted no due diligence on Front DRCs; (iii) regularly transmitted illegal fees; and (iv) failed to make any distributions whatsoever to creditors for approximately half its accounts.

759.  As a proximate result of Meracord's fraudulent misrepresentations, Class members suffered loss and damages.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**COUNT XXI**
**FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201,**
**OF MERACORD'S BREACH OF FIDUCIARY DUTY**

760.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

761.   Meracord was a custodial agent of and trustee to Class members.

762.   Meracord owed fiduciary duties to Class members to act for their benefit and safeguard their interests in all matters respecting its custodial, and trustee roles, including the establishment, maintenance, and management of Class members' debt settlement and MARS accounts.

763.   Meracord had a duty to use reasonable efforts to provide Class members with facts that Meracord knew, had reason to know, or should have known were material to Class members' interests.

764.   Meracord's fiduciary relationship with Class members did not privilege conduct that was tortious or criminal.

765.   Meracord negligently and intentionally breached duties owed to Class members by violating the Debt Adjusting Act as to 100% of Class members' accounts, as described above in Count XVII, and by aiding and abetting the Front DRCs' violations of that same Act, as described above in Count XIX.

766.   Meracord negligently and intentionally breached duties owed to Class members by violating the Consumer Protection Act as described above in Count XVIII, and by aiding and abetting the Front DRCs' violations of that same Act, as described above in Count XIX.

767.   Meracord also negligently and intentionally breached duties owed to Class members by, among other things:

    a.   Failing to disclose to Class members that their debt settlement and MARS contracts, pursuant to which fund transfers were being made, were void;

    b.   Failing to disclose to Class members that fees being paid from their debt settlement and MARS accounts were illegal and unearned;

    c.   Initiating transfers of Class members' money for purposes of paying unearned, unfair, and illegal fees;

CLASS ACTION COMPLAINT AND JURY DEMAND - 131



d.   Establishing, maintaining, and managing debt settlement and MARS accounts in ways designed to evade consumer protections, including limitations on debt relief fees;

e.   Paying and receiving unearned, unfair, and illegal fees using Class members' funds; and

f.   Elevating its own pecuniary interests above those of Class members, thereby unjustly enriching itself at the expense of Class members.

768.   Meracord materially benefitted from its breaches of fiduciary duties to Class members.

769.   As a proximate result of Meracord's breach of duties, Class members suffered loss and damages, and Meracord was unjustly enriched.

**COUNT XXII**
**FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201,**
**OF MERACORD'S UNJUST ENRICHMENT**

770.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

771.   As a result of the Meracord schemes, Meracord sold debt relief services to Class members at inflated prices, and collected money and fees that were unreasonable and would not have been collected but for the deceptive and fraudulent actions of the Meracord Enterprises.

772.   Meracord is aware of its receipt of the above-described benefits.

773.   Meracord received the above-described benefits to the detriment of Class members.

774.   Meracord continues to retain the above-described benefits to the detriment of the Class.

775.   As a result of Meracord's unjust enrichment, the Class has sustained damages in an amount to be determined at trial and seeks full disgorgement and restitution of Meracord's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

776.   Further, the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Meracord as a result of its unfair, unlawful and/or deceptive practices.

**COUNT XXIII**
**FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201,**
**THAT MERACORD VIOLATED 18 U.S.C. § 1962(C)**

CLASS ACTION COMPLAINT AND JURY DEMAND - 132

777.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

778.  Class members and Meracord are all "persons" as that term is defined in 18 U.S.C. § 1961(3).

779.  The RICO "enterprises" were associations-in-fact (the "Meracord Enterprises") and consisted of: (1) Meracord and its Front DRCs, including but not limited to Debt Life Solutions, First Rate Debt Solutions, SBL/Safeguard, Lloyd Ward & Associates, and others engaging in fraudulent and deceptive practices designed to enroll consumers in useless "debt settlement" plans and extract unearned fees from them; and (2) Meracord and its Front DRCs engaging in fraudulent and deceptive practices designed to enroll customers in useless MARS plans and extract unearned fees from them ("the Meracord Schemes"). The Meracord Enterprises were ongoing and continuing business organizations consisting of both corporations and individuals that were associated for the common or shared purposes of advancing the Meracord Schemes. Members of the Meracord Enterprises operated businesses that performed services and had business relationships that were distinct from the pattern of racketeering alleged herein.

780.  The Meracord Enterprises were ongoing organizations that engaged in, and whose activities affected, interstate commerce and had an existence apart from the racketeering acts set forth herein.

781.  While Meracord participated in and was a member and part of the Meracord Enterprises, it also had an existence separate and distinct from the Meracord Enterprises. For example, Meracord maintained a business servicing private mortgages that was separate and distinct from the Meracord Enterprises.

782.  In order to increase their revenue and profits, members of the Meracord Enterprises needed to enroll a continuous stream of customers into their debt relief programs. The Meracord Enterprises provided that stream by fraudulently inducing Class members to enter into illegal contracts through which members of the Meracord Enterprises extracted illegal fees directly from Class members' bank accounts.

783.  A critical component of the Meracord Schemes was the use of the Meracord-provided

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

account management software and the insertion of the Meracord sign-up agreements into the "contracts" foisted upon consumers by the Front DRCs. Without these integral steps, the Meracord Enterprises would not have had the ability to automatically withdraw thousands of dollars from Class members' bank accounts and then distribute unearned and illegal fees from Class members' escrow accounts.

784. The members of the Meracord Enterprises shared the common purpose of engaging in fraudulent and deceptive practices designed to enroll consumers in useless debt settlement plans and MARS plans and extract unearned fees from them. Each of the members of the Meracord Enterprises was rewarded financially based on its abilities to perform its role as a member of a Meracord Enterprise.

### 1. Conduct of the RICO Enterprise's Affairs.

785. Meracord has, in violation of Section 1962(c) of RICO, conducted or participated in the conduct of the affairs of the RICO Enterprises, directly or indirectly, by making false statements and promises in an attempt to encourage Class members to sign up for debt settlement and MARS programs through the Meracord Enterprises, and by extracting and processing debt settlement and MARS payments knowing that the underlying contracts provided for illegal fees and that Class members had signed those contracts based on the fraudulent and deceptive activities of the Enterprise's Front DRCs.

### 2. Meracord's Pattern of Racketeering Activity.

786. Meracord conducted and participated in the affairs of the above-referenced Meracord Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 2314, relating to the interstate transportation of stolen property; 18 U.S.C. § 1341, relating to mail fraud; 18 U.S.C. § 1343, relating to wire fraud; and 18 U.S.C. § 1344, relating to bank fraud. Meracord's pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Meracord Schemes, as well as many instances involving the interstate transmission of potentially millions of dollars in

CLASS ACTION COMPLAINT AND JURY DEMAND - 134

fraudulently obtained fees, which were withdrawn from accounts under the custody and control of financial institutions. Each of these instances constituted a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Meracord Enterprises intended to defraud Class members and other intended victims.

787.   Meracord's racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to defraud Class members. Each separate instance of racketeering employed by Meracord was related, had similar intended purposes, involved similar participants and methods of execution, and had the same injurious results affecting the same victims, including Class members. Meracord engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Meracord Enterprises.

### a.  Meracord's Use of the U.S. Mails and Interstate Wire Facilities in Violation of 18 U.S.C. §§ 1341 & 1343.

788.   Meracord's illegal conduct and wrongful practices were carried out by an array of agents and members of the Meracord Enterprises, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. mails and interstate wire facilities. The nature and pervasiveness of the Meracord Schemes, which were orchestrated primarily out of the offices of Meracord and the Front DRCs, necessarily required those offices to communicate directly and frequently with each other and with Class members by the U.S. mails and by interstate wire facilities. On the portion of its website devoted to marketing its debt settlement services, Meracord boasted that it was a licensed "money transmitter" in over 40 states.

789.   Many of the precise dates of Meracord's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Meracord's books and records. However, Class Representatives can ascertain when and how their transactions involved the mail and wire facilities and can and have described below several of the occasions on which the RICO

predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Meracord Scheme.

790.  Meracord's use of the U.S. mails and interstate wire facilities to perpetrate the Meracord Schemes involved thousands of communications including telephone, email, and U.S. Mail communications to Class members. Use of the U.S. Mail, email, and telephone systems also occurred on hundreds if not thousands of occasions where members of the Meracord Enterprises communicated among themselves. In addition to these RICO predicate acts, it was foreseeable to Meracord that its Front DRCs would communicate with Class members by the U.S. mails and by interstate wire facilities. Further, Meracord has, in furtherance of the Meracord Schemes, communicated through use of the U.S. mails and by interstate wire facilities with their various offices or divisions.

791.  Indeed, Meracord's business model and the ensnarement of Class members in this scheme were predicated upon and rely on use of the interstate wire facilities. Class members often "e-signed" their documents using the Internet (an instrument of interstate commerce) to indicate acceptance of the agreements. Further, the agreements were often then transmitted to Class members over the Internet for them to print on their home computers, or were sometimes sent to Class members through the U.S. mail system. Examples of such mailings and transmissions with respect to Class Representatives are set forth in detail below. Thus, for each and every Class member, the initiation of the scheme itself was done through the wires or the mails and involved at the very least the wire or mail communication in which their contracts were delivered to them, and often many other email and phone communications as well.

792.  Specifically, Meracord perpetrated the Meracord Schemes against the Class Representatives through interstate mail and wire facilities by sending emails and documents from Washington, and potentially other states, to the Class Representatives in Michigan, North Carolina, Pennsylvania, Ohio, New Jersey, Wisconsin, Florida, Washington D.C., California, Texas, and Arkansas.

793.  Class Representatives received contracts via the Internet. For example:

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

a. In August 2009, Robert Hewson received his contract with his Front DRC, Safeguard, as an attachment to an email.

b. On May 14, 2010, Amrish Rajagopalan received his contract with his Front DRC, FRDS, by email and electronically signed it.

c. On or about August 19, 2010, Marie Johnson-Peredo received her contract with her Front DRC, Lloyd Ward—already electronically signed for her—by email.

d. On September 13, 2012, Karen Hea received her contract with her Front DRC, DLS, by email.

e. In May 2012, Deborah Horton received contracts from representatives of her Front DRC via email.

f. On March 29, 2011, Donte Cheeks received his contract with his Front DRC, New Life Financial, via email.

g. In July 2012, Richard Pierce received his contract with his Front DRC, 1st United Consultants, via email.

h. In April 2010, Arthur Fuller received an email with a link to his contract with his Front DRC, EMA. On June 8, 2010, Arthur received an email with a link to an agreement with Meracord.

i. On October 19, 2012, Dawn Meade received an email with a link to contracts with Meracord and her Front DRCs, Esquire Litigation Services, and The Delta Law Firm.

j. In July 2010, Wahab Ekunsumi received the contract with his Front DRC, Waypoint Bay Financial, by email.

k. On January 23, 2013, Erma Sue Clyatt received an email with a link to documents from her Front DRC, Herman Law Firm, which included the Meracord Sign-Up Agreement.

l. In August 2009, Alex Casiano received his contract with his Front DRC, Lifeguard, via a link sent by email.

794. Class Representatives received notices about their Meracord accounts by email. For example:

a. Amrish Rajagopalan received an email from Meracord containing login information for his "NoteWorld Reporter" account, where he could manage his Meracord escrow account. Over the course of the following year, Amrish continued to receive emails from Meracord regarding withdrawals that Meracord made from his bank account.

b. Robert Hewson received at least one notice by email, on December 18, 2009, that Meracord withdrew his payment of $599.00.

c. On December 21, 2009, Robert Hewson emailed Meracord because he did not recall Carl mentioning Meracord and was confused as to why he received an email from Meracord. On December 22, Meracord responded and falsely claimed that it was only a "third party payment processing agency."

CLASS ACTION COMPLAINT AND JURY DEMAND - 137

d.  On July 17, 2010, Robert Hewson emailed Meracord to request his PIN and ask questions about his account, including whether any payments had been made to his creditors. On July 19, 2010, Meracord responded with Robert's PIN and stated that no payments had been made to his creditors.

e.  On May 14, 17, and 18, 2011, Robert Hewson emailed Meracord to inform it that he could not reach anyone at the Debt Relief Center and to request a refund. On May 17, 2011 Meracord responded with questions to verify Robert's identity, and on May 18, 2011, Meracord responded to Robert's request for a refund by stating that "If you wish to close your Meracord account, you will need to notify Meracord and your service provider 5 or more business days before your next scheduled payment."

f.  On October 6, 2011, Marie Johnson-Peredo received an email from LWA confirming that her Meracord account had been closed and that she would receive a refund of $2,280.60.

g.  Donte Cheeks received at least one notice by email, on November 28, 2011, that Meracord would withdraw his payment of $418.98.

h.  On July 23, 2012, Richard Pierce received a welcome email and Debt Appraisal Guide from 1st United.

i.  Bob and Amy Joyce communicated with their Front DRC, DLS, by email and after requesting a refund, received an email from Meracord in March 2013.

j.  Arthur Fuller received emails from EMA stating that his creditors were "receptive" to debt settlement. He also emails from Meracord when it deducted payments from his bank account.

k.  On October 24, 2012, Dawn Meade received an email with attachments, including a call log, from Esquire Litigation Services.

l.  Alex Casiano received emails from Lifeguard prior to signing up with them.

795.  The Class also received and sent documents by facsimile and mail. For example:

a.  At the direction of DLS, Karen Hea faxed them documents she received from her mortgagor.

b.  In October 2010, Amrish Rajagopalan received a letter from P&E Solutions regarding his account. This letter was the first time Amrish had heard of P&E Solutions, and when he called the number listed on the letter, he was informed that P&E Solutions was the same as FBL Associates, another company he didn't recall ever hearing about in relation to his debt relief account.

c.  On or about August 19, 2010, Meracord through LWA—used the mail to send Marie Johnson-Peredo a "Debt Relief Package" that included both LWA documents and a Meracord Sign-Up Agreement.

d.  On or about June 24, 2011, Marie Johnson-Peredo received a letter from LWA.

e.  In August-October 2012, Meracord used the mail to send Richard Pierce notices regarding withdrawals from his account.

CLASS ACTION COMPLAINT AND JURY DEMAND - 138



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

f.   Between April and December 2011, Meracord used the mail at least nine times to send Donte Cheeks notices regarding withdrawals from his account.

g.   Between May and July 2012, representatives of her Front DRC used the mail to send Deborah Horton a packet of documents to send to Wells Fargo, her mortgagor.

h.   In September 2012, DLS used the mail to send Bob and Amy Joyce documents, including the contract.

i.   In June and July 2010, Meracord used the mail to send Arthur Fuller information regarding his account, Meracord's privacy policy, and Meracord's Terms and Conditions.

j.   In October 2012, Meracord used the mail to send Dawn Meade a letter with her Meracord account number.

k.   On April 2, 2013, Meracord used the mail to send Wahab Ekunsumi a letter with his account history.

l.   On June 30, 2013, Meracord used the mail to send Erma Sue Clyatt a welcome letter.

m.   Alex Casiano received monthly notices from Meracord stating that his payments had been withdrawn from his checking account.

**b.   Meracord's Interstate Transportation of Stolen Property in Violation of 18 U.S.C. § 2314.**

796.   The Meracord Enterprises developed schemes, described in the above paragraphs of this Complaint, to obtain money from Class members by fraudulent means.

797.   In furtherance of these schemes, Meracord transmitted Class members' monthly payments and fees, in amounts exceeding $5,000, in interstate commerce. Meracord did so despite knowing that the authorization for those payments and fees were obtained by fraud.

798.   Specifically, over the course of the Class Representatives' dealings with Meracord, the company transmitted over $8,000 from Amrish Rajagopalan's bank account in North Carolina; over $4,000 from Karen Hea's bank account in Michigan; over $10,000 from Robert Hewson's bank in Pennsylvania; over $5,000 from Marie Johnson-Peredo's bank in Pennsylvania; over $24,000 from Wahab Ekunsumi's bank in Ohio; over $6,000 from Dawn Meade's bank in New Jersey; over $2,000 from Arthur Fuller's bank in Wisconsin; over $900 from Erma Sue Clyatt's bank in Florida; over $1,300 from Bob and Amy Joyce's bank in Florida; over $3,700 from Donte Cheeks's bank in Washington D.C.; over $2,600 from Deborah Horton's bank in Arkansas; over $9,800 from Richard Pierce's bank in California; and over $5,000 from Alex

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Casiano's bank in Texas to trust accounts held by Meracord's bank in Washington and/or other states.

799.  On information and belief, Meracord transmitted over $5,000 for each of the thousands of Class members in an ongoing pattern that continued with the ensnarement of each additional victim. Indeed, many, if not all, of the Front DRCs required that a consumer have at least $10,000 in debt in order to enroll in the program, which necessitates transfers exceeding $5,000.

### c.  Meracord's Commission of Bank Fraud Under 18 U.S.C. § 1344.

800.  Meracord knowingly executed the schemes described in previous paragraphs of this Complaint ("the Meracord Schemes"), to obtain money, by means of fraudulent pretenses, representations, and promises, from Class members' bank accounts, which were under the custody and control of financial institutions.

801.  Specifically, as described above, Meracord, through the Meracord Enterprises, obtained by fraudulent means:

    a.   Amrish Rajagopalan's authorization to withdraw money from his checking account, which was under the custody and control of Bank of America, a financial institution;

    b.   Karen Hea's authorization to withdraw money from her checking account, which was under the custody and control of PNC Bank, a financial institution;

    c.   Robert Hewson's authorization to withdraw money from his checking account, which was under the custody and control of TD Bank, a financial institution;

    d.   Marie Johnson-Peredo's authorization to withdraw money from her checking account, which was under the custody and control of Sovereign Bank, a financial institution;

    e.   Wahab Ekunsumi's authorization to withdraw money from his checking account, which was under the custody and control of Cincinnati Central Credit Union, a financial institution;

    f.   Dawn Meade's authorization to withdraw money from her checking account, which was under the custody and control of TD Bank, a financial institution;

    g.   Arthur Fuller's authorization to withdraw money from his checking account, which was under the custody and control of Bank First National, a financial institution;

    h.   Erma Sue Clyatt's authorization to withdraw money from her checking account, which was under the custody and control of Drummond Bank, a financial institution;

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

i.    Bob and Amy Joyce's authorization to withdraw money from their checking account, which was under the custody and control of PNC Bank, a financial institution;

j.    Donte Cheeks's authorization to withdraw money from his checking account, which was under the custody and control of Chevy Chase Federal Savings Bank, a financial institution;

k.    Deborah Horton's authorization to withdraw money from her checking account, which was under the custody and control of Arvest Bank, a financial institution;

l.    Richard Pierce's authorization to withdraw money from his checking account, which was under the custody and control of U.S. Bank, a financial institution; and

m.    Alex Casiano's authorization to withdraw money from his checking account, which was under the custody and control of BBVA Compass, a financial institution.

802.  On information and belief, the same process involving fraud in obtaining authorization to withdraw money from Class Representatives' bank accounts was repeated in a continuing and ongoing pattern with the ensnarement of each additional Class member victim.

### 3.    Damages Caused by the Meracord Schemes.

803.  Meracord's violations of federal law and its pattern of racketeering activity have directly and proximately caused members of the Class to be injured in their business or property because Class members:

a.    Paid fees in excess of legal limits and otherwise in violation of applicable state and federal law for their debt settlement and MARS programs;

b.    Would not have entered into those debt settlement and MARS programs if they had been aware of the illegality of the fees and/or the fraudulent nature of the schemes devised by the Meracord Enterprises;

c.    In many cases, paid fees for services that were never performed, and were unable to get refunds for those fees because of the fraudulent and deceptive practices of the Meracord Enterprises;

d.    Suffered continuing harm to their credit and creditworthiness as a result of the fraudulent and deceptive practices of the Meracord Enterprises;

e.    In many cases, incurred substantial legal fees as a result of the fraudulent and deceptive practices of the Meracord Enterprises, whether in pursuit of refunds from the Enterprise, or in the defense of lawsuits by creditors brought about by Class members' enrollment in the Meracord Enterprise's debt settlement or MARS programs; and

f.    In many cases, had judgments entered against them related to their failure to pay their debts as a result of entering into the Meracord Enterprises' "debt settlement" or

HB HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

MARS programs—sometimes despite the existence of valid defenses to those debts, including but not limited to, statute of limitations defenses.

804. Class members were harmed by the Meracord schemes because had they known: (1) that the fees they would be charged exceeded legal limits and were illegal; (2) that both Meracord and its Front DRCs were deceiving them about the true nature of their relationships; and (3) the true nature of the debt relief programs hidden by the Meracord Enterprises, they would not have entered into the contracts. Instead, they would have either purchased debt relief services elsewhere or, more likely, would have simply settled the debts themselves.

805. Under the provisions of Section 1964(c) of RICO, Meracord is liable to the Class for three times the damages that Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

806. A statement of damages, by state, by state, within each Bond Period, is contained in Appendix A to this Complaint.

<div align="center">

**COUNT XXIV**
**FOR A DECLARATION, PURSUANT TO 28 U.S.C. § 2201,**
**THAT MERACORD VIOLATED OF 18 U.S.C. § 1962(D)**

</div>

807. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

808. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

809. Meracord violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs described previously through a pattern of racketeering activity.

810. Meracord conspired with other affiliates in order to further and perfect the financial goals of the Meracord Enterprises. Meracord had overt written and oral agreements with the Front DRCs and other affiliates to further the goals of the Meracord Enterprises and to engage in the pattern of racketeering activity alleged herein. The nature of the acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that Meracord and its affiliates not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

fraudulent acts were part of an overall pattern of racketeering activity.

811.   As a direct and proximate result of Meracord's and the other Meracord Enterprise members' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Class members have been and continue to be injured in their business or property.

812.   Meracord and the members of the Meracord Enterprises sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

   a.   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

   b.   Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

   c.   Multiple instances of transporting fraudulently obtained money in violation of 18 U.S.C. § 2314;

   d.   Multiple instances of bank fraud in violation of 18 U.S.C. § 1344; and

   e.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 195.

## VII.  PRAYER FOR RELIEF

WHEREFORE, the Class demands judgment as follows:

1.   A declaratory judgment that Meracord's wrongful actions constitute a violation of the terms of each of the Bonds;

2.   Injunctive relief requiring the Sureties to tender the Bonds;

3.   Declaratory relief from this Court that Meracord is liable to the Class for the reasons stated in Counts XVII to XXIV, and that this Court's Final Judgment represents the resulting injury to the Class;

4.   For judgment for the Class awarding punitive damages and any available statutory damages or penalties against the Sureties on the Bad Faith Claims;

5.   For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

6.   For an order awarding Plaintiffs and the Class its attorneys' fees and costs; and

7.   Such other and further relief as may appear necessary and appropriate.

CLASS ACTION COMPLAINT AND JURY DEMAND - 143

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATE: February 24, 2015

**HAGENS BERMAN SOBOL SHAPIRO LLP**

/s/ Steve W. Berman
Steve W. Berman (WSBA# 12536)

/s/ Thomas E. Loeser
Thomas E. Loeser(WSBA# 38701)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

**THE PAYNTER LAW FIRM PLLC**
Stuart M. Paynter (*pro hac vice to be filed*)
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@paynterlawfirm.com

Celeste H.G. Boyd (*pro hac vice to be filed*)
1340 Environ Way
Chapel Hill NC 27517
Telephone: (919) 307-9991
Facsimile: (866) 734-0622
cboyd@paynterlawfirm.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT AND JURY DEMAND - 144



**APPENDIX A**
**TABLE OF SURETY BONDS**

| Exhibit # | Surety State[21] | Surety / Bond # | Bond Period[22] | Licensing Statute | Damages[23] | Trebled Damages[24] | Bond Amount[25] |
|---|---|---|---|---|---|---|---|
| 17 | Alabama | Platte River / 41180191 | July 24, 2009–Present | Alabama Sale of Checks Act, Ala.Code 1975 § 8-7-1 *et seq.* | $8,401,551.06 | $25,204,653.18 | $10,000 |
| 18 | Alaska | Platte River / 41180210 | August 5, 2009–Present | Alaska Uniform Money Services Act, AS § 06.55.101 *et seq.* | $1,898,430.86 | $5,695,292.58 | $30,000 |
| 19 | Arizona | Fidelity / 8935314 | November 29, 2008–Present | Title 6, Chapter 7, Arizona Revised Statutes, A.R.S. § 6-801 *et seq.* | $16,968,239.23 | $50,904,717.69 | $100,000 |
| 20 | Arkansas | Platte River / 41201953 | July 31, 2010–Present | Arkansas Uniform Money Services Act, A.C.A. § 23-55-101 *et seq.* | $3,741,038.29 | $11,223,114.87 | $50,000 |
| 21 | California | Fidelity / 9076415 & 9076416 | April 15, 2012–Present | California Money Transmission Act, Cal. Fin. Code § 2000 *et seq.* | $43,310,443.64 | $129,931,330.92 | $2,500,000 |
| 22 | Colorado | Fidelity / 8935306 | August 6, 2008–Present | Colorado Money Transmitters Act, Colo. Rev. Stat. Ann. § 12-52-101 *et seq.* | $8,363,590.85 | $25,090,772.55 | $1,000,000 |
| 23 | Connecticut | Fidelity / 8935315 | November 1, 2007–Present | Connecticut Money Transmission Act, Conn. Gen. Stat. Ann. § 36a-595 *et seq.* | $7,496,231.23 | $22,488,693.69 | $300,000 |

---

[21] From Final Judgment, Dkt. 287.

[22] From Final Judgment, Dkt. 287. This column reflects the effective date for the current Bond.

[23] From Final Judgment, Dkt. 287.

[24] From Final Judgment, Dkt. 287.

[25] This column reflects the total current Bond Amount.

| 24 | Delaware | Platte River / 41180316 | September 21, 2009–Present | Delaware Sale of Checks Act, Del. Code Ann. tit. 5, § 2301 *et seq.* | $1,706,170.25 | $5,118,510.75 | $25,000 |
| 25 | Florida | Platte River / 41167020 | February 1, 2009–Present | Title 33, Chapter 560, Florida Statutes, Fla. Stat. Ann. § 560.203 *et seq.* | $46,680,334.98 | $140,041,004.94 | $800,000 |
| 26 | Georgia | Fidelity / 8935329 | January 12, 2009–Present | Title 7, Chapter 1, Article 4, Code of Georgia Annotated, O.C.G.A. 7-1-680 *et seq.* | $188,360.75 | $565,082.25 | $55,000 |
| 27 | Hawaii | Platte River / 41180155 | July 9, 2009–Present | Money Transmitters Act, Haw. Rev. Stat. § 489D-1 *et seq.* | $2,885,833.25 | $8,657,499.75 | $1,000 |
| 28 | Idaho | Platte River/ 41180203 | August 3, 2009–Present | Idaho Money Transmitters Act, Idaho Code Ann. § 26-2901 | $3,652,248.65 | $10,956,745.95 | $15,000 |
| 29 | Illinois | Platte River / 41214981 | October 27, 2010–Present | Illinois Transmitters of Money Act, 205 ILCS 657/1 *et seq.* | $16,376,224.92 | $49,128,674.76 | $2,000,000 |
| 30 | Indiana | Fidelity / 8935336 | February 5, 2009–Present | Indiana Money Transmitters Act ("the Indiana Statute"), Ind. Code Ann. § 28-8-4-1 | $13,372,177.89 | $40,116,533.67 | $210,000 |
| 31 | Iowa | Platte River / 41167053 | March 1, 2009–Present | Iowa Uniform Money Services Act, I.C.A. § 533c.101 *et seq.* | $6,248,808.75 | $18,746,426.25 | $60,000 |
| 32 | Kansas | Platte River / 4110154 | July 15, 2009–Present | Kansas Money Transmitter Act, K.S.A. § 9-508 *et seq.* | $2,151,401.30 | $6,454,203.90 | $200,000 |
| 33 | Kentucky | Platte River / 41186147[26] | October 19, 2009–Present | Kentucky Money Transmitters Act of 2006, KRS § 286.11-001 *et seq.* | $4,086,811.33 | $12,260,433.99 | $500,000 |

---

[26] In addition to Platte River's Bond, Fidelity also issued Bond # 9076441in Kentucky, in the amount of $500,000, effective September 5, 2012. The language of the Bonds is identical, and the Class seeks recovery on both Bonds for their respective Bond Periods, which can be determined upon further discovery. Both Bonds are attached as Exhibit 33.

| 34 | Louisiana | Platte River / 41167088 | March 20, 2009–Present | Louisiana Sale of Checks and Money Transmission Act, La. Rev. Stat. Ann. 6:1031 *et seq.* | $8,293,679.83 | $24,881,039.49 | $350,000 |
| 35 | Maine | Platte River / 41180190 | July 24, 2009–Present | Maine Money Transmitters Act, Me. Rev. Stat. tit. 32, § 6101 *et seq.* | $2,369,514.51 | $7,108,543.53 | $100,000 |
| 36 | Maryland | Fidelity / 8935326 | January 1, 2009–Present | Maryland Money Transmission Act, MD Code, Financial Institutions, § 12-401 *et seq.* | $15,776,570.67 | $47,329,712.01 | $1,000,000 |
| 37 | Michigan | Fidelity / 8966789 | December 31, 2010–Present | Michigan Money Transmission Services Act, M.C.L.A. 487.1001 *et seq.* | $14,222,259.40 | $42,666,778.20 | $500,000 |
| 38 | Minnesota | Platte River / 41167031 | February 13, 2009–Present | Minnesota Money Transmitters Act, Minn. Stat. Ann. § 53B.01 *et seq.* | $11,326,539.60 | $33,979,618.80 | $25,000 |
| 39 | Mississippi | Platte River / 41174171 | May 5, 2009–Present | Mississippi Money Transmitters Act, Miss. Code. Ann. § 75-15-1 *et seq.* | $2,729,093.96 | $8,187,281.88 | $500,000 |
| 40 | Missouri | Fidelity / 8966777 | October 10, 2010–Present | Missouri Sale of Checks Law, V.A.M.S. 361.700 *et seq.* | $9,430,734.00 | $28,292,202.00 | $1,000,000 |
| 41 | Nebraska | Platte River / 41174223 | May 29, 2009–Present | Nebraska Money Transmitters Act, Neb. Rev. Stat. § 8-2701 *et seq.* | $3,508,251.64 | $10,524,754.92 | $100,000 |
| 42 | Nevada | Platte River / 41174170 | May 5, 2009–Present | Title 55, Chapter 671, Nevada Rev. Stat., Nev. Rev. Stat. Ann. § 671.010 *et seq.* | $8,622,199.63 | $25,866,598.89 | $10,000 |
| 43 | New Hampshire | Fidelity / 8935323 | November 30, 2008–Present | Title XXXVI, Chapter 399-G, New Hampshire Revised Statutes, N.H. Rev. Stat. § 399-G:1 *et seq.* | $1,602,750.07 | $4,808,250.21 | $100,000 |

| 44 | New Jersey | Fidelity / 8935317 | November 30, 2008–Present | New Jersey Money Transmitters Act, N.J.S.A. 17:15C-1 *et seq.* | $19,610,666.43 | $58,831,999.29 | $150,000 |
| 45 | New York | Fidelity / 8935347 | July 2, 2009–Present | N.Y. Banking Law § 643 *et seq.* | $43,671,792.60 | $131,015,377.80 | $500,000 |
| 46 | North Carolina | Platte River / 41167067 | March 5, 2009–Present | North Carolina Money Transmitters Act, N.C.G.S. § 53-208.1 *et seq.* | $9,732,260.47 | $29,196,781.41 | $150,000 |
| 47 | North Dakota | Platte River / 41180314 | September 23, 2009–Present | Title 13, Chapter 13-09, North Dakota Century Code, NDCC, 13-09-01 *et seq.* | $817,831.82 | $2,453,495.46 | $150,000 |
| 48 | Ohio | Fidelity / 8935340 | April 1, 2009–Present | Title 13, Chapter 1315, Ohio Revised Code, Ohio Rev. Code Ann. § 1315.01 *et seq.* | $26,807,867.56 | $80,423,602.68 | $2,000,000 |
| 49 | Oklahoma | Platte River / 41167077 | March 23, 2009–Present | Oklahoma Financial Transaction Reporting Act, Okla. Stat. Ann. tit. 6, § 1511 *et seq.* | $5,752,789.17 | $17,258,367.51 | $50,000 |
| 50 | Pennsylvania | Fidelity / 8935304 | June 27, 2008–Present | Title 7 P.S., Chapter 53, Pennsylvania Statutes and Consolidated Statutes, 7 P.S. § 6101 *et seq.* | $37,269,259.79 | $111,807,779.37 | $1,000,000 |
| 51 | Rhode Island | Platte River / 41174262 | June 23, 2009–Present | Title 19, Chapters 14 and 14.3 of the General Laws of Rhode Island 1956, R.I. Gen. Laws Ann. § 19-14-1, *et seq.* & R.I. Gen. Laws Ann. § 19-14.3-1 *et seq.* | $2,575,094.09 | $7,725,282.27 | $50,000 |
| 52 | South Dakota | Platte River / 41180209 | August 5, 2009–Present | Title 51a, Chapter 51A-17, South Dakota Codified Laws, SDCL § 51A-17-a *et seq.* | $1,004,159.76 | $3,012,479.28 | $100,000 |

| 53 | Tennessee | Fidelity / 8966774 | September 22, 2010–Present | Tennessee Money Transmitter Act of 1994, Tenn. Code Ann. § 45-7-201 *et seq.* | $6,507,283.81 | $19,521,851.43 | $60,000 |
| 54 | Texas | Fidelity / 8935318 | October 3, 2007–Present | Texas Money Services Act, V.T.C.A., Finance Code § 151.001 *et seq.* | $53,460,876.24 | $160,382,628.72 | $500,000 |
| 55 | Vermont | Platte River / 41180315 | September 21, 2009–Present | Title 8, Chapter 79, Vermont Statutes, Vt. Stat. Ann. tit. 8, 2505 *et seq.* | $682,327.37 | $2,046,982.11 | $100,000 |
| 56 | Virginia | Platte River / 41180261 & 41224500 | August 27, 2009–Present | Virginia money transmitter law, VA Code Ann. § 6.2-1900 *et seq.* | $141,593.26 | $424,779.78 | $475,000 |
| 57 | Washington | Fidelity / 8935316 | September 29, 2008–Present | Washington Uniform Money Services Act, RCW § 19.230.005 *et seq.* | $49,706.58 | $149,119.74[27] | $160,000 |
| 58 | Washington, D.C. | Platte River / 41186148 | October 19, 2009–Present | Title 26, Chapter 10, D.C. Code, DC ST § 26-1001 *et seq.* | $644,912.56 | $1,934,737.68 | $60,000 |
| 59 | West Virginia | Platte River/ 41167087 | March 20, 2009–Present | Article 2, Chapter 32A, of the Code of West Virginia, W. Va. Code, § 32A-2-1 *et seq.* | $2,060,221.61 | $6,180,664.83 | $300,000 |
| 60 | Wisconsin | Platte River / 41174234 | June 3, 2009–Present | Wisconsin Seller of Checks Law, Wis. Stat. Ann. § 217.01 *et seq.* | $7,571,680.50 | $22,715,041.50 | $10,000 |
| 61 | Wyoming | Fidelity / 9076442 | October 22, 2009–Present | Wyoming Money Transmitters Act, W.S.1977 § 40-22-106 *et seq.* | $988,125.14 | $2,964,375.42 | $400,000 |
| | | | **TOTALS** | | **$484,757,939.30** | **$1,454,273,817.90** | **$17,756,000.00** |

---

[27] This figure represents damages only to Washington residents. Since, however, the Washington Bond is not limited to Washington residents, and Meracord was a Washington company engaged in nationwide misconduct, the Washington Bond covers damages to the entire Class, which total $484,757,939.30.